No. 25-4014

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
*et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
TYLER J. BECKER
  *Attorneys*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5364*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION .............................................................. 3

STATEMENT OF THE ISSUES ................................................................... 3

PERTINENT STATUTES AND REGULATIONS ...................................... 3

STATEMENT OF THE CASE ...................................................................... 4

    A.    Statutory And Regulatory Background ........................................ 4

    B.    Factual Background .................................................................... 5

    C.    Prior Proceedings ....................................................................... 8

SUMMARY OF ARGUMENT ................................................................... 10

STANDARD OF REVIEW ......................................................................... 13

ARGUMENT ............................................................................................... 14

I.    The Government Is Likely To Prevail On The Merits ........................ 14

    A.    The FSLMRS Precludes District-Court Jurisdiction Over
          Plaintiffs' Claims. ................................................................... 14

    B.    Plaintiffs Have Not Established Even A Serious Question On
          The Merits Of Their First Amendment–Retaliation Claim ...... 22

          1.    First Amendment–Retaliation Claims Lie Only Where An
               Unconstitutional Motive Is The Sole Cause Of Official
               Action ............................................................................. 23

          2.    The District Court Erred In Concluding That Plaintiffs
               Established A *Prima Facie* Retaliation Claim. ................. 25

        3.     The District Court Failed To Complete The First Amendment–Retaliation Analysis, Under Which Plaintiffs Cannot Succeed. ...................................................................................34

II.     Plaintiffs Did Not Establish That They Would Likely Suffer Irreparable Harm. ................................................................................................... 37

III.   The Balance Of The Equities And Public Interest Weigh In Defendants' Favor. ..................................................................................................... 41

CONCLUSION .................................................................. 44

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*AFGE v. Loy,*
  367 F.3d 932 (D.C. Cir. 2004) ........................................................... 18

*AFGE v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ............................... 26, 28, 29, 32, 37

*AFGE v. Secretary of the Air Force,*
  716 F.3d 633 (D.C. Cir. 2013) ...........................................................14

*AFGE v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ............................... 15, 16, 17, 18, 19

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...................................................... 13, 43

*Alliance for the Wild Rockies v. Petrick,*
  68 F.4th 475 (9th Cir. 2023) ...........................................................13

*American Foreign Serv. Ass'n v. Trump,*
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) .........................................8

*Arcamuzi v. Continental Air Lines, Inc.,*
  819 F.2d 935 (9th Cir. 1987) ........................................................... 39

*Arizona Students' Ass'n v. Arizona Bd. of Regents,*
  824 F.3d 858 (9th Cir. 2016) ........................................................... 24

*Axon Enter., Inc. v. Federal Trade Comm'n,*
  598 U.S. 175 (2023) ........................................................... 15

*Bennett v. Isagenix Int'l LLC,*
  118 F.4th 1120 (9th Cir. 2024) ...................................................... 13, 14

*Board of Cnty. Comm'rs v. Umbehr,*
  518 U.S. 668 (1996) ........................................................... 29

*Boquist v. Courtney,*
  32 F.4th 764 (9th Cir. 2022) ........................................... 23–24, 24, 25, 31, 35

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ................................................................ 20

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
  29 F.4th 468 (9th Cir. 2022) ................................................... 35

*Department of the Navy, Naval Telecomms. Ctr. & Navtelcom Unit Loc. No. 1,*
  6 F.L.R.A. 498 (1981) ............................................................ 21

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.,*
  414 F.3d 700 (7th Cir. 2005) ................................................... 39

*Elgin v. Department of the Treasury,*
  567 U.S. 1 (2012) ............................................................ 18, 19

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ............................................................. 14

*Government of Guam v. Guerrero,*
  11 F.4th 1052 (9th Cir. 2021) .................................................. 28

*Hartman v. Moore,*
  547 U.S. 250 (2006) .................................... 23, 24, 24–25, 25, 35

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.,*
  902 F.3d 432 (4th Cir. 2018) ................................................... 39

*hiQ Labs, Inc. v. LinkedIn Corp.,*
  31 F.4th 1180 (9th Cir. 2022) ............................................ 39–40, 40

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ............................................. 25, 26, 32, 34, 36, 42

*Independent Union of Pension Emps. for Democracy & Just. & Pension Benefit Guar. Corp.,*
  68 F.L.R.A. 999 (2015) ......................................................... 19

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ............................................................. 27

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ...................................................................13

*National Treasury Emps. Union v. Trump*,
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................. 7, 8, 38, 39, 40

Order, *NTEU v. Trump*,
  No. 25-5157 (D.C. Cir. July 16, 2025) .......................................................7

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) .................................................................... 23, 31

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................ 41

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) ...............................................................24

*Reichle v. Howards*,
  566 U.S. 658 (2012) ........................................................................23

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022) ............................................................. 23

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ..................................................................... 25, 34

*Small v. Avanti Health Sys., LLC*,
  661 F.3d 1180 (9th Cir. 2011) ..............................................................38

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................. 15, 19

*TikTok Inc. v. Garland*,
  145 S. Ct. 57 (2025) .............................................................. 26, 31, 36

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...................................................... 26, 27, 28, 32, 36

*Trump v. International Refugee Assistance Project*,
  582 U.S. 571 (2017) ....................................................................... 41

*Twitter, Inc. v. Garland,*
    61 F.4th 686 (9th Cir. 2023) ............................................................. 25, 32

*United States v. Ruiz,*
    536 U.S. 622 (2002) ............................................................................ 20

*U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966,*
    57 F.L.R.A. 750 (2002) .................................................................. 16, 21

*U.S. Dep't of Com. Pat. & Trademark Off. & Pat. Off. Pro. Ass'n,*
    60 F.L.R.A. 869 (2005) ....................................................................... 38

*U.S. Dep't of Def. v. AFGE, AFL-CIO Dist. 10,*
    No. 6:25-cv-00119, 2025 WL 2058374 (July 23, 2025) ......................... 8

*U.S. Dep't of Def., Ohio Nat'l Guard & AFGE Loc. 3970,*
    71 F.L.R.A. 829 (2020) ....................................................................... 39

*U.S. Dep't of the Air Force Davis-Monthan Air Force Base & AFGE Loc. 2924,*
    62 F.L.R.A. 332 (2008) ....................................................................... 19

*U.S. Dep't of the Treasury, U.S. Mint & AFGE Mint Council,*
    35 F.L.R.A. 1095 (1990) ..................................................................... 39

*U.S. Dep't of Treasury v. National Treasury Emps. Union Chapter 73,*
    No. 2:25-cv-00049, 2025 WL 1446376 (E.D. Ky. May 20, 2025) .............. 8

*Webster v. Doe,*
    486 U.S. 592 (1988) ...................................................................... 27, 33

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................ 13, 37, 39, 41

**Statutes:**

5 U.S.C. §§ 7101–7135 ............................................................................ 4

5 U.S.C. § 7102(2) ................................................................................... 4

5 U.S.C. § 7103(a)(3) ............................................................................... 4

5 U.S.C. § 7103(a)(9) ................................................................ 20

5 U.S.C. § 7103(b)(1) ........................ 1, 2, 5, 9, 19, 20, 21, 22, 25, 26, 27, 28, 29 …
........................................................................ 30, 31, 32, 33, 34, 37, 41

5 U.S.C. § 7104(f)(2) ................................................................ 4

5 U.S.C. § 7105(a) .......................................................... 9, 18, 20

5 U.S.C. § 7105(a)(2) .............................................................. 14

5 U.S.C. § 7106 ...................................................................... 4

5 U.S.C. § 7112(b)(6) .............................................................. 18

5 U.S.C. § 7114 ...................................................................... 4

5 U.S.C. § 7116 ...................................................................... 4

5 U.S.C. § 7116(a) ................................................................. 16

5 U.S.C. § 7116(a)(8) ......................................................... 18, 20

5 U.S.C. § 7118(a) ................................................................. 16

5 U.S.C. § 7118(a)(1) ............................................................... 4

5 U.S.C. § 7118(a)(1)-(2) ........................................................... 4

5 U.S.C. §§ 7121–7122 ............................................................. 4

5 U.S.C. § 7121(a) ................................................................. 16

5 U.S.C. § 7122(a) ................................................................. 16

5 U.S.C. § 7123(a) ......................................................... 4, 15, 16, 17

28 U.S.C. § 1292(a)(1) .............................................................. 3

28 U.S.C. § 1331 ................................................................. 3, 14

28 U.S.C. § 2201 ................................................................................ 3


**Regulatory Materials:**

5 C.F.R. §§ 2423.3–2423.6 ............................................................... 4

Exec. Order No. 12,171,
    44 Fed. Reg. 66,565 (Nov. 20, 1979) ............................................ 5

Exec. Order No. 13,039,
    62 Fed. Reg. 12,529 (Mar. 14, 1997) ............................................ 5

Exec. Order No. 13,480,
    73 Fed. Reg. 73,991 (Dec. 4, 2008) .............................................. 5

Exec. Order No. 14,251,
    90 Fed. Reg. 14,553 (Apr. 3, 2025) ................................... 6, 29, 36

**Other Authorities:**

AFGE, *AFGE E-Dues*, https://perma.cc/6A5M-VGJ5 ........................ 40

AFGE, *Switch to AFGE E-Dues Now Before It's Too Late* (June 2, 2025),
    https://perma.cc/EL9B-Y3B9 ...................................................... 40

Memorandum from Charles Ezell, Acting Director,
    U.S. Office of Personnel Management, to Heads
    and Acting Heads of Departments and Agencies,
    *Guidance on Executive Order*
    (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F .......................... 6, 7

Nat'l Inst. of Allergy & Infectious Diseases, *Biodefense
    and Related Programs*, https://perma.cc/3S9W-XSKC ................... 34

## INTRODUCTION

When Congress enacted the Federal Service Labor–Management Relations Statute (FSLMRS) and granted members of the civil service the right to unionize and bargain collectively, it recognized that those activities could, in certain circumstances, be inconsistent with the needs of national security. Accordingly, Congress vested the President with discretion to exclude certain agencies and agency subdivisions from FSLMRS coverage "if the President determines" that national security so requires. 5 U.S.C. § 7103(b)(1). Like his predecessors, President Trump exercised that authority by issuing an executive order determining that certain agencies and agency subdivisions should be so excluded.

Plaintiffs, which are unions that represent employees in those agencies, have challenged that executive order. In this case, as in two cases challenging the same executive order in the District Court for the District of Columbia, the district court preliminarily enjoined the government from enforcing the executive order. The district court in this case held that plaintiffs raised a serious question that the President retaliated against them in violation of the First Amendment; that, because of lost revenue and bargaining power, plaintiffs were likely to incur irreparable harm; and that, notwithstanding the government's national-security interests, the balance of the equities and public interest weighed in plaintiffs' favor.

This Court should, consistent with the D.C. Circuit's decisions to stay the other preliminary injunctions entered against the executive order, reverse the district court

1

and vacate the preliminary injunction. First, the district court was wrong to exercise jurisdiction over the unions' challenges, which should have been brought to the Federal Labor Relations Authority (FLRA), with judicial review available directly in the courts of appeals. Second, the district court's First Amendment analysis is wrong several times over. As a preliminary matter, the district court failed to afford the considerable deference owed to the President in making a national-security determination under 5 U.S.C. § 7103(b)(1). Instead, the district court improperly drew negative inferences at every turn, assuming that the President issued the executive order to retaliate against plaintiffs, rather than to safeguard national security. The district court also failed to complete the First Amendment–retaliation analysis, disregarding the legitimate reasons that independently support the executive order. Finally, the district court incorrectly weighed the equitable factors, finding on the one hand that plaintiffs had incurred irreparable harm based on theories that this Court's precedents foreclose, and on the other ignoring the serious national-security interests that Congress left to the President to safeguard and that the executive order addresses.

In light of the district court's unwarranted usurpation of a national-security prerogative statutorily entrusted to the President, this Court should vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs-appellees invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331, 2201. ER-219. The district court granted plaintiffs-appellees' motion for a preliminary injunction on June 24, 2025. ER-30–32. Defendants-appellants filed a timely notice of appeal on June 26, 2025. ER-258. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

There are three issues on appeal:

1.  Whether the district court lacked Article III jurisdiction because plaintiffs' claims must be channeled to the FLRA, with judicial review directly in a court of appeals, in accordance with the FSLMRS.

2.  Whether plaintiffs are likely to succeed on their First Amendment–retaliation claim that the President's facially neutral executive order making national-security determinations was based solely on unconstitutional motivations.

3.  Whether plaintiffs demonstrated that equitable factors support a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

Congress enacted the FSLMRS as part of the Civil Service Reform Act of 1978 (CSRA). *See* 5 U.S.C. §§ 7101–7135. The FSLMRS grants federal employees collective-bargaining rights, requiring that unions and federal agencies negotiate over certain matters. *Id.* §§ 7102(2), 7106, 7114.

The FSLMRS also mandates exclusive mechanisms for resolving labor disputes. An employee or a union may file a charge with the FLRA alleging that an agency has engaged in an unfair labor practice, which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision. *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6. The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)–(2); *see also id.* § 7104(f)(2). Under the statutory scheme, an employee or union may also file a grievance through procedures that all collective-bargaining agreements must include, culminating in an arbitration that can be appealed through the FLRA. *See id.* §§ 7121–7122. With certain exceptions, an FLRA final order is subject to judicial review in a court of appeals. *Id.* § 7123(a).

The FSLMRS exempts several federal agencies from coverage, including the Government Accountability Office, Tennessee Valley Authority, FBI, and CIA. 5 U.S.C. § 7103(a)(3). Additionally, it provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1).

Shortly after the FSLMRS's enactment, President Carter issued an executive order excluding more than 45 agencies or subdivisions from coverage, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Those agencies included, *inter alia*, subdivisions of the Department of Treasury, Internal Revenue Service, Department of Energy, and Agency for International Development. *Id.* § 1–2, 44 Fed. Reg. at 66,565–66. Every President since, except President Biden, has issued similar executive orders expanding that list in response to changing circumstances and agencies' evolving investigative and national-security responsibilities. *E.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997).

## B.    Factual Background

In March 2025, President Trump issued another such executive order, determining that certain agencies and subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS "cannot be applied to th[ose] agencies and agency subdivisions in a manner

consistent with national security requirements and considerations." Exec. Order No. 14,251, §§ 1–2, 90 Fed. Reg. 14,553, 14,553–55 (Apr. 3, 2025). The designated agencies include, *inter alia*, the Departments of State and Defense, Federal Communications Commission, and Environmental Protection Agency, along with subdivisions of the Departments of Treasury, Energy, Agriculture, Justice, and Health and Human Services. *Id.*

The same day, the Office of Personnel Management (OPM) issued guidance to federal agencies. Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, *Guidance on Executive Order* (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F (OPM Guidance). OPM explained that "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS. *Id.* at 3. OPM advised agencies to "consult with their General Counsels as to how to implement" the order. *Id.*

The OPM guidance identified several ways in which exclusion from the FSLMRS could improve agency functions. OPM explained that collective-bargaining agreements "often create procedural impediments to separating poor performers beyond those required by statute or regulation," and covered agencies and subdivisions would have a freer hand to "separate employees for unacceptable performance in appropriate cases." *Id.* at 3–4. The guidance also emphasized that covered agencies could "eliminate waste, bloat, and insularity" by conducting

reductions in force where appropriate, ordering employees to return to in-person work, and ensuring that agency resources are used for agency, not union, business. *Id.* at 5–6. The Chief Human Capital Officers Council, an interagency forum led by the Director of OPM, has also shared with the designated agencies a Frequently Asked Questions document regarding implementation of the executive order. The document advises agencies not to "terminate any [collective-bargaining agreements]" or file FLRA petitions to "decertify bargaining units" "until the conclusion of litigation." ER-125–31.

Many designated agencies and subdivisions have collective-bargaining agreements with employee unions. Some federal labor unions have sued to challenge the executive order. In two cases, the District of Columbia district court preliminarily enjoined enforcement of the order. The D.C. Circuit stayed both injunctions: In *National Treasury Employees Union v. Trump* (*NTEU*), the court held that the government is likely to prevail on appeal because the plaintiff union failed to establish irreparable harm, and the injunction irreparably harmed the President by impeding his national-security prerogatives. No. 25-5157, 2025 WL 1441563, at *1–3 (D.C. Cir. May 16, 2025) (per curiam). The court denied NTEU's motion for reconsideration en banc. Order, No. 25-5157 (D.C. Cir. July 16, 2025) (en banc) (per curiam). In *American Foreign Service Association v. Trump* (*AFSA*), the court held that the government is likely to prevail because the executive order is likely consistent with the governing statute under appropriately deferential review of the President's national-security

7

determinations, and the injunction's irreparable harm to the government outweighs any potential non-monetary harm to the plaintiff union. No. 25-5184, 2025 WL 1742853, at *2–3 (D.C. Cir. June 20, 2025). AFSA filed a petition for rehearing en banc on July 14, 2025, on which the court has not ruled.

Several agencies have also filed suits requesting declaratory judgments that, under Executive Order 14,251, they can legally repudiate such agreements. *See* Complaint, *U.S. Dep't of Def. v. American Fed'n of Gov't Emps., AFL-CIO Dist. 10*, No. 6:25-cv-119 (W.D. Tex. Mar. 27, 2025) (*DoD*); Complaint, *U.S. Dep't of Treasury v. National Treasury Emps. Union Chapter 73*, No. 2:25-cv-00049 (E.D. Ky. Mar. 28, 2025) (*Treasury*). The district court in *DoD* concluded that although the government made "compelling arguments that the Executive Order is a lawful exercise of the President's authority delegated to him by Congress under 5 U.S.C. § 7103(a)(3) and the President's inherent authority under Article II," the government lacked standing to seek a declaratory judgment. *DoD*, No. 6:25-cv-00119, 2025 WL 2058374, at *1 (July 23, 2025); *see also Treasury*, No. 2:25-cv-00049, 2025 WL 1446376, at *1 (E.D. Ky. May 20, 2025) ("Treasury makes a good argument on the merits.").

## C.    Prior Proceedings

Plaintiffs, which are several unions representing federal employees, filed this action against the President, the Director of OPM, several agencies that the President excluded, and the leaders of those agencies on April 3, 2025. ER-214. The complaint raised several claims: the executive order (1) violates the First Amendment (retaliation

and viewpoint discrimination), (2) violates the Fifth Amendment (procedural due process, abrogation of property rights in a federal contract, and equal protection), and (3) is inconsistent with 5 U.S.C. § 7103(b)(1) and therefore ultra vires. ER-248–54.

Plaintiffs moved for a temporary restraining order on April 7, 2025. Dkt. No. 15. The following day, the district court denied the motion, concluding that plaintiffs did "not establish the immediacy required for a [temporary restraining order]." ER-132. The district court instead treated the motion as a motion for a preliminary injunction, held a hearing, and, on June 24, 2025, granted the motion. ER-30–32 Despite the FSLMRS's provisions making the FLRA "responsible for carrying out the purpose of this chapter" and resolving disputes arising under the statute, 5 U.S.C. § 7105(a), the district court concluded that it had jurisdiction over plaintiffs' claims because the executive order "expressly removed the employees of the listed departments, agencies, and subdivisions from Chapter 71's coverage." ER-18–19. The court rested this conclusion on the view that excluded "employees, and their unions as representatives, are no longer covered by the statute" and thus could not bring their claims that they should continue to fall within the FSLMRS's provisions before the FLRA. ER-18.

The district court then preliminarily enjoined section 2 of the executive order based on its determination that plaintiffs had raised a "serious question" on their First Amendment–retaliation claim (which the court deemed their "strongest claim"). ER-20–25. In so doing, the court refused to apply a presumption of regularity to the

President's exercise of his § 7103(b)(1) authority. ER-24–25. The court also concluded that plaintiffs had established a likelihood they would incur irreparable harm without an injunction, pointing to the loss of dues collected through government payroll deduction. ER-25. In terms of weighing the equities, rather than applying the standard that it had earlier recited, in which a plaintiff showing a serious question going to the merits had to show that the "balance of hardships tips sharply in [their] favor," the court asserted that "[t]he question is whether a pause of the implementation of the Order will harm the government more than it benefits the plaintiffs." ER-17, 28. The district court concluded that it would not. ER-28–31.

Two days later, on June 26, 2025, defendants filed a notice of appeal. ER-156. On July 1, 2025, defendants filed a motion in district court to stay the preliminary injunction pending appeal, attaching numerous declarations from various agencies explaining the deleterious effects of the preliminary injunction, including with respect to national security. Dkt. No. 63; ER-37–113. The district court denied the motion on July 8, 2025. Dkt. No. 65.

On July 3, 2025, defendants also filed a motion to stay the preliminary injunction pending appeal in this Court. The Court granted an administrative stay and, on July 17, 2025, held argument on the motion.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction fails at every level. It was entered in defiance of the exclusive statutory scheme for resolving claims that the federal

government has violated the FSLMRS. It is based on an incomplete First Amendment analysis without any deference to the President's exercise of his statutory authority to determine when the demands of collective bargaining in federal agencies conflict with the interests of national security. It rests on an inadequate showing of harms, which could be remedied by the FLRA should plaintiffs ultimately prevail. And it fails to reflect the proper balancing of the equities and the public's interest, including that in permitting the President to safeguard the national-security functions of federal agencies. Any one of these considerations warrants reversal and vacatur of the preliminary injunction.

I.     To begin, plaintiffs are unlikely to succeed on the merits of their suit. Congress withdrew district-court jurisdiction over union claims like plaintiffs' through the FSLMRS, which establishes a comprehensive scheme for reviewing and remedying allegations that federal agencies have violated the FSLMRS. In accordance with Congress's design, plaintiffs should be required to submit their claims to the FLRA; only after receiving a final FLRA order may plaintiffs seek judicial review, directly in the court of appeals.

On the merits of plaintiffs' First Amendment–retaliation claim—the only claim that the district court considered, and which the district court deemed plaintiffs' "strongest" claim—plaintiffs plainly fall short. Plaintiffs assert that the President's facially neutral executive order, which excludes certain agencies from FSLMRS coverage for national-security reasons, was actually issued to retaliate against plaintiffs

in violation of the First Amendment. Plaintiffs provide no direct evidence to support this claim, and the district court's willingness to draw inferences *against* the President turns both the deference owed to the President's national-security determinations and the presumption of regularity upside down. And even if plaintiffs could establish a *prima facie* case of First Amendment retaliation, they still could not succeed on this claim because the President's decision was independently supported by constitutionally permissible reasons within the scope of Congress's broad delegation of authority.

II.    Plaintiffs have not established that they would likely incur irreparable harm absent a preliminary injunction. The district court relied on only two identified harms—monetary loss and diminution of bargaining power—both of which are unsupported by the record and neither of which would support the extraordinary remedy of a preliminary injunction.

III.    The balance of the equities and the public interest weigh in defendants' favor. In the FSLMRS, Congress left it to the President to determine when the government's national-security functions are incompatible with the demands of collective bargaining. The district court's preliminary injunction intrudes on the President's discharge of his duties under that statute, subjecting the government to collective-bargaining requirements that the President has concluded are inconsistent with various agencies' national-security functions. On the other side of the ledger, plaintiffs assert remediable harms that bear no resemblance to that weighty public

interest. The district court's contrary judgment turned on a manifestly incorrect view of both the record and this Court's precedent.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain one, "a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023)). The Ninth Circuit has adopted a "sliding scale approach" to these factors: "A preliminary injunction is appropriate when a plaintiff demonstrates … that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).[1]

---

[1] Defendants recognize that circuit precedent permits preliminary injunctions upon a showing of a "serious question" but maintain that this standard is inconsistent with Supreme Court precedent, which requires that a plaintiff seeking a preliminary injunction "must establish that he is *likely* to succeed on the merits," *Winter*, 555 U.S. at 20 (emphasis added). This Court's "less-stringent 'serious questions' standard," *Alliance for the Wild Rockies*, 68 F.4th at 496–97, falls short of—and is thus inconsistent with—the Supreme Court's likelihood-of-success test. And notably, neither party applied the "serious questions" standard in their preliminary-injunction briefing. *See* Dkt. No. 15-1, at 14; Dkt. No. 44, at 5–6.

This Court reviews a district court's preliminary injunction for abuse of discretion. *Bennett*, 118 F.4th at 1125. It reviews the court's underlying legal conclusions de novo and factual findings for clear error. *Id.*

## ARGUMENT

## I. The Government Is Likely To Prevail On The Merits.

### A. The FSLMRS Precludes District-Court Jurisdiction Over Plaintiffs' Claims.

**1.** Although Congress has generally granted district courts original jurisdiction over civil actions arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, Congress has at times withdrawn such jurisdiction by establishing an alternative statutory scheme for administrative and judicial review of a dispute. "[W]hen Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems," those procedures are generally intended "to be exclusive." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted).

With the FSLMRS, as with the rest of the CSRA, "Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector," along with dedicated mechanisms for resolving federal labor disputes. *American Fed'n of Gov't Emps. (AFGE) v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013). In particular, the FSLMRS channels adjudication of such disputes to the FLRA, followed by direct review in the court of appeals. *See* 5 U.S.C. §§ 7105(a)(2),

7123(a). The FSLMRS's "regime is exclusive," and a union "cannot circumvent [it] by instead bringing suit in district court." *AFGE*, 716 F.3d at 636–37; *see also id.* at 638 ("The FSLMRS provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.").

The district court thus lacks jurisdiction to review plaintiffs' claims alleging that the government has acted contrary to the provisions of the FSLMRS, unless those claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). In determining whether the claims presented here fit within the statutory review scheme, the Court must consider whether "a finding of preclusion could foreclose all meaningful judicial review," whether the claims are "wholly collateral" to the FSLMRS's review provisions, and whether the claims are "outside the [FLRA's] expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212–13 (quotation marks omitted). "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme … reaches the claim in question." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023).

Each of the three *Thunder Basin* factors weighs in favor of finding plaintiffs' claims precluded. First, requiring plaintiffs to proceed through the statutory review

scheme would not foreclose all meaningful judicial review. Specifically, plaintiffs can litigate their claims through the statutory scheme by alleging that the defendant agencies have committed unfair labor practices by "refus[ing] to consult or negotiate in good faith with a labor organization as required by" the FSLMRS or "otherwise fail[ing] or refus[ing] to comply with any provision" of the statute, 5 U.S.C. § 7116(a). A union can file such a charge with the FLRA's General Counsel, *see id.* § 7118(a), or raise such a claim through the grievance and arbitration procedures that the FSLMRS requires be included in every collective-bargaining agreement, *id.* § 7121(a), and then appeal any adverse arbitrator's award to the FLRA, *id.* § 7122(a). In either event, the union can then obtain judicial review of an adverse FLRA decision regarding an alleged unfair labor practice in the court of appeals. *See id.* § 7123(a); *see also AFGE*, 929 F.3d at 757–58 (identifying ways a union could obtain judicial review of constitutional challenges to executive orders through the FSLMRS review scheme, including by filing unfair-labor-practice proceedings). In addition, plaintiffs could challenge the executive order in cases already pending before the FLRA. If an agency moves to dismiss such a case because the executive order excludes the agency from the provisions of the FSLMRS, or if the FLRA asks the parties to address its jurisdiction in light of the executive order, the union plaintiffs could raise their arguments that the FLRA continues to have jurisdiction over those pending cases because the executive order is invalid. *See, e.g., U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750, 750 (2002) (noting the FLRA "requested and

received submissions from the parties as to why the[] cases should not be dismissed for lack of jurisdiction in light of the Executive Order" excluding U.S. Attorneys' Offices from coverage of the FSLMRS). If the FLRA disagrees with the unions and dismisses such a case, that dismissal order would generally be subject to judicial review. *See* 5 U.S.C. § 7123(a).

Second, plaintiffs' claims are not wholly collateral to the FSLMRS's statutory review scheme. On the contrary, plaintiffs' complaint squarely raises a claim under the FSLMRS, alleging (among other things) that the executive order "is contrary to Chapter 71 of Title 5" (*i.e.*, the FSLMRS). ER-149. The unions' challenge in this case is thus "of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated." *AFGE*, 929 F.3d at 760. And the remedies that plaintiffs seek include, *inter alia*, a declaration that the executive order is unlawful and an order prohibiting the defendant agencies from implementing it, a declaration that the termination of collective-bargaining agreements and grievances is unlawful, and an order directing the agency defendants to continue to withhold union dues from employees. ER-152. This is precisely the type of relief that the unions could obtain through the statutory scheme. *See AFGE*, 929 F.3d at 760 ("[T]he unions ask the district court for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining disputes."). Indeed, in analogous contexts regarding orders

excluding federal workers from the FSLMRS and collective bargaining, the D.C. Circuit has held that the FLRA has "exclusive authority to render judgment on the question" whether that exclusion was valid. *AFGE v. Loy*, 367 F.3d 932, 935–36 (D.C. Cir. 2004). The unions' challenge is thus not wholly collateral to the statutory scheme. *See Elgin v. Department of the Treasury*, 567 U.S. 1, 22 (2012) (holding that a constitutional claim was not wholly collateral to the CSRA scheme because the plaintiffs challenged "precisely the type of personnel action regularly adjudicated by the [Merit Systems Protection Board] and the Federal Circuit within the CSRA scheme" and "request[ed] relief that the CSRA routinely affords").

Third, the unions' claims are not beyond the expertise of the FLRA. Plaintiffs' statutory challenges "lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations.'" *AFGE*, 929 F.3d at 760. Their claims "require interpreting the FSLMRS—the very law that the FLRA is charged with administering and interpreting," *id.* at 760–61; *see* 5 U.S.C. § 7105(a), and Congress has directed the FLRA to adjudicate disputes over whether an agency has failed or refused to comply with the statute, see 5 U.S.C. § 7116(a)(8). *See Elgin*, 567 U.S. at 23 (ruling that a claim was not outside the Merit Systems Protection Board's expertise where the challenged statute was one that the Board "regularly construes"). The FLRA could also bring its expertise to bear on factual issues that may be presented in this case; after all, it regularly resolves disputes over whether certain employees are "engaged in intelligence, counterintelligence, investigative, or security work which directly affects

18

national security," 5 U.S.C. § 7112(b)(6)—a standard with obvious overlap with the provision at issue in this case. *See, e.g., U.S. Dep't of the Air Force Davis-Monthan Air Force Base & AFGE Loc. 2924*, 62 F.L.R.A. 332, 334–36 (2008) (considering whether employees were engaged in work that directly affects national security). The FLRA also adjudicates First Amendment–retaliation claims in the course of its ordinary work. *See Independent Union of Pension Emps. for Democracy & Just. & Pension Benefit Guar. Corp.*, 68 F.L.R.A. 999, 1014 (2015) (considering a claim that an agency had initiated arbitration in retaliation for a union's exercise of free-speech rights). The FLRA thus has expertise that goes to the core issues in this case.

Even if the FLRA declined to address all of plaintiffs' claims or lacked expertise on some issue raised by those claims, however, a court of appeals could consider the claims on appeal from the FLRA. *See AFGE*, 929 F.3d at 758. After all, "[i]t is not unusual for an appellate court reviewing the decision of an administrative agency to consider a constitutional challenge to a federal statute that the agency concluded it lacked authority to decide." *Elgin*, 567 U.S. at 18 n.8. There is thus no reason why plaintiffs' constitutional or statutory claims could not be "meaningfully addressed in the Court of Appeals." *Thunder Basin Coal Co.*, 510 U.S. at 215.

**2.** The district court reasoned that "[t]he statute's plain language makes clear [that] the FLRA's authority extends only to those disputes which arise under Chapter 71" and that the dispute here did not meet that description. ER-18. That is incorrect. This dispute plainly arises under Chapter 71 (*i.e.*, the FSLMRS), because

19

plaintiffs allege that the President exceeded his authority under 5 U.S.C. § 7103(b)(1). Plaintiffs' claims thus require construing that provision of the FSLMRS and determining whether the Executive Branch's actions are consistent with the statute; resolving such a claim is within the FLRA's authority. And although the district court cited provisions specifically authorizing the FLRA to resolve other types of disputes, ER-18, those cannot be read in derogation of the FLRA's general statutory authority to "provide leadership in establishing policies and guidance relating to matters under [the FSLMRS]" and take "actions as are necessary and appropriate to effectively administer the provisions of [the FSLMRS]." 5 U.S.C. § 7105(a). The FLRA undoubtedly has the authority, and obligation, to resolve unfair-labor-practice claims alleging that an agency has in any way "fail[ed] or refuse[d] to comply with any provision of" the FSLMRS and grievances alleging that an agency has "violat[ed] … any law … affecting conditions of employment," *id.* §§ 7103(a)(9), 7116(a)(8).

The district court likewise erred in reasoning that the union plaintiffs cannot bring claims before the FLRA against the agencies identified in the challenged executive order. Just as "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), including to consider the scope and validity of a jurisdiction-stripping provision, *see generally Boumediene v. Bush*, 553 U.S. 723 (2008), the FLRA also has authority to consider whether the executive order was a valid exercise of the President's authority under § 7103(b)(1) to exclude agencies from coverage of the FSLMRS. Considering the scope of the FLRA's

20

jurisdiction will of course give the FLRA an opportunity to decide the question at the heart of plaintiffs' claims—whether the challenged executive order is lawful—and however the FLRA disposes of that question, the losing party may then obtain judicial review of that question in the court of appeals.

The district court noted that the FLRA has disclaimed authority to hear claims brought in connection with agencies excluded from the FSLMRS, ER-18, but that does not mean that the FLRA lacks authority to consider the *validity* of a presidential exclusion and thus whether the relevant agencies are in fact excluded from the scope of the statute. Indeed, in *U.S. Attorney's Office Southern District of Texas & AFGE Local 3966*, for example, the FLRA "requested and received submissions from the parties" as to whether it should dismiss a pending case in light of an exclusion order under § 7103(b)(1). 57 F.L.R.A. at 750. Although none of the parties in that case disputed the validity of the executive order, if one of them had, the FLRA could have resolved that dispute in order to resolve the question of its jurisdiction. And in *Department of the Navy, Naval Telecommunications Center & Navtelcom Unit Local No. 1*, the FLRA had to construe the scope of an exclusion order in order to determine its jurisdiction. 6 F.L.R.A. 498, 500 (1981). There is thus no reason to think that the FLRA would refuse to consider the validity of an executive order where doing so is necessary to determining its jurisdiction. And in any event, even if the FLRA declined to opine on the validity of a challenged exclusion order, such an FLRA order would nonetheless

trigger plaintiffs' ability to seek judicial review of that preserved question in a court of appeals. *See supra* p. 15–17.[2]

### B. Plaintiffs Have Not Established Even A Serious Question On The Merits Of Their First Amendment–Retaliation Claim.

The President exercised his authority under 5 U.S.C. § 7103(b)(1) to exclude certain agencies that he has determined cannot operate under the FSLMRS "in a manner consistent with national security requirements." The district court erred in concluding that plaintiffs established a sufficient likelihood of success on their claim that this determination violated the First Amendment because they raised a "serious question" on this issue. The district court disregarded the presumption of regularity, the deference owed to the President for such national-security determinations, and the broad discretion that § 7103(b)(1) affords to him, in favor of improperly inferring from a scant record that the President made such determinations to retaliate against plaintiffs' First Amendment–protected activity. And even if plaintiffs made a *prima facie* showing of such retaliation, the district court independently erred in failing to

---

[2] The district court considered the government to have taken an inconsistent jurisdictional position by suing unions for a declaratory judgment in *DoD*. ER-19–20. The government considers its suit materially different than the unions' challenge to the executive order in this case, which turns on the theory that the FSLMRS remains applicable yet seeks to evade that statute's review scheme. But whether the government is right or wrong about district-court jurisdiction in its affirmative actions is immaterial here. Even if the government's jurisdictional theory were inconsistent between this case and *DoD*, the district court must evaluate jurisdiction in the case before it and cannot exercise jurisdiction on some theory of estoppel.

complete the First Amendment analysis by determining whether any improper presidential motives were the but-for cause of the executive order or if the President would have issued the order even absent such motives.

      **1.     First Amendment–Retaliation Claims Lie Only Where An Unconstitutional Motive Is The Sole Cause Of Official Action.**

The First Amendment provides, "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. This includes, "as a general matter," a prohibition on "government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). It is not enough, however, for "an official [to] take[] adverse action against someone based on that forbidden motive"—it is only where "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences" that "the injured person may generally seek relief by bringing a First Amendment claim." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

Importantly, official action is not unconstitutional simply because it comes in response to First Amendment–protected activity. In many contexts, "[t]he causal inquiry [in a retaliation claim] is complex because protected speech" can be a "'wholly legitimate consideration'" underlying official action. *Nieves*, 587 U.S. at 401 (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)); *see also Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (holding that "government officials do not violate a plaintiff's First

Amendment rights if they had an objectively legitimate need to implement security measures in response to information conveyed by the plaintiff's speech, and would have implemented the same security measures in the absence of any retaliatory motive").

The contexts in which retaliation claims arise are varied, as are the legal standards that courts use to review such claims. *See Boquist*, 32 F.4th at 774 (describing the different contexts). In all cases, however, the plaintiff must make out a *prima facie* retaliation claim: "(1) [the plaintiff] engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct." *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (quoting *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016)).

Showing such a motivating factor does not end the analysis; rather, it shifts "the burden … to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Boquist*, 32 F.4th at 778 (quoting *Hartman*, 547 U.S. at 260). Where "retaliation was not the *but-for cause* of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.* (alteration in original) (emphasis added) (quoting *Hartman*, 547 U.S. at 260). Thus, "if the government officials would have taken the same

24

adverse action even in the absence of their … retaliatory motive arising from the plaintiff's speech, … there was no violation of the plaintiff's constitutional rights." *Id.*

### 2. The District Court Erred In Concluding That Plaintiffs Established A *Prima Facie* Retaliation Claim.

The district court erred in concluding that plaintiffs established a *prima facie* retaliation claim; plaintiffs have not pointed to "a substantial causal relationship between the constitutionally protected activity and the adverse action," *Boquist*, 32 F.4th at 775 (quotation marks omitted). Instead, the district court inferred from extrinsic and circumstantial evidence that unconstitutional motives prompted the executive order. In doing so, the court improperly disregarded two key principles.

**a.** First, the President's evaluation of the national-security matters that § 7103(b)(1) entrusts him to make should be afforded the highest degree of deference. In the First Amendment context, as in others, "[t]he government is entitled [to] deference when it comes to factual judgments bearing on national security." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023). This is because "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) (citation omitted) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)). Courts therefore may not "demand[] hard proof—with 'detail,' 'specific facts,' and 'specific evidence'"—but rather must defer to the government's "informed judgment," even if

the government does not "conclusively link all the pieces in the puzzle." *Id.* at 34–35; *see also TikTok Inc. v. Garland*, 145 S. Ct. 57, 70 (2025) (per curiam) (affording "the Government's 'informed judgment' substantial respect").

The need for judicial deference is even greater when evaluating a challenge to the President's motivations underlying a determination to safeguard national security that Congress has delegated him broad authority to make. Courts have resisted efforts to require the President to "explain" such determinations "with sufficient detail to enable judicial review." *Trump v. Hawaii*, 585 U.S. 667, 685–86 (2018) (explaining that the "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications" for finding certain aliens' entry detrimental to the United States "is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere" involving a "preventive measure" implicating "national security") (quotation marks omitted)). In the FSLMRS context in particular, the D.C. Circuit has held that the President need not include "written findings" or "utilize any particular format" in making a determination under § 7103(b)(1) that the FSLMRS cannot be applied to certain agencies consistent with national security. *AFGE v. Reagan*, 870 F.2d 723, 727–28 (D.C. Cir. 1989). Indeed, when assessing constitutional challenges to the President's reasons for making congressionally authorized decisions implicating national security, the Supreme Court has indicated that judicial review is "highly constrained." *Trump*, 585 U.S. at 704. In this sensitive area, courts presumptively "limit[ their] review to whether the Executive gave a

'facially legitimate and bona fide' reason for its action" and "'will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of" plaintiffs. *Id.* at 703 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972)). And even if "it may be appropriate" to look "beyond the facial neutrality of the order," the order should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 704–05.

Here, there is no dispute that § 7103(b)(1) by its terms implicates the President's factual judgments on matters of national security, both as they relate to "a primary function" of the excluded agency or subdivision and whether the FSLMRS can extend to the excluded "agency or subdivision in a manner consistent with national security requirements." 5 U.S.C. § 7103(b)(1). Moreover, the statute plainly leaves such judgments to the President's complete discretion: the President may exclude an agency or subdivision whenever he "*determines*" as much—not when some other actor concludes that a primary function of the agency *is* national security or that the FSLMRS *cannot* be applied consistent with national security. *Id.* (emphasis added). Section 7103(b)(1) therefore "fairly exudes deference to the" President and "foreclose[s] the application of any meaningful judicial standard of review" as to whether the requisite connection between FSLMRS exclusion and national security exists. *Webster v. Doe*, 486 U.S. 592, 600 (1988). At minimum, the President's assessment that § 7103(b)(1)'s conditions for exclusion have been satisfied is subject

to substantial judicial deference. And under the standard applied to other presidential national-security determinations, a facially neutral exercise of § 7103(b)(1) authority must be upheld if it could be understood as resulting from constitutional motivations. *See Trump*, 585 U.S. at 704–05.

    **b.**    Next, the President's determination under § 7103(b)(1) is also entitled to a strong presumption of regularity. That presumption "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *AFGE*, 870 F.2d at 727 (quotation marks omitted); *see also Government of Guam v. Guerrero*, 11 F.4th 1052, 1058 (9th Cir. 2021) (holding "that a public actor is entitled to the presumption of regularity where there is some evidence that the public actor properly discharged the relevant official duties, which an opposing party must rebut with clear, affirmative evidence to the contrary").

    This presumption, in conjunction with § 7103(b)(1)'s notable feature of "not expressly call[ing] upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order," indicates that courts should accept the President's § 7103(b)(1) determinations at face value even absent explicit presidential findings. *AFGE*, 870 F.2d at 727; *see also id.* at 728 ("The Act does not itself require or even suggest that any finding be reproduced in the order."). Put simply, courts may not engage in "an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted

deliberately in contravention of them." *Id.* at 728. And the propriety of "presuming executive regularity" and deferring to the President's determinations under § 7103(b)(1), *id.*, is unscored by the context here: the President's determination about the instances when the Executive Branch will enter into collective-bargaining agreements with unions qua employer, not qua sovereign. The government enjoys special flexibility to act as an employer and a contractor, and the Supreme Court has recognized its "legitimate interests as contractor [or employer], deferentially viewed," can sometimes "outweigh [any] free speech interests at stake." *Board of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 685 (1996).

**c.** The district court improperly disregarded these principles in concluding that plaintiffs established a *prima facie* case that the President violated the First Amendment in issuing the executive order. Congress entrusted the President to exclude agencies from the FSLMRS based on the President's determinations about those agencies' national-security functions and whether the FSLMRS could be applied consistent with national-security requirements and considerations. The President here exercised that authority, stating "[t]he agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work" and "that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, 90 Fed. Reg. at 14,553.

Rather than deferring to the President's facially valid national-security assessment and presuming its validity, the district court accepted plaintiffs' invitation to infer from extrinsic and circumstantial evidence that unconstitutional motives prompted the executive order. *See* ER-20–25. Specifically, the district court pointed to three reasons why it believed plaintiffs had established the necessary causal link between the order and protected activity: (1) a White House "Fact Sheet," (2) the large number of agencies that the President excluded relative to prior § 7103(b)(1) orders, and (3) the district court's own view that some agencies' functions were inconsistent with the definition of "national security" in an FLRA opinion. *See* ER-20–25. These reasons reflect the district court's profound misunderstanding of its role in evaluating the executive order and are in any event incorrect on their own terms.

The fact sheet does not support the district court's conclusion that the President issued the executive order for unconstitutional motives rather than the national-security reasons stated on the order's face. The White House often issues "fact sheets" along with articles, briefings, and other statements to inform the public about the President's agenda after the President makes the relevant decision and often without his direct review. *See generally* The White House, *Fact Sheets*, https://perma.cc/B77G-VQYW. The particular fact sheet that the district court cited recounts how unions' activities have impaired agency functioning in a manner inconsistent with national-security requirements and considerations. After discussing examples at various agencies, the fact sheet observed that the largest union (AFGE)

30

has been "widely filing grievances" to "'fight[] back' against Trump," in a manner that has "interfere[d] with [the President's] efforts to protect Americans and our national interests." ER-161–63. Such union activity is undoubtedly relevant to the determination Congress directed the President to make under the FSLMRS: the statute explicitly permits the President to consider the effect of union activity in his § 7103(b)(1)(B) determinations. As in other contexts, it is "wholly legitimate" to consider whether any First Amendment–protected activity by the unions demonstrated a basis for official action under § 7103(b)(1). *Nieves*, 587 U.S. at 401 (quotation marks omitted); *see also Boquist*, 32 F.4th at 778. And that is true whether the President looked to the actions of only AFGE, the largest union of federal employees, or of federal unions more generally. *Cf. TikTok Inc.*, 145 S. Ct. at 68–69 (holding that singling out TikTok for divestiture was not subject to strict scrutiny because of TikTok's "special characteristics" as a particularly large social media company). Instead of acknowledging the relevance of union activity to the § 7103(b)(1) determination and presuming that to the extent the fact sheet reflected the President's views it indicated legitimate considerations regarding past union practices, the district court drew the most negative possible inference and attributed unconstitutional motives to the President: the court suggested that the President issued the executive order to punish AFGE because of its opposition to his agenda. *See* ER-20–25. In doing so, the district court disregarded both the deference owed to the President's national-security assessments and its duty not to assume "that the

31

President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728.

The other two bases upon which the district court found that unconstitutional motivations caused the order are equally infirm. The district court assumed that because "President Trump applied the national-security label to an unprecedented swath of federal agencies," there was a "serious question" whether he had a retaliatory motive. *See* ER-23. Once again, rather than defer to the President on his national-security determinations or presume the validity of his motivations, *see, e.g.*, *Twitter, Inc.*, 61 F.4th at 698–99, the district court improperly drew a negative inference. Allegations that the President has established an "overbroad" policy that "does little to serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Trump*, 585 U.S. at 707–08 (quotation marks omitted). The district court's disagreement with the President's line-drawing and its assumption that the order's breadth indicated unconstitutional motives turned the presumption of regularity on its head and was "unwarranted." *AFGE*, 870 F.2d at 728.

At any rate, it is not surprising that over time, in response to different national-security requirements and considerations, and applying different "informed judgment[s]," *Humanitarian L. Project*, 561 U.S. at 34, different Presidents will make different determinations under § 7103(b)(1). Some determinations may be limited,

reflecting a narrower view of agencies' national-security functions and the impact of the FSLMRS on prevailing national-security requirements and considerations. Other determinations may be broader, reflecting a different view and assessment. But Congress provided no standards by which to judge Presidents' invocation of § 7103(b)(1), leaving it to the President to make those determinations. *See Webster*, 486 U.S. at 600. The district court's suggestion that the President must have acted unconstitutionally because he took a capacious view of national-security interests is entirely misplaced.

Finally, for similar reasons, the district court erred in inferring that unconstitutional motives caused the executive order based on its view that some excluded agencies do not have a primary function of national security. *See* ER-23–24. In the first place, the district court relied on the FLRA's understanding of "national security" under § 7112(b), which does not involve presidential determinations and is more limited in scope, applying only to the scope of employees included in bargaining units—specifically, whether an employee's work "directly affects" national security, not whether the agency as a whole performs national-security work. But even apart from these differences, it is for neither the district court nor the FLRA to decide whether an agency "has as a primary function intelligence, counterintelligence, investigative, or national security work" under § 7103(b)(1)(A). Congress left that determination to the President alone. *Id.* The President's decision to be more

33

protective of national security under § 7103(b)(1) than the FLRA or the district court might choose is no basis to infer unconstitutional motives.

Indeed, the district court's order highlights its "lack of competence" in making national-security determinations. *Humanitarian L. Project*, 561 U.S. at 34 (quoting *Rostker*, 453 U.S. at 65). The court asserted that the National Institute of Allergy and Infectious Diseases did "not readily appear to fit [the FLRA's § 7112(b)] definition." ER-23–24. But that agency "supports research and early development of medical countermeasures against terrorist threats from infectious diseases, radiation exposure and chemical threats to the civilian population," Nat'l Inst. of Allergy & Infectious Diseases, *Biodefense and Related Programs*, https://perma.cc/3S9W-XSKC. The district court's blinkered view of agency functions underscores the need for courts to defer to the President's determinations under § 7103(b)(1).

In sum, none of the reasons the district court invoked supports the inferences it drew to conclude that plaintiffs established a *prima facie* case that the executive order resulted from unconstitutional retaliation.

### 3. The District Court Failed To Complete The First Amendment–Retaliation Analysis, Under Which Plaintiffs Cannot Succeed.

Even if plaintiffs had made out a *prima facie* retaliation claim, the district court nonetheless erred in concluding that their First Amendment claim could serve as a basis for a preliminary injunction. The district court entirely failed to complete the unconstitutional-retaliation analysis, which required it to determine whether the

34

asserted retaliation was the "the but-for cause" of the executive order. *Boquist*, 32 F.4th at 778 (quoting *Hartman*, 547 U.S. at 260). Even assuming plaintiffs had shown any "proof of some retaliatory animus in the official's mind," their claims would "fail[] for lack of causal connection" because the President "would have taken the action complained of" (*i.e.*, the executive order) anyway. *Id.* (quoting *Hartman*, 547 U.S. at 260).

The district court nowhere addressed this point, despite the parties' discussion of it. *See* Dkt. No. 44, at 24; Dkt. No. 47, at 6. Rather, the court rested its conclusion that plaintiffs were sufficiently likely to succeed on their retaliation claim based only on their *prima facie* showing. Under Supreme Court and Ninth Circuit precedents, however, if the President "would have taken the same adverse action even in the absence of … [any] retaliatory motive arising from [plaintiffs'] speech, … there was no violation of [plaintiffs'] constitutional rights." *Boquist*, 32 F.4th at 778; *see also Hartman*, 547 U.S. at 260. The district court's failure to consider this aspect of the First Amendment–retaliation test and defendants' argument on this score is reason enough to reverse the preliminary injunction. *See California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (holding that district courts abuse their discretion issuing preliminary injunctions where they "misapprehend[] the law with respect to the underlying issues in the litigation" (quotation marks omitted)).

Under the correct First Amendment standard, the plaintiffs' retaliation claim cannot succeed. As a threshold matter, even assuming that retaliation was *a* motive of

the executive order, judicial deference to the President's national-security determinations does not evaporate. Here, as in *Trump*, "[i]t cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus." 585 U.S. at 706 (quotation marks omitted). Because the order has "a legitimate grounding in national security concerns, quite apart from any [asserted retaliatory animus]," courts "must accept that independent justification." *Id.* And even short of the type of rational-basis review the Supreme Court applied to the President's national-security-related determinations in *Trump*, courts must still "afford the Government's 'informed judgment' substantial respect" on such determinations, *TikTok Inc.*, 145 S. Ct. at 70 (quoting *Humanitarian L. Project*, 561 U.S. at 34). The executive order is clear on its face that it was based on the President's determination that the FSLMRS could not be applied to the listed agencies "in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, § 1, 90 Fed. Reg. at 14,553. That motive—legitimate and consistent with the statute—does not cease to exist even if the President also had a retaliatory motive.

In addition to the constitutionally permissible motive identified in the text of the executive order, the very fact sheet plaintiffs claim establishes an unconstitutional motive reflects the legitimacy of the President's order. That document gives examples of the ways in which union activities have proven inconsistent with national-security considerations. *See* ER-161–63 (observing, for example, "that [U.S. Immigration and

Customs Enforcement] could not modify cybersecurity policies without giving its union an opportunity to negotiate").[3] Thus, although the President need not substantiate his § 7103(b)(1) determinations to establish their validity, *AFGE*, 870 F.2d at 727, the record here highlights the legitimate considerations supporting the challenged executive order.

## II. Plaintiffs Did Not Establish That They Would Likely Suffer Irreparable Harm.

"A plaintiff seeking a preliminary injunction must [also] establish that he is … likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court identified two harms that supported its injunction: plaintiffs' loss of bargaining power and dues revenue. ER-25–26. Neither of these asserted harms comes close to the required showing under *Winter*.

A. Any asserted losses of bargaining power are "speculative" because, as the D.C. Circuit recently explained in staying a similar injunction, "they would materialize only *after* an agency terminates a collective-bargaining agreement, and the

---

[3] The constitutionally permissible reasons underlying the executive order are also reflected in the declarations the government submitted to the district court in support of its stay motion describing how enjoining the President from excluding agencies from the FSLMRS affects national-security requirements and considerations. *See, e.g.*, ER-37–40 (explaining how the "injunction risks slowing down the Secretary's resource allocation decisions" at a time when the Secretary of State has determined that all available resources and authorities are needed to secure the border); ER-70–72 (same).

Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes." *NTEU*, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (per curiam). As noted, agencies have been advised not to terminate collective-bargaining agreements and not to decertify bargaining units until litigation has concluded. Dkt. No. 44, at 14; ER-33–36. Even as to the few agencies that terminated collective-bargaining agreements before receiving OPM's guidance,[4] any loss of bargaining power is reparable because the FLRA or a court could reinstate the agreements and undo any changes to working conditions if plaintiffs prevail. *See, e.g.*, *U.S. Dep't of Com. Pat. & Trademark Off. & Pat. Off. Pro. Ass'n*, 60 F.L.R.A. 869, 882 (2005) (affirming the reinstatement of a collective-bargaining agreement that the agency repudiated).

The district court reasoned that suspending union representation could cause irreparable harm through "weakened support for unions" that would cause "'the spark to organize'" to be "'extinguished.'" ER-25–26 (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011)). But it is speculative to assume that employees—whose membership is purely voluntary regardless of the executive order—will leave the union during this litigation, and even before their bargaining unit

---

[4] Plaintiffs alleged that two agencies cancelled collective-bargaining agreements: the State Department and Animal and Plant Health Inspection Service (APHIS). ER-26–27. Both agencies cancelled agreements prior to OPM's guidance, *see* ER-137; ER-212–13, but APHIS reinstated the relevant agreement over two months ago. *See* ER-87.

has been decertified, and just as speculative to think that the loss of some members would materially weaken plaintiffs' bargaining position. *See Winter*, 555 U.S. at 20 (requiring "likely" irreparable harm). A union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction." *East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005); *see also Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th Cir. 2018) (rejecting "theory that interim relief is necessary to prevent the Union from losing employee support").

**B.** The district court also based its irreparable-harm determination on lost revenue from the elimination of government-payroll deductions from plaintiffs' members, but "temporary economic loss alone generally is not a basis for injunctive relief." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987). Should plaintiffs prevail, the FLRA could make plaintiffs whole, including by requiring defendant-agencies to compensate plaintiffs for revenues lost from improperly failing to withhold dues, as the D.C. Circuit recently explained, *see NTEU*, 2025 WL 1441563, at *2–3, and the FLRA has done before. *E.g., U.S. Dep't of Def., Ohio Nat'l Guard & AFGE Loc. 3970*, 71 F.L.R.A. 829, 830 (2020); *U.S. Dep't of the Treasury, U.S. Mint & AFGE Mint Council*, 35 F.L.R.A. 1095, 1100–02 (1990).

Nevertheless, the district court relied on an exception to this principle, observing that "the 'threat of being driven out of business is sufficient to establish irreparable harm.'" ER-25 (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

1188 (9th Cir. 2022)). This Court has recognized that when "the loss of an ongoing business representing many years of effort and the livelihood of its owners" is threatened, there may be irreparable harm; in such a situation, there would be no business to repair. *hiQ Labs, Inc.*, 31 F.4th at 1188 (cleaned up). Nothing in the record supports the district court's conclusion that plaintiffs face such a scenario. The declarations from plaintiffs that the court cited, even if accepted at face value, assert some economic loss but not an end to the plaintiffs' existence. ER-25–26. This is far from a situation where the enjoined action threatens the business's only source of revenue, forcing the business to cancel all of its contracts, "lay off most if not all of its employees, and shutter its operations," *hiQ Labs, Inc.*, 31 F.4th at 1189 (quotation marks omitted).

To the contrary, it is clear that plaintiffs have a "viable alternative" to collect dues even if the government does not do it for them through payroll deductions. *hiQ Labs, Inc.*, 31 F.4th at 1189. "[N]othing prevents Union members covered by the Executive Order from voluntarily paying the dues they owe." *NTEU*, 2025 WL 1441563, at *2. In fact, AFGE is currently soliciting such direct dues payments, AFGE, *AFGE E-Dues*, https://perma.cc/6A5M-VGJ5, and its website indicates that "[m]ore than 150,000" members now pay dues directly, AFGE, *Switch to AFGE E-Dues Now Before It's Too Late*, AFGE (June 2, 2025), https://perma.cc/EL9B-Y3B9. As the D.C. Circuit observed, "that is, after all, how most other voluntary membership organizations collect dues." *NTEU*, 2025 WL 1441563, at *2. Nothing about the need

for plaintiff organizations to adhere to the usual means of collecting voluntary contributions from their own members during this litigation supports a need for preliminary relief.

## III. The Balance Of The Equities And Public Interest Weigh In Defendants' Favor.

In this case involving the President's national-security determinations, the final two preliminary-injunction factors—which merge because the government is the opposing party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—strongly favor defendants.

"The interest in preserving national security is an urgent objective of the highest order." *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam) (quotation marks omitted). To interfere with the President's assessment of the government's investigative, intelligence, and national-security functions "would appreciably injure [the Nation's] interests." *Id.* at 582; *see also Winter*, 555 U.S. at 31 (holding that it would be "cold comfort" to allow the Navy to request relief from a preliminary injunction on an emergency basis if the injunction "actually results in an inability to train and certify sufficient naval forces to provide for the national defense" (cleaned up)).

Congress granted certain labor rights to federal employees subject to § 7103(b)(1)'s major caveat: the President would have broad discretion to exclude agencies that, in his determination, (A) have as a primary function intelligence,

counterintelligence, investigative, or national-security work and (B) cannot operate under the FSLMRS consistent with national-security requirements and considerations. The President, whose "informed judgment" in this area must be afforded (at minimum) "respect," *Humanitarian L. Project*, 561 U.S. at 34, has determined that the excluded agencies meet those criteria. To prevent the President from carrying out his national-security responsibilities would do grave harm to important public interests.

The district court wrongly rested its contrary assessment on the government's willingness to forgo decertifying plaintiff unions under the executive order "until litigation regarding [the executive order] has been resolved." ER-29 (quoting ER-125). Such forbearance, the court mistakenly believed, "indicates that [the government] is not likely to be harmed by a preliminary injunction which orders the same thing." ER-29. But the injunction is hardly coextensive with the advice to defendant agencies not to decertify unions. Rather, it much more broadly requires defendants to refrain from giving effect to *any* aspect of section 2 of the executive order, meaning that they must adhere to all aspects of all existing collective-bargaining agreements. *See* ER-30. The preliminary injunction ties the defendant agencies' hands, inappropriately precluding them from heeding the President's order permitting them to advance their national-security functions regardless of any collective-bargaining requirements.

Moreover, the district court's conclusion that the equitable factors support a preliminary injunction reflects a clear error of law. Despite earlier recognizing that this Court's precedent permits a preliminary injunction to issue upon a finding of a

42

"serious question" on the merits only where "the balance of hardships tips sharply" in plaintiffs' favor, ER-17 (quotation marks omitted), when it came to weighing the equities, the district court failed to apply that standard. Instead, the court framed the inquiry as "whether a pause of the implementation of the Order will harm the government more than it benefits the plaintiffs." ER-28. At minimum, the balance of hardships does not weigh "sharply" in plaintiffs' favor, as this Court has required where a district court finds something less than a likelihood of success on the merits. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
*s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO
TYLER J. BECKER
  *Attorneys*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5364*
  *benjamin.takemoto@usdoj.gov*

July 2025

44

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,537 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.


*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

**ADDENDUM**

## TABLE OF CONTENTS

5 U.S.C. § 7103.................................................................................................A1

5 U.S.C. § 7105.................................................................................................A1

5 U.S.C. § 7116.................................................................................................A2

5 U.S.C. § 7122.................................................................................................A4

5 U.S.C. § 7123.................................................................................................A5

**Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101, et seq.**

**§ 7103. Definitions; application**

(b)(1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that--

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

**§ 7105. Powers and duties of the Authority**

(a)(1) The Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter.

(2) The Authority shall, to the extent provided in this chapter and in accordance with regulations prescribed by the Authority--

(A) determine the appropriateness of units for labor organization representation under section 7112 of this title;

(B) supervise or conduct elections to determine whether a labor organization has been selected as an exclusive representative by a majority of the employees in an appropriate unit and otherwise administer the provisions of section 7111 of this title relating to the according of exclusive recognition to labor organizations;

(C) prescribe criteria and resolve issues relating to the granting of national consultation rights under section 7113 of this title;

(D) prescribe criteria and resolve issues relating to determining compelling need for agency rules or regulations under section 7117(b) of this title;

(E) resolves issues relating to the duty to bargain in good faith under section 7117(c) of this title;

(F) prescribe criteria relating to the granting of consultation rights with respect to conditions of employment under section 7117(d) of this title;

(G) conduct hearings and resolve complaints of unfair labor practices under section 7118 of this title;

(H) resolve exceptions to arbitrator's awards under section 7122 of this title; and

(I) take such other actions as are necessary and appropriate to effectively administer the provisions of this chapter.

A1

* * *

(g) In order to carry out its functions under this chapter, the Authority may--

(1) hold hearings;

(2) administer oaths, take the testimony or deposition of any person under oath, and issue subpenas as provided in section 7132 of this title; and

(3) may require an agency or a labor organization to cease and desist from violations of this chapter and require it to take any remedial action it considers appropriate to carry out the policies of this chapter.

## § 7116. Unfair labor practices

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

(3) to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status;

(4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter;

(5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of this title) which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

(b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization--

A2

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to cause or attempt to cause an agency to discriminate against any employee in the exercise by the employee of any right under this chapter;

(3) to coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's duties as an employee;

(4) to discriminate against an employee with regard to the terms or conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition;

(5) to refuse to consult or negotiate in good faith with an agency as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7)(A) to call, or participate in, a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations, or

(B) to condone any activity described in subparagraph (A) of this paragraph by failing to take action to prevent or stop such activity; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

Nothing in paragraph (7) of this subsection shall result in any informational picketing which does not interfere with an agency's operations being considered as an unfair labor practice.

(c) For the purpose of this chapter it shall be an unfair labor practice for an exclusive representative to deny membership to any employee in the appropriate unit represented by such exclusive representative except for failure--

(1) to meet reasonable occupational standards uniformly required for admission, or

(2) to tender dues uniformly required as a condition of acquiring and retaining membership.

This subsection does not preclude any labor organization from enforcing discipline in accordance with procedures under its constitution or bylaws to the extent consistent with the provisions of this chapter.

A3

(d) Issues which can properly be raised under an appeals procedure may not be raised as unfair labor practices prohibited under this section. Except for matters wherein, under section 7121(e) and (f) of this title, an employee has an option of using the negotiated grievance procedure or an appeals procedure, issues which can be raised under a grievance procedure may, in the discretion of the aggrieved party, be raised under the grievance procedure or as an unfair labor practice under this section, but not under both procedures.

(e) The expression of any personal view, argument, opinion or the making of any statement which--

(1) publicizes the fact of a representational election and encourages employees to exercise their right to vote in such election,

(2) corrects the record with respect to any false or misleading statement made by any person, or

(3) informs employees of the Government's policy relating to labor-management relations and representation,

shall not, if the expression contains no threat of reprisal or force or promise of benefit or was not made under coercive conditions, (A) constitute an unfair labor practice under any provision of this chapter, or (B) constitute grounds for the setting aside of any election conducted under any provisions of this chapter.

## § 7122. Exceptions to arbitral awards

(a) Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the arbitration (other than an award relating to a matter described in section 7121(f) of this title). If upon review the Authority finds that the award is deficient--

(1) because it is contrary to any law, rule, or regulation; or

(2) on other grounds similar to those applied by Federal courts in private sector labor-management relations;

the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations.

(b) If no exception to an arbitrator's award is filed under subsection (a) of this section during the 30-day period beginning on the date the award is served on the party, the award shall be final and binding. An agency shall take the actions required by an arbitrator's final award. The award may include the payment of backpay (as provided in section 5596 of this title).

## § 7123. Judicial review; enforcement

(a) Any person aggrieved by any final order of the Authority other than an order under--

    (1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

    (2) section 7112 of this title (involving an appropriate unit determination),

may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

(b) The Authority may petition any appropriate United States court of appeals for the enforcement of any order of the Authority and for appropriate temporary relief or restraining order.

(c) Upon the filing of a petition under subsection (a) of this section for judicial review or under subsection (b) of this section for enforcement, the Authority shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of the petition, the court shall cause notice thereof to be served to the parties involved, and thereupon shall have jurisdiction of the proceeding and of the question determined therein and may grant any temporary relief (including a temporary restraining order) it considers just and proper, and may make and enter a decree affirming and enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Authority. The filing of a petition under subsection (a) or (b) of this section shall not operate as a stay of the Authority's order unless the court specifically orders the stay. Review of the Authority's order shall be on the record in accordance with section 706 of this title. No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances. The findings of the Authority with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the Authority, or its designee, the court may order the additional evidence to be taken before the Authority, or its designee, and to be made a part of the record. The Authority may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed. The Authority shall file its modified or new findings, which, with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The

Authority shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with the court, the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the judgment and decree shall be subject to review by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(d) The Authority may, upon issuance of a complaint as provided in section 7118 of this title charging that any person has engaged in or is engaging in an unfair labor practice, petition any United States district court within any district in which the unfair labor practice in question is alleged to have occurred or in which such person resides or transacts business for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the agency to carry out its essential functions or if the Authority fails to establish probable cause that an unfair labor practice is being committed.