No. 25-4014

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO;
*et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

*Defendants-Appellants.*

---

On Appeal from Order of the United States District Court
for the Northern District of California,
U.S. District Court Action No. 3:25-CV-03070-JD

---

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

---

Abigail V. Carter
Ramya Ravindran
Lane M. Shadgett
J. Alexander Rowell
BREDHOFF & KAISER P.L.L.C.
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ....................................................... 3

COUNTER-STATEMENT OF THE ISSUES ........................................ 4

PERTINENT STATUTES AND REGULATIONS ................................. 4

COUNTER-STATEMENT OF THE CASE ............................................ 4

   I.   Congress Grants Collective-Bargaining Rights to Federal Workers to Safeguard the Public Interest ............................................................ 4

   II.  In Response to "Hostile" Federal Unions, the President Issues the EO .......... 5

   III. Agencies Have Implemented the EO, Harming Plaintiffs and Their Members ................................................................................ 7

   IV. Procedural History ................................................................ 9

SUMMARY OF THE ARGUMENT ..................................................... 10

ARGUMENT ..................................................................................... 14

   I.   Standard of Review ................................................................ 15

   II.  The District Court Correctly Determined It Had Jurisdiction Over Plaintiffs' Claims ............................................................... 16

   III. Plaintiffs Demonstrated that the EO Unconstitutionally Retaliates Against Them in Violation of the First Amendment ................................. 23

      A.  The District Court's Finding that Plaintiffs Established a Prima Facie Claim Was Not Clearly Erroneous ................................. 24

      B.  Defendants Failed to Satisfy Their Evidentiary Burden That the President *Would* Have Issued the Same Executive Order Targeting Plaintiffs Even Absent Their First Amendment Activity ....................... 30

      C.  Defendants' Various Attempts to Substantively Alter and Narrow the Retaliation Standard are Contrary to Law and Would Severely Weaken First Amendment Protections ................................. 38

   IV. Plaintiffs Demonstrated Irreparable Harm ................................. 49

V.   The Balance of Harms and Public Interest Weigh Strongly In Favor of Injunctive Relief ..................................................................................55

CONCLUSION ...................................................................................................58

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Loc. 2118 & Dep't of Energy, Albuquerque Operations, Los Alamos Area Off.*,
2 F.L.R.A. 916 (1980) .......................................................................17

*AFGE Loc. 446 v. Nicholson*,
475 F.3d 341 (D.C. Cir. 2007) ...........................................11, 17, 21

*AFGE v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) .......................................................20

*AFGE v. Reagan*,
870 F.2d 723 (D.C. Cir. 1989) ...................................................47, 48

*AFGE v. Trump*,
139 F.4th 1020 (9th Cir. 2025) ..................................................20, 22

*AFGE v. Trump*,
2025 WL 1358477 (N.D. Cal. May 9, 2025) .................................21

*AFGE v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ...................................................19, 20

*AFSA v. Trump*,
__ F.Supp.3d __, 2025 WL 1387331 (D.D.C. May 14, 2025) ..........17

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) (per curiam) ...................................................54

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................................16

*Allen v. Iranon*,
283 F.3d 1070 (9th Cir. 2002) .......................................................24

*Allen v. Scribner*
812 F.2d 426 (9th Cir. 1987) .......................................................34

*Am. Bar Ass'n v. DOJ*,
__ F.Supp.3d __, 2025 WL 1388891 (D.D.C. May 14, 2025) ..........42

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ...................................................................43

*Arc of California v. Douglas*,
  757 F.3d 975 ...........................................................................................11

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ............................................................29, 34

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023)..............................................................20, 21, 22

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ..............................................................58

*Bello-Reyes v. Gaynor*,
  985 F.3d 696 (9th Cir. 2021) ...........................................................23, 32

*Boquist v. Courtney*,
  32 F.4th 764 (9th Cir. 2022) .............................................................23, 34

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)................................................................................31

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) .................................................................55

*CarePartners, LLC v. Lashway*,
  545 F.3d 867 (9th Cir. 2008) .................................................................23

*Clairmont v. Sound Mental Health*,
  632 F.3d 1091 (9th Cir. 2011) ...............................................................30

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ...........................................................25, 30

*Crawford-El v. Britton*,
  523 U.S. 574 (1998)................................................................................23

*Ctr. for Biological Diversity v. Mattis*,
  868 F.3d 803 (9th Cir. 2017) .................................................................46

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)................................................................46

*Dep't of Treasury v. NTEU Ch. 73*,
    No. 25-cv-49 (E.D. Ky.) .......................................................18

*DHS, U.S. ICE & AFGE Council 11*,
    67 F.L.R.A. 501 (2014).............................................................6

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ........................................2, 14, 15, 53

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) ................................................52

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012)........................................................10, 16, 19, 22

*Elrod v. Burns*,
    427 US 347 (1976)..................................................................42

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) ...................................24, 31, 32

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ...............................................49

*FEA v. Trump*,
    2025 WL 2355747 (D.D.C. Aug. 14, 2025) ...............................17, 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ...............................................15

*Gillette v. Delmore*,
    886 F.2d 1194 (9th Cir. 1989) ...............................................34

*Gov't of Guam v. Guerrero*,
    11 F.4th 1052 (9th Cir. 2021) ...............................................47, 48

*Hartman v. Moore*,
    547 U.S. 250 (2006)................................................................39, 40

*Health Freedom Def. Fund, Inc. v. Carvalho*,
    104 F.4th 715 (9th Cir. 2024) ...............................................................48

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ...............................................................53

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...................................................................................43

*Immigrant Defs. L. Ctr. v. Noem*,
    2025 WL 2017247 (9th Cir. 2025) .......................................................57

*Janus v. AFSCME Council 31*,
    585 U.S. 878 (2018)........................................................................40, 41

*Jenner & Block LLP v. DOJ*,
    __ F.Supp.3d __, 2025 WL 1482021 (D.D.C. May 23, 2025)...........42

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)................................................................................1

*Kleindeinst v. Mandel*,
    408 U.S. 753 (1972)..................................................................42, 43, 44

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018).................................................................................40

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)............................................................2, 31, 32, 34, 37

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964)...............................................................................40

*Nat'l Inst. of Family and Life Advocs. v. Becerra*,
    585 U.S. 755 (2018)...............................................................................29

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024).................................................................10, 23, 46

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) ...................................................................24

*Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.*,
    682 F.2d 858 (9th Cir. 1982) ...................................................................24

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)..................................................................................39

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.*,
    902 F.3d 432 (4th Cir. 2018) ...................................................................52

*NTEU v. Trump*,
    2025 WL 1441563 (D.C. Cir. May 16, 2025) ...............................17, 51

*NTEU v. Trump*,
    780 F.Supp.3d 237 (D.D.C. 2025)............................17, 18, 48, 51

*O'Brien v. Welty*,
    818 F.3d 920 (9th Cir. 2016) ...................................................32, 34, 47

*Ostad v. Or. Health Scis. Univ.*,
    327 F.3d 876 (9th Cir. 2003) ..........................................................26, 32

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .................................................................15

*Perkins Coie LLP v. DOJ*,
    __ F.Supp.3d __, 2025 WL 1276857 (D.D.C. May 2, 2025) ............42

*Pinard v. Clatskanie Sch. Dist. 6J*,
    467 F.3d 755 (9th Cir. 2006) ...................................................................25

*President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland
    Security*,
    __ F.Supp.3d __, 2025 WL 1737493 (D. Mass. June 23, 2025) ........42

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .................................................................57

*Small v. Avanti Health Systems, LLC*,
    661 F.3d 1180 (9th Cir. 2011) .................................................51, 52, 54

*Soranno's Gasco, Inc. v. Morgan*,
  874 F.2d 1310 ...................................................................34

*Stilwell v. City of Williams*,
  831 F.3d 1234 (9th Cir. 2016) .........................................44

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994).........................................................20

*Trump v. Hawaii*,
  585 U.S. 667 (2018)...........................................42, 43, 44

*Trump v. International Refugee Assistance Project*,
  582 U.S. 571 (2017) (per curiam)........................13, 55, 56

*Twitter, Inc. v. Garland*,
  61 F.4th 686 (9th Cir. 2023) ............................................43

*U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*,
  57 F.L.R.A. 750 (2002).....................................................17

*U.S. Dep't of Def. v. AFGE Dist. 10*,
  2025 WL 2058374 (W.D. Tex. July 23, 2025).................7, 18

*United States v. Armstrong*,
  517 U.S. 456 (1996).........................................................48

*United States v. Robel*,
  389 U.S. 258 (1967).........................................................40

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .........................................38

*W. Va. Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943).........................................................41

*Webster v. Doe*,
  486 U.S. 592 (1988).........................................................42

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008).............................................................56

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) ..............................................................15

**Statutes**

5 U.S.C. § 7101(a)(2) ...........................................................................5

5 U.S.C. § 7103 .......................................... 5, 13, 21, 22, 33, 36, 37, 39, 41, 45, 47

5 U.S.C. § 7105 ............................................................................17, 19

5 U.S.C. § 7106(a)(2)(D) ....................................................................57

5 U.S.C. § 7112(b)(6) .........................................................................57

5 U.S.C. § 7116(a)-(b) ........................................................................17

5 U.S.C. § 7117(c) .............................................................................17

5 U.S.C. § 7118(a)(6)-(8) ....................................................................17

5 U.S.C. § 7122(a) .............................................................................17

5 U.S.C. § 7532 .................................................................................57

28 U.S.C. § 1331 ...............................................................................16

**Other Authorities**

124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay) ...........................5

Emily Peck, *Exclusive: VA rescinds weeks of parental leave - even for
some giving birth this week*, Axios (Aug. 15, 2025),
https://www.axios.com/2025/08/15/va-maternity-leave-veterans-
union ......................................................................................8

Erich Wagner, *VA is selectively enforcing Trump's order stripping
workers of union rights*, Gov't Exec. (Apr. 18, 2025),
https://www.govexec.com/workforce/2025/04/va-selectively-
enforcing-trumps-order-stripping-workers-union-rights/404694/.....................28

Exec. Order No. 12171, 44 Fed. Reg. 66565 (Nov. 20, 1979) .................................5

Exec. Order No. 14251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 3, 2025).....................................5

Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025) ....................28, 37

## INTRODUCTION

When the Government "punishes many organizations and their members merely because of their political beliefs and utterances," this "smacks of a most evil type of censorship" that "cannot be reconciled with the First Amendment." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143 (1951) (Black, J., concurring). This case presents a textbook example of such conduct.

On March 27, 2025, the President issued a sweeping Executive Order ("EO") eliminating statutory labor law rights for nearly two-thirds of the federal workforce and dramatically upending the federal labor relations framework that has existed for decades. The President explained, in a statement issued contemporaneously with the EO, that its purpose was to target federal unions deemed "hostile" because they had engaged in speech and petitioning activity critical of the President's policy agenda. The factual record—which was both extensive and unrebutted before the District Court—showed that the EO is causing substantial harmful effects on Plaintiffs and their members. Based on these facts, the District Court granted Plaintiffs' request for a preliminary injunction to maintain the status quo pending resolution of the serious constitutional questions raised by the EO. The District Court did not abuse its discretion in granting preliminary relief, nor were the factual findings underlying that decision clearly erroneous.

1

This Court granted a stay of the preliminary injunction on the basis that Defendants had established the affirmative defense provided in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), Dkt. 33 ("Stay Op."), but its "predictive analysis" is not binding, as such "pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to act responsibly, rather than doling out justice on the fly." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). Because Defendants only tangentially alluded to *Mt. Healthy* before the District Court, this brief represents Plaintiffs' first opportunity to fully address their arguments on that point. As detailed below, the panel's provisional endorsement of Defendants' *Mt. Healthy* argument incorporates Defendants' mistaken understanding of the legal framework governing First Amendment retaliation claims, which conflicts with long-standing Circuit precedent governing retaliation claims and would reduce First Amendment protections against retaliation to a hollow shell.

Once a plaintiff demonstrates that protected speech was a motivating factor for an adverse action, the burden shifts to the Government to demonstrate through evidence that it *would* have taken the same action even absent the plaintiff's protected activity. Importantly, the Government cannot meet this burden by showing that it *could* have taken the same action. An otherwise-lawful action is still unconstitutional if taken in retaliation for protected speech. That is why, to prevail

under *Mt. Healthy*, the Government must prove, as a *factual* matter, that a plaintiff is no worse off than if it had never engaged in protected speech in the first place.

Defendants cannot demonstrate that the District Court's factual findings supporting the preliminary injunction are clearly erroneous. Indeed, Defendants did not even attempt before the District Court, nor have they done so on appeal, to meet their burden of proof that the President *would* have issued the same EO targeting Plaintiffs had Plaintiffs never engaged in First Amendment-protected activity opposing the President's agenda. Defendants submitted no evidence to the District Court, and their evidentiary argument on appeal is that the EO "*could* be understood as resulting from constitutional motivations." Gov't Br. 28 (emphasis added). But this Court has repeatedly held that such a showing is *insufficient* to satisfy the Government's burden that the same action *would* have been taken absent protected activity.

Based on the record evidence, the District Court's factual findings, and the applicable legal standards, Defendants cannot establish that the District Court abused its discretion in granting the preliminary injunction. The order of the District Court must therefore be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs agree with Defendants' statement of jurisdiction.

3

## COUNTER-STATEMENT OF THE ISSUES

1.      Whether the District Court correctly rejected Defendants' jurisdictional argument that Plaintiffs' claims must be "channeled" to the Federal Labor Relations Authority ("FLRA").

2.      Whether the District Court made clearly erroneous factual findings in determining that Plaintiffs had demonstrated a serious question on their First Amendment retaliation claim.

3.      Whether the District Court made clearly erroneous factual findings in determining that Plaintiffs were likely to suffer irreparable harm in the absence of preliminary injunctive relief.

4.      Whether the District Court abused its discretion in determining that equitable factors weighed in favor of granting preliminary injunctive relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief, except for those contained in Defendants' addendum.

## COUNTER-STATEMENT OF THE CASE

## I.      Congress Grants Collective-Bargaining Rights to Federal Workers to Safeguard the Public Interest

Nearly a half century ago, Congress rejected the proposition that federal workers' right to bargain collectively with their employer should depend on Presidential grace. In the Civil Service Reform Act of 1978 ("CSRA"), Congress

declared that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a)(2), and established "[a] statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay).

Codified in Chapter 71 of Title 5, the CSRA permits the President to exclude a particular agency or subdivision from the statute, but only if two conditions are met: (1) "the agency or subdivision has as a *primary* function intelligence, counterintelligence, investigative, or national security work"; and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Past Presidents have invoked this authority sparingly, specifying subdivisions "at a high level of granularity" and never using it to exclude cabinet-level departments in their entirety. ER-12.

## II.    In Response to "Hostile" Federal Unions, the President Issues the EO

On March 27, 2025, President Trump issued Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 3, 2025). The EO amended Executive Order 12171, 44 Fed. Reg. 66565 (Nov. 20, 1979), "exclud[ing]" a broad array of agencies and subdivisions "from coverage under Chapter 71," *id.* ¶ 1-101, ranging from Veterans Affairs, to USAID, to the EPA. ER-145-47. Thus, by its own terms, the EO immediately "excluded an

5

unprecedented number of federal employees from coverage" of federal labor law—roughly two-thirds of the entire federal workforce. ER-12.[1]

That same day, the White House published a Fact Sheet explaining the rationale for the EO. ER-161-65. The Fact Sheet complained that "[t]he CSRA enables hostile Federal unions to obstruct agency management" and therefore interfered with a "responsive and accountable civil service to protect our national security."[2] ER-162-63. It further explained that "[c]ertain Federal unions have declared war on President Trump's agenda" and expressly criticized Plaintiff AFGE, "[t]he largest Federal union," for "describ[ing] itself as 'fighting back' against Trump." ER-163. That quote came from an AFGE publication which detailed the union's "[m]ajor [a]ctions [a]gainst Trump's [a]ttacks on [c]ivil [s]ervice," including lawsuits against the administration, lobbying, public statements opposing the President's policies, and town halls. SER-211-14. The Fact Sheet contrasted unions

---

[1] The EO also permitted the Departments of Defense ("DoD") and Veterans Affairs ("VA") to reinstate bargaining rights for certain subdivisions, ER-149, § 4, and delegated authority to the Department of Transportation to exclude others, *id.* § 5. DoD and the VA exercised that authority to "carve in" a smattering of bargaining units, reinforcing the EO's jagged line drawing. *See infra* at 28.

[2] The Fact Sheet provides a few examples of union "obstruction." One refers to an FLRA decision, which the Fact Sheet characterizes as holding "that ICE could not modify cybersecurity policies" without completing union bargaining. ER-163. But that case found ICE could implement urgent policies without bargaining over their substance, ordering only post-hoc "impact and implementation" bargaining. *DHS, U.S. ICE & AFGE Council 11*, 67 F.L.R.A. 501, 502, 504 (2014).

that are "hostile" to President Trump with those who "work with him," announcing

that the President "supports constructive partnerships" with the latter. ER-162-63.[3]

## III. Agencies Have Implemented the EO, Harming Plaintiffs and Their Members

Also on March 27, the Office of Personnel Management ("OPM") issued

guidance alongside the EO. ER-154-59. Per that guidance, excluded agencies were

"no longer subject to the collective-bargaining requirements of chapter 71" and

therefore "no longer required to collectively bargain with Federal unions." ER-156.

In addition, OPM advised that under the EO, unions were no longer "the

'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and

agency subdivisions covered by [the EO]." *Id.*

OPM subsequently instructed agencies to refuse to recognize and negotiate

with unions, abide by the terms of collective bargaining agreements ("CBAs"),

process grievances, transmit member dues, allow employees union representation at

disciplinary meetings, or provide official time to union representatives. ER-125-31.

---

[3] Several hours before the EO was published, many Defendants in this case sued AFGE affiliates in federal court. *See U.S. Dep't of Def. v. AFGE Dist. 10*, No. 6:25-cv-119, (W.D. Tex. Mar. 27, 2025), ER-167-203. That lawsuit, which sought a declaratory judgment that the EO was lawful and that Defendants could terminate CBAs, expressly targeted Plaintiff AFGE's First Amendment activity, linking to AFGE's "fighting back" press release and complaining that AFGE was "tak[ing] steps to litigate" against the President. ER-201, ¶ 172. The district court granted the affiliates' motion to dismiss for lack of Article III standing. 2025 WL 2058374 (W.D. Tex. July 23, 2025).

Record evidence demonstrates that Defendants have implemented those directives to the detriment of Plaintiffs and their members. SER-75, ¶ 8; ER-117, 119, ¶¶ 11-13, 22-24; *see also, e.g.*, SER-6-7, ¶¶ 6-10; SER-90, ¶ 6; SER-221, ¶ 14; SER-258-59, ¶ 10.

In this litigation and before other courts, the Government has opposed equitable relief partially on the ground that harms to unions and their members "would materialize only *after* an agency terminates a collective-bargaining agreement," and "agencies have been advised not to terminate collective-bargaining agreements and not to decertify bargaining units until litigation has concluded." Stay Mot. 21-22 (emphasis in original).[4] Nevertheless, within days of the panel's stay order, the Government formally terminated CBAs at the VA, EPA, and several other agencies, wiping out lawfully bargained contracts covering hundreds of thousands of workers. *See* Dkt. 34.1. EPA specifically cited the panel's stay decision in its notice. Dkt. 36.2, Attach. 4.[5]

---

[4] The panel noted this statement in its stay decision. Stay Op. 17 ("Whatever harm to collective bargaining rights that Plaintiffs will experience due to a stay is mitigated by the direction to agencies to refrain from terminating collective bargaining agreements *until litigation has concluded*.") (emphasis added).

[5] The contractually guaranteed benefits rescinded included clawing back maternity leave from employees. *See* Emily Peck, *Exclusive: VA rescinds weeks of parental leave – even for some giving birth this week*, Axios (Aug. 15, 2025), https://www.axios.com/2025/08/15/va-maternity-leave-veterans-union.

**IV.  Procedural History**

Plaintiffs commenced this lawsuit on April 3, 2025, alleging that the EO was unconstitutional under the First and Fifth Amendments and was *ultra vires*. Plaintiffs filed a motion for a TRO, which the District Court denied and converted to a preliminary injunction motion. Plaintiffs provided declarations and exhibits in support of their motion, while Defendants submitted no evidence. *See* SER-97-135.

Following a hearing, the District Court granted the preliminary injunction on June 24, ER-4-32, finding, amongst other things, that Plaintiffs "demonstrated a serious question" that the EO retaliated against Plaintiffs' protected speech in violation of the First Amendment, that "Plaintiffs have shown that they are likely to suffer irreparable harm," that "the balance of hardships tips sharply in their favor," and that "an injunction would be in the public interest." ER-6, 20, 28. Accordingly, the District Court enjoined Agency Defendants from enforcing Section 2 of the EO against Plaintiffs and their members. ER-30. The District Court subsequently denied Defendants' motion to stay that order pending appeal.

Defendants filed a notice of appeal on June 26. On July 3, Defendants filed an emergency motion to stay the preliminary injunction and a request for immediate administrative stay. The panel granted an administrative stay and ordered expedited briefing and argument. On August 1, the panel granted an emergency stay pending appeal. Defendants subsequently filed a Rule 28(j) letter advising the Court that,

contrary to previously cited guidance, "several defendant-agencies" had started terminating Plaintiffs' CBAs. Dkt. 34.1. Plaintiffs filed a response letter providing additional information regarding the CBA terminations. Dkt. 36.1.

## SUMMARY OF THE ARGUMENT

The First Amendment "prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191-92 (2024) (cleaned up). Here, Plaintiffs presented substantial evidence that the Executive Order was issued to retaliate against First Amendment-protected activity, that it is causing significant ongoing harm to Plaintiffs and their members, and that the balance of harms tips sharply in favor of maintaining the status quo pending resolution of this litigation. Defendants have not shown that the District Court made clearly erroneous factual findings or relied on an erroneous legal standard in granting preliminary injunctive relief.

First, the District Court correctly held that it had jurisdiction over Plaintiffs' claims. Plaintiffs' claims are not "channeled" to the FLRA because the Executive Order excluded the Defendant Agencies from the coverage of statute and thus removed them from the FLRA's jurisdiction. Channeling applies only when it is "fairly discernible" that Congress intended such claims to "proceed exclusively through [a] statutory review scheme." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10

(2012). Defendants do not, and cannot, point to any authority that Congress intended the FLRA to sit in judgment over disputes involving unions and agencies *not* covered by the statute. Throughout its history, the FLRA has repeatedly—and summarily— declined to exercise jurisdiction over cases brought by a union against an agency that the President has excluded from CSRA coverage. As the D.C. Circuit recognized, when executive action takes a claim "outside the FLRA's purview," unions may seek review of the "legality" of that action in federal district court. *AFGE Loc. 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007).

Second, the District Court's factual findings that Plaintiffs' First Amendment activity was a "substantial or motivating" factor for the EO and that Defendants did not sufficiently "rebut this nexus" are not clearly erroneous. *See Arc of California v. Douglas*, 757 F.3d 975, 984 (factual finding constitutes clear error only if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record"). Both findings are supported by the evidentiary record, including the sweeping overbreadth and jagged line drawing in the EO and the express statements of animus in the White House Fact Sheet, which as the District Court found "condemned unions who criticized the President and expressed support only for unions who toed the line." ER-23. Defendants' contention that it was error for the District Court to consider "extrinsic" evidence both  mischaracterizes the Fact

Sheet and is contrary to law. This Court has repeatedly held that retaliation can be proven through "direct or circumstantial" evidence.

Third, Defendants did not come close to meeting their burden that the President would have issued the same EO even absent Plaintiffs' protected activity. Once a plaintiff shows that retaliation for protected speech was a motivating factor in the adverse action, the burden shifts to the government to show through evidence that the government *would* have taken the *same* action—not that it *could* have done so—even if the plaintiff had never engaged in protected activity. Here, Defendants point only to the Order and Fact Sheet, but both documents are inconsistent with the proposition that the President would have issued the same EO targeting Plaintiffs absent their protected activity. It is clear from the Order itself that the existence of "union activities and collective bargaining" at the alleged "national security" agencies, Stay Op. 15-16, would *not* alone result in elimination of bargaining rights because the Order permits union activities and collective bargaining to continue at these agencies for *some* unions. The Fact Sheet further makes clear that the President would *support* maintaining statutory rights for employees at these "national security" agencies so long as their unions will "work with him."

Fourth, the three legal arguments Defendants advance to escape their burden of proof conflict with clear Circuit precedent and would result in exempting Presidential retaliation from the constraints of the First Amendment. Defendants'

argument that the President is authorized under § 7103(b) to retaliate against unions for protected activity is not supported by the text and would render the statute unconstitutional. Defendants' reliance on *Trump v. Hawaii* and *Klendeinst v. Mandel* is also misplaced. Those cases have not been applied outside the immigration context and doing so here would rewrite First Amendment retaliation jurisprudence. And Defendants cannot rely on a "presumption of regularity" to overcome actual evidence to the contrary.

Fifth, the District Court made extensive factual findings that Plaintiffs face concrete, ongoing, and existential harms from the EO that this Court has recognized as irreparable, including that Plaintiffs and their members have lost collective bargaining rights and numerous non-economic benefits and that Plaintiffs face weakened support and the threat of being driven out of business. Defendants do not demonstrate these findings are clearly erroneous, and recent events further confirm that ongoing threat as Defendants have now formally terminated CBAs and are making changes to lawfully bargained benefits that cannot be recouped later.

And finally, the balance of equities tilts sharply in favor of Plaintiffs. Defendants presented no evidence to rebut the myriad harms experienced by Plaintiffs, and the District Court correctly found that Defendants' unelaborated claim of harm to national security was "purely conclusory and unsupported." While Defendants suggest that under *Trump v. International Refugee Assistance Project*,

13

582 U.S. 571, 581 (2017) (per curiam), the assertion of national security automatically results in the equities weighing in favor of the government, the *IRAP* Court *maintained* a preliminary injunction enjoining certain applications of an executive order given the "concrete burdens" faced by plaintiffs in those instances.

In sum, the record contains ample evidence that, at the very least, Plaintiffs presented a serious First Amendment question and that the preliminary injunction factors weigh in favor of relief. The District Court did not abuse its discretion in granting Plaintiffs' preliminary injunction and its order should be affirmed.

## ARGUMENT

In granting Defendants' emergency motion to stay, the panel accepted Defendants' argument that they were likely to prove their affirmative defense that the President would have issued the same EO even absent Plaintiffs' First Amendment activity. *See* Stay Op. 15-16. Given the compressed nature of the stay proceedings, this submission represents Plaintiffs' first opportunity to fully respond to Defendants' argument, which Defendants only briefly alluded to before the District Court. SER-129. The panel's earlier decision addressed a question "an additional step removed" from the merits of the preliminary injunction, and its "predictive analysis…does not forever decide the merits of the parties' claims." *E. Bay Sanctuary Covenant*, 993 F.3d at 661. As such, it is not binding on the merits of the preliminary injunction. *Id.* at 662. As explained below, Defendants misapply the

relevant legal standards and fundamentally misconstrue their evidentiary burden. The District Court's conclusions are well-supported by the evidence and consistent with Circuit precedent and thus should be affirmed.

## I. Standard of Review

A district court's grant of preliminary injunctive relief is subject to "limited and deferential" review. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024) (quotation omitted). Accordingly, this Court reviews the grant of a preliminary injunction for abuse of discretion, asking whether the District Court "rel[ied] on an erroneous legal standard or clearly erroneous finding of fact." *E. Bay Sanctuary Covenant*, 993 F.3d at 668. A district court's factual findings are reviewed for clear error and its legal conclusions de novo. *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017).

To obtain a preliminary injunction, the movant must show (1) "a likelihood of success on the merits," (2) "irreparable harm in the absence of preliminary relief," (3) a "favorable balance of the equities," and (4) that an injunction is in the public interest. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The "last two factors merge" when the Government is a party. *Id.* If the defendant opposes a preliminary injunction based on an affirmative defense, then once the plaintiff has met its initial burden, "the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d

1146, 1158 (9th Cir. 2007). Under the Ninth Circuit's "sliding scale" approach, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction" if "there is a likelihood of irreparable injury" and "the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## II. The District Court Correctly Determined It Had Jurisdiction Over Plaintiffs' Claims

Congress granted federal district courts jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Only when it is "fairly discernible" that Congress intended certain claims by certain parties to "proceed exclusively through [a] statutory review scheme," is district court jurisdiction precluded. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012).

Chapter 71 requires that certain types of labor disputes between covered employees and agencies be heard by the FLRA. But here the EO expressly removes Defendant Agencies from this statutory framework, rendering them incapable of being respondents in FLRA proceedings and eliminating Plaintiffs' ability to raise their claims in that forum. The District Court was correct to conclude that Plaintiffs' challenge to the EO is not channeled to the very agency the President has barred them from accessing. ER-18-20.

**1.** Congress empowered the FLRA to adjudicate certain labor-relations disputes between unions and covered agencies to determine compliance with the

16

substantive requirements of the statute. *See* 5 U.S.C. §§ 7105, 7116(a)-(b), 7117(c), 7118(a)(6)-(8), 7122(a). Congress did not empower the FLRA to sit in judgment over disputes involving unions and agencies *not* covered by the statute.

As the D.C. Circuit recognized, when executive action takes a claim "outside the FLRA's purview," unions may seek review of the "legality" of that action in federal district court. *AFGE Loc. 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007). Throughout its history, the FLRA has repeatedly—and summarily—declined to exercise jurisdiction over cases brought by a union against an agency that the President has excluded from CSRA coverage. *See, e.g.*, *U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750 (2002); *AFGE Loc. 2118 & Dep't of Energy, Albuquerque Operations, Los Alamos Area Off.*, 2 F.L.R.A. 916 (1980).

It is therefore no surprise that each district court faced with a union's challenge to this EO has found jurisdiction to hear the case, and no appellate court has disagreed. ER-18-20; *NTEU v. Trump*, 780 F.Supp.3d 237, 249-50 (D.D.C. 2025), *stayed on other grounds*, 2025 WL 1441563 (D.C. Cir. May 16, 2025); *FEA v. Trump*, 2025 WL 2355747, at *5-6 (D.D.C. Aug. 14, 2025); *cf. AFSA v. Trump*, __ F.Supp.3d __, 2025 WL 1387331, at *4-6 (D.D.C. May 14, 2025), *stayed on other grounds*, 2025 WL 1742853 (D.C. Cir. June 20, 2025). As one federal court explained, the FLRA channel "is not available" to unions "for the simple reason that

17

those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here." *NTEU*, 780 F.Supp.3d at 249.

Elsewhere, the Government agrees. It has instructed agency heads to take the position that the FLRA cannot hear claims against excluded agencies because a union "no longer has standing" to bring such claims. ER-125. And upon issuance of the EO, it immediately turned to district courts, not the FLRA, seeking a declaration that the EO was valid. *See AFGE Dist. 10*, *supra* n.3; *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky.).

Thus, as Defendants would have it, district courts have jurisdiction to decide the validity of the EO—but only at the request of the Government. Those same courts lack jurisdiction to decide that question at the request of unions harmed by the EO. Instead, according to the Government, courts must redirect such unions to the FLRA—which the Government says is required to deny standing to those unions. While the Government attempts to defend its Kafka-esque position by claiming its lawsuits are "materially different" since it believes that the EO is valid, Gov't Br. 22 n.2, the District Court correctly recognized that the channeling inquiry "is not answered by the plaintiffs' or defendants' beliefs about the merits of the case," but rather by Congressional intent. ER-19; *see also FEA*, 2025 WL 2355747, at *6. Here, "the plain language of the FSLMRS" makes clear that Congress did not intend to

18

create an exclusive review scheme for unions that are "expressly not covered by Chapter 71." ER-19.

Seeking to avoid this straightforward conclusion, Defendants point to residual provisions in the enumeration of the FLRA's powers to "provide leadership in establishing policies and guidance" and "take such other actions as are necessary to effectively administer the provisions of this chapter." 5 U.S.C. § 7105(a). But these types of catch-all provisions are not a freestanding grant of authority that would broaden the scope of the FLRA's jurisdiction to resolve disputes between unions and agencies that are not covered by the statute.

Tellingly, Defendants have identified no case that involves parties removed from CSRA coverage. For example, in *Elgin*, the Supreme Court repeatedly emphasized that the plaintiffs were "*covered* employees appealing *covered* agency actions." 567 U.S. at 10 (emphasis added); *see also id.* at 13-14, 19, 20-22. As such, those plaintiffs, whose access to the Merit Systems Protection Board was uncontested, *id.* at 20-21, were required to bring their constitutional claims there. Likewise, in *AFGE v. Trump*, 929 F.3d 748, 753 (D.C. Cir. 2019), the challenged executive order did not exclude agencies from Chapter 71 coverage but set certain rules and priorities for agencies engaged in collective bargaining. Union plaintiffs

were still able to bring claims before the FLRA, which retained jurisdiction over the parties to the dispute. *Id.* at 757-59.[6]

As this Court recently explained when denying a stay in a different case, it is "unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction." *AFGE v. Trump*, 139 F.4th 1020, 1033 (9th Cir. 2025), *stay granted on other grounds*, 145 S. Ct. 2635 (Mem.) (July 8, 2025).[7] So too here.

**2.** Because Defendants' channeling argument fails at a threshold level, the Court need not turn to the factors set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), under which otherwise-covered claims may nonetheless be raised in district court. However, even if the Court were to apply the *Thunder Basin* factors, they confirm the District Court's jurisdiction. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (claim must be "of the type Congress intended to be reviewed" through the administrative scheme).

---

[6] Defendants also mischaracterize *AFGE v. Loy*, 367 F.3d 932 (D.C. Cir. 2004), as involving an order "excluding federal workers from the FSLMRS and collective bargaining." Gov't Br. 17-18. In actuality, the challenged order was silent on Chapter 71 and did not exclude the employees from its coverage, but instead used authority under a separate statute to prohibit *collective bargaining*. *Loy*, 367 F.3d at 934. The court found that the FLRA had jurisdiction to determine how Chapter 71 rights— which extend beyond collective bargaining—applied in the face of such an order.

[7] While the Supreme Court stayed the underlying preliminary injunction, the stay was based on the merits of the claim, not jurisdictional grounds.

The first *Thunder Basin* factor asks whether "meaningful judicial review" is available through the statutory scheme. *Id.* at 190-91. Here, Plaintiffs could not receive meaningful judicial review through the FLRA because—as of March 27—excluded agencies, and their employees, fall *outside* the FLRA's jurisdiction. Thus, none of the avenues that Defendants contend exist, Gov't Br. 16-17, are actually available to Plaintiffs. *See Nicholson*, 475 F.3d at 347.

Furthermore, even assuming Plaintiffs could access the FLRA, judicial review would "come too late to be meaningful." *Axon*, 598 U.S. at 191. In *Thunder Basin*, meaningful judicial review was available because the plaintiff was a mining company that all agreed could function as such while awaiting agency adjudication as to whether it violated the statute and merited a fine. Here, in contrast, the EO has caused excluded agencies to cease dealing altogether with Plaintiffs, not only threatening their continued existence and depriving their members of contractual benefits, like parental leave, whose value cannot be recouped, *see infra* Part IV, but also depriving Plaintiffs of their ability to function as labor organizations, whose very "purpose" is "dealing with an agency concerning grievances and conditions of employment." 5 U.S.C. § 7103(a)(4). The availability of appellate review is insufficient when the nature of the injury, plus time, precludes a meaningful remedy. *Axon*, 598 U.S. at 191; *see also AFGE v. Trump*, 2025 WL 1358477, at *14 (N.D. Cal. May 9, 2025), *stayed on other grounds* 145 S. Ct. 2635 (Mem).

The second and third factors—whether the claim is "wholly collateral to [the] statute's review provisions" and "outside the agency's expertise"—"reflect in related ways the point of special review provisions," *i.e.*, "to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Axon*, 598 U.S. at 186. The FLRA has never adjudicated cases against agencies excluded from the statute's coverage and therefore cannot apply any distinctive knowledge to collateral questions as to whether an exclusion satisfies the statutory standards or is the product of unconstitutional animus.[8] By statutory design, the FLRA's expertise lies in deciding whether covered entities violated the FLRA's substantive provisions, not the antecedent question whether the President has validly invoked § 7103(b).[9]

---

[8] Defendants cite an FLRA decision involving an allegation of retaliation to show its expertise in First Amendment claims, Gov't Br. 19, but this misunderstands *Thunder Basin*, which focuses on whether the administrative agency has *special* expertise over the issue raised. Clearly, the FLRA does not have specialized expertise superior to federal district courts in interpreting the First Amendment. *See Axon*, 598 U.S. at 194 ("The Commission knows a good deal about competition policy, but nothing special about the separation of powers.").

[9] Indeed, because the FLRA's practice, upon seeing that the respondent agency is excluded from coverage, is to summarily dismiss for lack of jurisdiction, *see supra* at 17, questions of this EO's validity will not become intertwined with questions the FLRA routinely adjudicates. That further distinguishes this case from *Elgin*, 567 U.S. at 23, where channeling was required because the agency, in adjudicating that dispute, would not dismiss the case at the outset but instead resolve all non-constitutional issues before it, potentially obviating the need for constitutional questions to be addressed. *See AFGE*, 139 F.4th at 1031.

### III. Plaintiffs Demonstrated that the EO Unconstitutionally Retaliates Against Them in Violation of the First Amendment

Retaliation against First Amendment activity "offends the Constitution" because it "threatens to inhibit exercise of the protected right." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998). Accordingly, the First Amendment "prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (cleaned up).

To establish a prima facie retaliation claim, a plaintiff must show: (1) it "engaged in a constitutionally protected activity"; (2) it was subject to actions that "would chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) that "the protected activity was a substantial or motivating factor in the defendant's conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) (quotation omitted). Once a plaintiff establishes these elements, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (quotation omitted). "To meet this burden, a defendant must show by a preponderance of the evidence that it *would* have reached the same decision; it is insufficient to show merely that it *could* have" done so. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).

Both those determinations—whether retaliatory animus was a substantial or motivating factor and whether the Government would have taken the same action—are "purely a question of fact." *Eng v. Cooley*, 552 F.3d 1062, 1071, 1072 (9th Cir. 2009). "The clearly erroneous standard applies to findings of fact even when the trial court relies…solely on a written record." *Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.*, 682 F.2d 858, 864 n.6 (9th Cir. 1982). "This standard is significantly deferential." *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002). A factual finding is only "clearly erroneous if it is implausible in light of the record, viewed in its entirety, or if the record contains no evidence to support it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (citations omitted).

Here, the District Court found that Plaintiffs sufficiently demonstrated that their protected activity was a "substantial motivating" factor for the EO, and that Defendants did not sufficiently "rebut this nexus." ER-22-23. Because Defendants have not shown that the District Court's factual analysis was clearly erroneous, this Court should affirm.

### A. The District Court's Finding that Plaintiffs Established a Prima Facie Claim Was Not Clearly Erroneous

Defendants do not dispute the first two elements of Plaintiffs' prima facie case. The record contains extensive evidence that Plaintiffs engaged in protected activity, including lawsuits challenging the President's executive actions, SER-194-205, ¶¶ 6-50; SER-250-52, ¶¶ 19-24, public criticism of the President, SER-211-14; SER-

239-41, ¶¶ 40-48, and grievances against his policies, SER-189-90, ¶ 8; SER-220, ¶ 12. As the District Court correctly concluded, Plaintiffs' "activities constitute speech that ranks 'high in the hierarchy of First Amendment values.'" ER-21 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018)). The record also contains myriad evidence of the chilling effect caused by the EO. ER-21-22.

Instead, Defendants rest their case on causation, advancing arguments that ignore both the District Court's factual findings and the applicable legal standards.

**1.** The record contains substantial evidence supporting the District Court's finding of a causal nexus between the EO and Plaintiffs' protected activity. Under well-established law, causation can be shown by evidence demonstrating at least *one* of the following: (1) temporal proximity "from which a jury logically could infer" retaliation; (2) the defendant had "expressed opposition to [plaintiff's] speech, either to him or to others;" or (3) defendant's "proffered explanations…were false and pre-textual." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (quotations omitted). Such evidence can be "direct or circumstantial." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 771 n.21 (9th Cir. 2006). Here, Plaintiffs adduced evidence of all three.

Most obviously, as the District Court found, the White House Fact Sheet by itself is "solid evidence of a tie between the exercise of First Amendment rights and a government sanction." ER-23. The Fact Sheet explains that the EO was issued in

25

response to "hostile Federal unions" who had "declared war on President Trump's agenda." ER-162-163. It quotes from an article published by AFGE detailing protected activities opposing President Trump's policies. *Id.*; SER-211-14. It expressly attacks the "VA's unions" for First Amendment activity: filing grievances challenging "Trump policies." ER-163. The Fact Sheet closes by explaining that bargaining rights are henceforth reliant on how supportive the union is of the President's agenda: "President Trump supports constructive partnerships with unions who work with him." *Id.*; *see also* SER-53-54 (quoting VA spokesperson linking bargaining rights to individual unions' grievance activity); *see also* ER-23 (finding that the Fact Sheet expressly "condemned unions who criticized the President and expressed support only for unions who toed the line").

Thus, the Fact Sheet is prime evidence that the Government "expressed opposition" to Plaintiffs' protected activity, and that the EO's national-security rationale was a pretext for targeting federal unions that were critical of the administration and its policies.[10]

---

[10] That the Fact Sheet also refers to national security—claiming, for example, that the VA has a "primary function" of national security because it "serves as the backstop healthcare provider for wounded troops in wartime," or that Treasury has such a function because it "collects the taxes that fund the government," ER-161-162—does not erase the expressions of animus contained therein. The mere assertion of a non-retaliatory explanation does not preclude a finding of retaliation. Plaintiffs must only prove that retaliatory intent was a substantial or motivating factor, not the sole driver, of the EO. The *Mt. Healthy* test is specifically designed to handle "dual motive" cases. *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 884-85 (9th Cir. 2003).

Second, Plaintiffs have demonstrated not only that the EO was issued in close proximity to union-led lawsuits challenging Trump policies, *see* SER-146-48, but that the administration was keenly aware of that fact. Just two weeks before the EO, a district court granted a preliminary injunction in a lawsuit brought by AFGE, AFSCME, and others, requiring reinstatement of thousands of fired probationary workers.[11] *See* SER-147. The lawsuit filed by the Government the same night as the EO cited to the same AFGE publication as the EO, alleging that it showed AFGE "will take steps to litigate" against the administration. ER-201.

Third, the EO itself is evidence that its purported justifications were pretextual. As the District Court recognized, the EO's exclusionary scope is orders-of-magnitude wider than any prior order, ER-23-24, sweeping in agencies with no discernible nexus to national security and calling into doubt the proffered explanation. In addition to its overbreadth, the entire structure of the EO is to draw lines based on protected activity. While Defendants claim that collective bargaining at Defendant Agencies is incompatible with national security, the EO carves out police officers, firefighters, and security guards working at the *very same agencies*. That is, unless those employees work at the Bureau of Prisons, who are exclusively

---

[11] In February 2025, then-administration official Elon Musk reposted a post on X attacking organizations suing over Trump administration policies. That post accused Plaintiffs AFGE, AFSCME, and NFFE of participating in a "coordinated hit job" against the President. ER-205-06 ("Almost every single lawsuit that has been filed against the second Trump administration has come from this group.").

represented by Plaintiff AFGE—*those* law enforcement employees lost their rights. SER-256-57, ¶¶ 4-5.

Finally, the EO has been implemented to further target unions based on their protected activity. The VA Secretary restored bargaining rights on a *union-by-union* basis,[12] with a VA spokesperson explaining that certain unions were reinstated because they had filed "no or few grievances," unlike Plaintiffs "AFGE, NAGE, NNU and SEIU."[13] As a result, members of unions who have spoken out have been stripped of labor protections, while members of other unions, at the same hospitals serving the same patients, retained their rights. The VA continues to target unions based on First Amendment activity: after this Court stayed the preliminary injunction pending appeal, the VA terminated the CBAs held by Plaintiffs AFGE, NAGE, NFFE, NNOC/NNU, and SEIU. Dkt. 36.2, Attach. 1-3. Its accompanying press release did not reference national security but rather cited the unions' lobbying and litigation activity against Trump-supported policies. *Id.* Attach. 2.

The EO's strange mixture of over- and under-inclusiveness is hard to square with a non-retaliatory motive, but easy to see how it reflects the exact animus

---

[12] Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025).

[13] Erich Wagner, *VA is selectively enforcing Trump's order stripping workers of union rights*, Gov't Exec. (Apr. 18, 2025), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/.

articulated in the contemporaneous Fact Sheet. *See, e.g., Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755, 744 (2018) ("[U]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."). In short, the District Court did not commit clear error in finding Plaintiffs established a prima facie case of retaliation.

**2.** Defendants' argument that it was improper for the District Court to consider "extrinsic and circumstantial evidence" when analyzing the causal connection between Plaintiffs' protected activity and the EO, Gov't Br. 30, is also flawed. For starters, characterizing the official Fact Sheet that provided a contemporaneous explanation of the reasoning behind *this* EO as "extrinsic evidence" stretches the term to its breaking point.[14] Regardless, there is no question that plaintiffs can prove retaliatory motive with extrinsic evidence. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) ("A plaintiff may establish motive using direct or circumstantial evidence."). If plaintiffs were unable to use such evidence, with fact-finders instead required to accept as true a defendant's explanation for the

---

[14] Defendants acknowledge that the White House publishes Fact Sheets to "inform the public about the President's agenda" before asserting without relevant citation or evidence that they are published "often without his direct review." Gov't Br. 30. The Fact Sheet states that it issued from the White House and is posted on the White House's official government website. Defendants further acknowledged at oral argument before the District Court that the Fact Sheet contains the "President's claim[s]" about the EO. SER-16-17 at 9:15-10:7.

challenged action, it would be nigh impossible to establish even a prima facie case of retaliation. Such a rule would upend settled First Amendment law. *See, e.g.*, *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1099, 1106 (9th Cir. 2011) ("emails in the record" support causation prong, even when termination letter referred to concerns about "performance"); *Coszalter*, 320 F.3d at 972 (temporal proximity and evidence of pretext supports causation, though defendant claimed plaintiff was fired for violating a cell phone policy).

Unsurprisingly, Defendants cite no retaliation case where plaintiffs were forced to rely on their antagonists' preferred explanation for the challenged action. There would be little First Amendment protection left if the White House could take retaliatory action and expressly acknowledge it did so based on protected speech, warning others to fall in line or suffer the same fate, so long as those threats are in a separate document.

## B. Defendants Failed to Satisfy Their Evidentiary Burden That the President *Would* Have Issued the Same Executive Order Targeting Plaintiffs Even Absent Their First Amendment Activity

Defendants alternatively argue that Plaintiffs cannot succeed on their First Amendment claim because they have established their *Mt. Healthy* affirmative defense. Defendants claim a "constitutionally permissible motive" exists for the EO, Gov't Br. 36, but this fundamentally misunderstands their burden of proof. Defendants' burden is to show that the President *would* have, not *could* have, taken

30

the same action absent protected speech. Contrary to the panel's initial decision, the evidence Defendants rely on—the EO and Fact Sheet—fails to meet this burden and instead supports the opposite conclusion.

**1.** Defendants begin their argument with a clear misstatement of law, asserting that First Amendment retaliation only occurs when the unconstitutional motive "[i]s [t]he [s]ole [c]ause" of an action. Gov't Br. 23; *see also id.* at 3 (describing issue as whether Plaintiffs would succeed in showing the EO "was based solely on unconstitutional motivations"). This is plainly false. Plaintiffs need not show that retaliation was the *sole* motivation for the EO, but rather that it was a "substantial" or "motivating" factor. *Mt. Healthy*, 429 U.S. at 287. Defendants then bear the burden to prove that retaliation was not a "but-for cause" of the EO. As the Supreme Court recognized, events can have "multiple but-for causes," and Defendants cannot disprove but-for causation "just by citing some *other* factor that contributed to [the] challenged" action. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

Indeed, Defendants have the legal standard backwards. Defendants must prove the President "would have taken the adverse action if the proper reason *alone* had existed." *Eng*, 552 F.3d at 1072 (emphasis added). As the *Mt. Healthy* Court explained, the "constitutional principle" is "sufficiently vindicated if [plaintiff] is placed in no worse a position than if he had not engaged in the [First Amendment] conduct." 429 U.S. at 285-86. Thus, if the evidence establishes that the defendant

"would have reached the *same* decision…even in the absence of the protected conduct," then the defendant can defeat a retaliation claim. *Id.* at 287 (emphasis added); *see also O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). But if the evidence shows that the plaintiff is *worse* off because it engaged in protected speech, then the Government cannot satisfy its burden. *Mt. Healthy*, 429 U.S. at 285. Furthermore, the "Government must show more than that they *could* have punished the plaintiffs in the absence of the protected speech; instead, the burden is on the defendants to show through evidence that they *would* have" done so. *Bello-Reyes*, 985 F.3d at 702 (quotations omitted). As noted above, this inquiry is "a question of fact." *Eng*, 552 F. 3d at 1072.

Thus, Defendants must prove—as a matter of fact—that even if Plaintiffs had never expressed public opposition to the President's agenda, or filed lawsuits and grievances challenging his policies, the President would still have issued the same EO targeting Plaintiffs. Defendants fail to do so.

**2.** Defendants submitted no evidence during the preliminary injunction proceedings, and their brief made only a cursory reference to *Mt. Healthy*, without recognizing the evidentiary burden they must carry, let alone attempting to meet it. SER-129. Instead, Defendants buried the point within a paragraph discussing whether *Plaintiffs* had met their burden on causation, *id.*, which confused and misstated the law. *See, e.g., Ostad*, 327 F.3d at 885 ("defendants bear the burden of

establishing their affirmative defense" under *Mt. Healthy* and "it would be improper to require that a plaintiff surmount it as part of the 'substantial or motivating' factor analysis"). Under these circumstances, Defendants can hardly fault the District Court for quickly dispensing with the issue and finding Defendants had not rebutted Plaintiffs' prima facie case. ER-23-25.

The District Court relied on both the sweeping overbreadth of the EO and the statements of animus in the Fact Sheet in concluding that "[t]he invocation of the national security exception in Section 7103(b)(1) does not necessarily rebut this nexus, as the government would have it," between "the exercise of First Amendment rights and a government sanction." ER-23-24. As the District Court correctly held, pointing to a potential non-retaliatory justification is not sufficient because "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." ER-24 (quoting *Ariz. Students' Ass'n*, 824 F.3d at 869). Nor, as the District Court pointed out, could a "presumption of regularity" overcome actual evidence of irregularity. ER-24-25; *see infra* at 47-48.

Defendants fail to demonstrate clear error in the District Court's finding. Defendants have proffered no evidence that the President *would* have taken the same action absent Plaintiffs' protected activity, instead pointing only to the text of the EO and the Fact Sheet, which they argue articulate a "constitutionally permissible

motive" that is "legitimate and consistent with the statute." Gov't Br. 36. But even assuming that were true, it is *insufficient* to satisfy the *Mt. Healthy* test. This Court has "made it clear that there is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action." *O'Brien*, 818 F.3d at 936; *see also Boquist*, 32 F.4th at 785 (government barred from retaliating against political expression "even when that action could be taken lawfully in the absence of such improper motivation"); *Ariz. Students' Ass'n*, 824 F.3d at 869.[15]

By pointing only to alleged "legitimate considerations" that "*could* be understood" to be the rationale for the Executive Order, Gov't Br. 28, 31 (emphasis added), Defendants' submission falls demonstrably short of satisfying their burden under *Mt. Healthy*. *See e.g.*, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 (Defendants "merely established that they *could* have suspended the permits. This court has clearly stated that this is insufficient…"); *Allen v. Scribner* 812 F.2d 426, 435 (9th Cir. 1987) ("That [plaintiff's] insubordinate conduct might have justified an adverse employment decision, including a transfer, does not suffice."); *Gillette v. Delmore*, 886 F.2d 1194, 1198 (9th Cir. 1989) (even though "two other charges were serious enough to warrant termination," defendant "must show that it *would* have

---

[15] *Mt. Healthy* itself is clear on this point. While the Court acknowledged that "[c]learly the Board legally could have dismissed respondent had the radio station incident never come to its attention," that was not sufficient to establish that the Board *would* have taken that action absent the plaintiff's protected speech. 429 U.S. at 285.

terminated him, not that it *could* have"). The District Court's conclusion was not clearly erroneous and should be affirmed.

**3.** In granting the emergency stay, the panel stated that the EO and Fact Sheet "fairly indicate that the President would have issued the Order, regardless of Plaintiffs' speech, based on the perceived impact of *union activities and collective bargaining* on the sound operation of agencies and subdivisions with national security-related missions." Stay Op. 16 (emphasis added). These documents, however, both demonstrate that "union activities and collective bargaining" at agencies with "national security-related missions" would *not* alone result in elimination of bargaining rights at those agencies.

As shown by the text of the EO itself, the President did not eliminate all "union activities and collective bargaining" at the excluded agencies. Rather, on the face of the EO, certain classes of employees—police, fire, and security guards—working at those same agencies retain the right to engage in the same "union activities" that purportedly drove the EO's elimination of Plaintiffs' rights. As a result, under the EO, the very same "national security" agencies at which "union activities and collective bargaining" purportedly impede the operation of the agency, must still collectively bargain, respond to grievances, and abide by contractual obligations relating to discipline and termination. This exemption shows that "union activities and collective bargaining" at these *agencies* does not result in exclusion under

§ 7103(b), but rather that only certain *unions* are deemed to impede agency operations. To further underline this point, the EO expressly carves out from the law enforcement exemption employees at the Bureau of Prisons, where AFGE represents all bargaining unit employees. *See supra* at 27-28.

While the text of the EO casts serious doubt on Defendants' ability to establish their *Mt. Healthy* defense, the Fact Sheet affirmatively refutes it. The Fact Sheet acknowledges that the President *would* permit union activities and collective bargaining at the excluded agencies—*i.e.*, at those agencies deemed to have a "primary function" of national security and at which Chapter 71 purportedly cannot be applied consistent with national security, 5 U.S.C. § 7103(b)—so long as the *unions* representing employees at those agencies are aligned with the President's agenda. *See* ER-163 ("President Trump supports constructive partnerships with unions who work with him."). This is further shown by the Fact Sheet's explicit references to Plaintiffs' First Amendment activity and the characterization of unions who engage in such activities as "hostile" to the President's agenda. *See supra* at 6-7. Thus, far from establishing that the President would have issued the same EO targeting Plaintiffs even absent their protected activity, the Fact Sheet expressly conveys the opposite message: unions who are supportive of the President's agenda will be spared. The Fact Sheet therefore provides strong evidence that Plaintiffs *are*

in a worse position because they engaged in First Amendment activity opposing the President's policies. *See Mt. Healthy*, 429 U.S. at 285-86.

This is starkly illustrated by the operation of the EO at the VA, where the Secretary used his delegated authority from the EO to reinstate collective bargaining rights *by union*. *See supra* at 28. Notably, although the order reiterated that the VA had a "primary function" of national security and that Chapter 71 "cannot be applied to its operations consistent with national security requirements and considerations," 90 Fed. Reg. 16427, the unions identified by the Secretary retain their bargaining rights. A VA spokesperson confirmed that a union's First Amendment activity was the deciding factor. *See supra* at 28. Moreover, shortly after the panel's stay decision, the VA terminated their CBAs with certain unions effective immediately, citing their First Amendment activities as justification. *See supra* at 28. Thus, under this EO, employees lost rights based on their unions' speech and petitioning while other employees working *side-by-side at the very same agency* maintained theirs. *See* SER-79-82, ¶¶ 4-23; SER-85-88, ¶¶ 4-23; SER-93-96, ¶¶ 4-18.

The evidence therefore shows that the mere existence of a union exercising its statutory collective bargaining rights would not necessarily result in exclusion under § 7103(b). Rather, only the activities of certain unions create the alleged impact on the "sound operation of agencies and subdivisions with national security-related missions." Stay Op. 16. The Fact Sheet makes clear those unions are the ones who

are deemed "hostile" to the President's agenda. *See supra* at 6-7. The evidence therefore not only fails to establish that Plaintiffs would not have been targeted by the EO absent their First Amendment activity, it affirmatively demonstrates the opposite.[16]

### C. Defendants' Various Attempts to Substantively Alter and Narrow the Retaliation Standard are Contrary to Law and Would Severely Weaken First Amendment Protections

Unable to produce factual evidence to satisfy their burden, Defendants invoke various legal doctrines in an attempt to alleviate that burden and render the courts unable to address First Amendment retaliation claims. None of Defendants' arguments have merit. They are borrowed from inapplicable legal settings, conflict with long-standing Circuit precedent governing First Amendment retaliation claims, and would narrow First Amendment protections in this context to the point of non-existence.

---

[16] Given that the only evidence Defendants cite for their *Mt. Healthy* defense is inconsistent with the proposition that the President *would* have issued the same EO absent Plaintiffs' protected activity, this Court should affirm the preliminary injunction even if it were to conclude that the District Court did not fully complete the *Mt. Healthy* analysis. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1021 (9th Cir. 2013) (PI may be affirmed "on any ground supported by the record"). At most, a remand would be appropriate to complete the analysis. The record certainly is not sufficient to establish that the *only* plausible reading of the EO and Fact Sheet is that the same EO would have been issued absent Plaintiffs' protected activity. Indeed, Defendants' acknowledgement that a union's "First Amendment-protected activity" factored into the President's determinations, Gov't Br. 31, itself raises a serious First Amendment question.

38

### 1. The President's Statutory Authority Cannot Constitutionally Encompass the Power to Eliminate Collective Bargaining Rights Based on First Amendment Activity

Congress authorized the President to exclude an agency from the provisions of Chapter 71 only when two statutory criteria are met: the agency has a "primary function" of national security and applying Chapter 71 would not be "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). This statutory exception focuses on the nature of the *agency* and does not authorize elimination of rights by *union*. Defendants nevertheless assert that not only does the provision grant the President discretionary authority to eliminate bargaining rights for only some unions at an agency, they also advance the extraordinary proposition that he may do so based on "First Amendment-protected activity by the unions." Gov't Br. 31. In other words, according to Defendants, the President could determine that a union's activity is inconsistent "with national security requirements and considerations" under § 7103(b) because that union engaged in protected activity opposing the President's policies, whether by filing grievances under Ch. 71 or as private citizens through lawsuits, lobbying, and public speech. Defendants' proposed reading of the statute should be rejected as an affront to the First Amendment.[17]

---

[17] Defendants argue that "[i]n many contexts" protected speech is a "'wholly legitimate consideration' underlying official action." Gov't Br. 23 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019)). But the "contexts" in which the Supreme Court has found this appropriate are retaliatory arrest and retaliatory prosecution cases, *see Nieves*, 587 U.S. at 401; *Hartman v. Moore*, 547 U.S. 250 (2006), which are

The First Amendment reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). That commitment has little meaning if the President can re-define "national security" as "allegiance to the President," and take punitive action against citizens because they failed to demonstrate fealty. *See, e.g.*, *United States v. Robel*, 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties…which makes the defense of the Nation worthwhile.").

Plaintiffs' speech and petitioning activities opposing the President's agenda, both as private citizens as well as in their role as collective bargaining representatives, involve core First Amendment expression entitled to the highest protection. *See Lozman*, 585 U.S. at 101 (Plaintiff's "lawsuit against the City and his criticisms of public officials…is high in the hierarchy of First Amendment values."); *Janus v. AFSCME Council 31*, 585 U.S. 878, 914 (2018) (public sector union's "speech in the handling of grievances may be of substantial public importance and may be directed at the 'public square'"). Indeed, the Supreme Court has "squarely

---

evaluated under a different causation standard than "ordinary retaliation claims" and require the plaintiff to prove lack of probable cause. *Hartman*, 547 U.S. at 259; *see also Lozman v. City of Riviera Beach*, 585 U.S. 87, 99 (2018) (declining to apply *Hartman* where plaintiff alleged retaliation under a city policy).

rejected th[e] argument" that a public sector union's "speech in collective bargaining…is basically a matter of only private interest." *Janus*, 585 U.S. at 910 (quotations omitted). Such speech can address "important matters," including "sensitive political topics" that are "undoubtedly matters of profound value and concern to the public," and "occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Id.* 912-14.

Against this backdrop, this Court should reject Defendants' brazen assertion that Plaintiffs' lawsuits, grievances, and positions taken in collective bargaining are permissible grounds to strip rights from labor unions and their members. However broad the President's § 7103(b) authority is alleged to be, it could never include the power to punish unions because they engaged in First Amendment-protected activity critical of his agenda. *See W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). To hold otherwise is antithetical to not only the First Amendment, but also what "the First Amendment was intended to protect, a democratic

system…indispensably dependent on the unfettered judgment of each citizen on matters of political concern." *Elrod v. Burns*, 427 US 347, 372 (1976).[18]

### 2. The Deferential Standard of Review from *Trump v. Hawaii* is Not Applicable to Plaintiffs' Retaliation Claim

Before this Court, Defendants argued for the first time that the Court should look to *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Kleindeinst v. Mandel*, 408 U.S. 753 (1972), for the governing standard to evaluate Plaintiffs' First Amendment claim.[19] According to Defendants, judicial review of a Presidential decision in this circumstance is "highly constrained" such that a court need only determine whether there is a "facially legitimate and bona fide reason" supporting the action and cannot "look behind" that stated rationale. Gov't Br. 26-27.[20]

---

[18] This EO is only one action taken by the President targeting private institutions in retaliation for protected speech or petitioning, and the District Court's preliminary injunction aligns with numerous courts who have held such actions incompatible with the First Amendment. *See, e.g.*, *Jenner & Block LLP v. DOJ*, __ F.Supp.3d __, 2025 WL 1482021 (D.D.C. May 23, 2025); *Perkins Coie LLP v. DOJ*, __ F.Supp.3d __, 2025 WL 1276857 (D.D.C. May 2, 2025); *President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Security*, __ F.Supp.3d __, 2025 WL 1737493 (D. Mass. June 23, 2025); *Am. Bar Ass'n v. DOJ*, __ F.Supp.3d __, 2025 WL 1388891 (D.D.C. May 14, 2025).

[19] When opposing the preliminary injunction, Defendants argued that the EO was entitled to deference based on the "presumption of regularity." SER-128-29. The District Court correctly rejected that argument, as we explain in Part III.C.3 *infra*.

[20] Defendants again cite *Webster v. Doe*, 486 U.S. 592 (1988), to support their argument that the President's action is shielded from constitutional scrutiny because he invoked a national security rationale, but that case held the opposite. Even where a statute delegated complete discretion to act "in the interest of national security,"

Both *Mandel* and *Hawaii* involved executive action denying entry into the country to foreign nationals, and the Court determined deferential review over such decisions was appropriate in light of the President's authority over immigration matters. *See Mandel*, 408 U.S. at 769-70; *Hawaii*, 585 U.S. at 702-03; *see also Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995) ("The *Kleindienst* [*v. Mandel*] analysis expressly rests upon the Attorney General's discretionary power to determine who may enter the country from abroad…"). Neither this Court nor the Supreme Court has held that this deferential standard applies to executive action outside that narrow context. *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1056 (foreign policy powers do not permit "subject[ing] aliens *who reside here* to a fundamentally different First Amendment associational right") (emphasis added); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (applying heightened scrutiny to national security law burdening speech of U.S. organizations); *Twitter, Inc. v. Garland*, 61 F.4th 686, 696 (9th Cir. 2023) (applying strict scrutiny to First Amendment claim in national security context).

In particular, Defendants cite no case where the deferential standard from *Mandel* or the rational basis test applied in *Hawaii* was used to limit judicial review

---

the Supreme Court held that such decisions were still subject to review for "constitutional claims." *Id.* at 603-04.

of a First Amendment retaliation claim. This is for good reason—doing so would conflict not only with long-standing Circuit precedent, but with the very concept of a retaliation claim. Under the *Hawaii*/*Mandel* test, the Government satisfies its burden so long as there is a legitimate motive that *could* plausibly justify the action taken. *See Hawaii*, 585 U.S. at 705 (policy permissible if "it *can* reasonably be understood to result from a justification independent of unconstitutional grounds") (emphasis added); *Mandel*, 408 U.S. at 770 (government need only proffer a "facially legitimate and bona fide reason" for denying entry visa). But as discussed above, this Court has repeatedly held that such a showing is *insufficient* to defeat a retaliation claim. *See supra* at 31-32.[21]

For that same reason, importing the *Hawaii* Court's reluctance to look beyond the order's text would also run counter to established precedent governing First Amendment retaliation claims.[22] Even assuming that the EO in this case is facially neutral, a framework permitting the President to issue an executive order with a stated legitimate rationale while simultaneously issuing an *official statement*

---

[21] First Amendment retaliation claims "are reviewed with heightened scrutiny," which makes them "much more likely to be the basis of a successful constitutional claim than are those subject to rational basis review." *Stilwell v. City of Williams*, 831 F.3d 1234, 1249 (9th Cir. 2016).

[22] Although expressing reluctance, the *Hawaii* Court went on to do just that, finding support in the record for its conclusion that the proclamation was enacted for non-discriminatory reasons, and referencing multiple times the "worldwide, multi-agency review" supporting the President's decision. 585 U.S. at 676-79, 684, 707.

explaining that he acted to target organizations critical of his agenda, and threatening to do the same to others, would effectively immunize the President from First Amendment retaliation claims. It would also upend First Amendment retaliation jurisprudence. This Court has made clear that retaliation can be established by "direct or circumstantial" evidence, including evidence of express opposition to speech, *see supra* at 25, which necessarily involves looking behind the face of the order. The Fact Sheet is a prime example of the type of evidence that this Court has specifically endorsed.

Defendants' remaining arguments in support of deferential review similarly falter. Defendants contend that courts must defer to the President's "factual judgments" on national security, Gov't Br. 25, but even if reciting the statutory criteria in § 7103(b) is the type of "factual judgment" deserving deference, Defendants' argument misses the point. As noted above, even assuming that each listed agency could have been properly excluded under the statute, it is still *unlawful* for the President to take such action for retaliatory reasons. *See supra* at 31-32.[23]

Even further afield is Defendants' argument that courts may not demand "hard proof" or detailed evidence of the President's rationale and must defer to his decision

---

[23] A purported determination that the statutory criteria was met as to each excluded agency is not sufficient to demonstrate that the President *would* have issued the same Executive Order targeting the same unions absent protected activity. *See supra* Part III.B.

45

"even if the government does not 'conclusively link all the pieces in the puzzle.'" Gov't Br. 25-26 (quoting *Holder*, 561 U.S. at 34-35). No such question is presented here. The issue before the Court is not whether Defendants should be ordered to produce "hard proof" or "written findings" explaining the EO, but whether the written explanation the President has *already* provided demonstrates retaliatory animus. In other words, Plaintiffs are not arguing that the President failed to explain himself, but rather that the explanation he provided demonstrates the causal link between the EO and his unconstitutional motive.

There is no precedential, constitutional, or logical reason to exclude the President from the normal constraints of First Amendment retaliation law. If anything, there is good reason for courts to be *more* protective of First Amendment interests when the nation's highest official engages in retaliation. *See Vullo*, 602 U.S. at 191 (The "power that a government official wields" is relevant to "whether a reasonable person would perceive the official's communication as coercive."). The District Court correctly found that the Fact Sheet demonstrated "a tie between the exercise of First Amendment rights and a government sanction." ER-23. It is not an intrusion on the President for a court to decline to turn a blind eye to express evidence of retaliatory motive that the President volunteered. As the Supreme Court explained, "[o]ur review is deferential, but we are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752,

785 (2019) (quotation omitted); *see also Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017) (Even when "national security and foreign affairs" are involved, "a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis.").

### 3. The EO is Not Entitled to a "Presumption of Regularity"

Defendants' final attempt to deviate from the governing First Amendment retaliation standard is their argument that the EO was entitled to a "strong presumption of regularity," and therefore the District Court should have assumed its substantive legitimacy. Gov't Br. 28-29. That argument fails to withstand scrutiny.

Defendants cite no case in which a court has deferred to the proffered rationale of the Government in a First Amendment retaliation claim based on a "presumption of regularity." The primary case they rely on, *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989), did not involve any constitutional claims. For the same reasons discussed above, Defendants' contention that the Court must apply a "presumption of regularity" and "accept the President's § 7103(b)(1) determinations at face value," Gov't Br. 28, is contrary to Circuit law that Plaintiffs have the right "to be free from retaliation even if a non-retaliatory justification exists." *O'Brien*, 818 F.3d at 936.

Moreover, Defendants' argument fails on its own terms. As recognized in the very cases Defendants cite, the "presumption of regularity" is rebutted where the

plaintiff presents "clear, affirmative evidence" that a government official failed to properly discharge their duty. *Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1060 (9th Cir. 2021); *see also Reagan*, 870 F.2d at 728 (showing of "actual irregularity in the President's factfinding process or activity" rebuts presumption). A plaintiff can meet this burden by pointing to "some evidence" supporting the essential elements of the underlying claim. *United States v. Armstrong*, 517 U.S. 456, 470 (1996). Whether the presumption has been rebutted is an "essentially factual" determination reviewed for clear error. *Guerrero*, 11 F.4th at 1055, 1059.

Here, the District Court did not commit clear error when it found that the presumption of regularity was likely rebutted. ER-24-25. As the District Court observed, the Fact Sheet forthrightly states that the President excluded certain unions from collective bargaining based—at least in part—on their protected speech. Defendants themselves admit as much. Gov't Br. 31. Even standing alone, that is "clear, affirmative evidence" of an improper motive, *Guerrero*, 11 F.4th at 1060, demonstrating that the President was either "indifferent to the purposes and requirements" of the statute or "acted deliberately in contravention of them." *NTEU*, 780 F.Supp.3d at 253 (*quoting Reagan*, 870 F.2d at 728); *see also Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 723 (9th Cir. 2024) (presumption rebutted by extrinsic statements from dissenting legislators), *rev'd on other grounds* 2025 WL 2167401 (9th Cir. July 31, 2025) (en banc). Thus, Defendants' argument

fails at the most basic level: a "presumption" cannot overcome actual evidence to the contrary.

## IV. Plaintiffs Demonstrated Irreparable Harm

The District Court did not abuse its discretion in finding that Plaintiffs were likely to suffer multiple types of irreparable harm from the EO that justified granting preliminary relief. Its factual findings that Plaintiffs lost collective bargaining rights, that their members lost numerous non-economic benefits, that Plaintiffs face weakened support from their members, and that Plaintiffs face a threat of being driven out of business are each supported by record evidence, and such harms have been recognized by this Court as irreparable. ER-25-28. "Because the district court's finding of irreparable harm…is supported by facts in the record, it does not constitute an abuse of discretion." *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) (quotation omitted).

**A.** The District Court correctly found that Plaintiffs and their members were irreparably harmed by the elimination of collective bargaining rights and other benefits of union representation. ER-25-28. The record is replete with evidence demonstrating that Plaintiffs were unable to exercise their statutory and contractual rights as labor unions in the aftermath of the EO. Official guidance from OPM instructed agencies not to recognize and negotiate with unions, comply with CBAs, process grievances, transmit member dues, allow union representatives at

disciplinary meetings, or provide official time to union representatives. ER-125-31. Plaintiffs put forward evidence that agencies were complying with those instructions, stripping Plaintiffs and their members of their rights. SER-75, ¶ 8; ER-117, 119, ¶¶ 11-13, 22-24; *see also, e.g.*, SER-6-7, ¶¶ 6-10; SER-90, ¶ 6; SER-221, ¶ 14; SER-258-59, ¶ 10.

Defendants did not dispute this evidence at the preliminary injunction stage. Moreover, the declarations they subsequently produced only confirm that Plaintiffs lost critical rights due to the EO. Their summary exhibit contains row after row of agencies admitting that they stopped allotting dues, granting official time, and/or processing grievances—all of which are binding CBA provisions. ER-33-36. And Defendants' declarations confirm their refusal to negotiate with unions, respond to information requests, comply with CBAs, bargain over changes to conditions of employment, or include union representatives in disciplinary meetings. ER-38-39, ¶ 5(b); ER-49, ¶ 5(d); ER-75 ¶ 6(c)-(d); ER-85, ¶¶ 6(e)-(f), 7.

Defendants insist that these harms are "speculative." Gov't Br. 37-39. But that assertion is contradicted by the record, given that these harms had already begun at the time the injunction was issued. The District Court correctly rejected Defendants' claim that the harms were "too speculative" because the "record…demonstrates otherwise." ER-28.

Defendants' argument is based on the premise that no Plaintiff can be harmed until a CBA is formally "terminate[d]." Gov't Br. 37-38. Their insistence that agencies were merely ignoring CBAs instead of officially "terminating" them, however, is a distinction without a difference: the record shows that Plaintiffs and their members could not exercise contractual rights, regardless of how the agencies described the status of the CBA. Regardless, the façade has now been lifted: just days after this Court stayed the preliminary injunction, the official guidance advising agencies "not to terminate collective-bargaining agreements" on which the Defendants relied on in their stay motion, Stay Mot. 22, and opening brief, Gov't Br. 38, was conveniently changed, and Defendants have begun formally terminating CBAs covering hundreds-of-thousands of employees. Dkt. 34.1, 36.1. [24]

Furthermore, the District Court correctly applied this Court's precedent in finding these harms irreparable. This Court recognized in *Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011), that the refusal to bargain with a union "will likely cause a myriad of irreparable harms," as occurred here. The record is clear that Plaintiffs' members have lost substantial rights, and "[t]he value

---

[24] While Defendants rely on *NTEU v. Trump*, 2025 WL 1441563 (D.C. Cir. May 16, 2025) to support their contention that all harms were speculative, that panel decision was based on a factual premise contrary to the record here. The *NTEU* panel found that the union was not suffering irreparable harm because the Government had already "voluntarily imposed" limits such that the EO was "already-paused." *Id.* at *1 n.2. This record contains ample evidence that EO implementation was not "paused" as to Plaintiffs and their members.

of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Id.* at 1192. *Small* also makes clear that "a delay in bargaining weakens support for the union," and that the "deprivation to employees from the delay in bargaining and the diminution of support is immeasurable" and not remediable at litigation's end. *Id.* The District Court did not abuse its discretion in finding that such harms were present here and irreparable.

While Defendants point to the possibility of reinstating CBAs at the end of this litigation, Gov't Br. 38, such an order cannot remedy the loss of "benefits that good-faith collective bargaining…might otherwise have secured for them in the present." *Small*, 661 F.3d at 1192 (quotations omitted). Reinstating a CBA at the end of the litigation will do little for those who lacked rights in the breach, especially in light of Defendants' own declarations detailing their plans for restructuring agencies and terminating employees. *See, e.g.*, ER-38-39, ¶ 5(b) (RIF and reassignment of employees); *see also* SER-89-91 (RIF-in-progress); SER-67-72 (harms to VA employees). These harms are already occurring after the stay order: no CBA reinstatement can restore to VA employees the weeks to bond with their newborn children that Defendants have now stripped away. *See supra* n.5.

Defendants do not grapple with *Small*, instead turning to out-of-circuit cases that are inconsistent with this Court's precedent and factually distinguishable from the sweeping loss of rights at issue. Gov't Br. 39. Whether a preliminary injunction

is warranted by the layoff of a single worker in violation of a CBA, *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 702 (7th Cir. 2005), or bad-faith surface bargaining, *Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 435-36 (4th Cir. 2018), sheds little light on the harms resulting from the complete elimination of labor rights for hundreds-of-thousands of employees.

**B.** Nor did the District Court commit clear error in finding that Plaintiffs had demonstrated a "threat of being driven out of business" that established irreparable harm. ER-25. Record evidence showed that Plaintiffs faced catastrophic reductions in their revenue due to the EO. ER-119-20, ¶¶ 23-24; SER-76, ¶ 12. As a result, the largest federal union, Plaintiff AFGE, was forced to authorize massive layoffs. As detailed in the affidavit of AFGE's president, the magnitude of these losses hamstring the union's ability to maintain services for its members and will result in irreversible damage to the union. ER-120-23, ¶ 29-35. Even if lost revenue is later restored, that would not remedy the harm caused by the loss of institutional knowledge, the loss of personnel in key positions, the impact on services in the interim, or the damage to goodwill among its membership who experienced reduced services. Defendants have failed to show that the District Court clearly erred in finding that these harms likely present an existential threat for Plaintiffs, which cannot be remedied after-the-fact. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th

1180, 1188 (9th Cir. 2022) ("threat of 'extinction'" shows irreparable harm); *E. Bay Sanctuary Covenant*, 993 F.3d at 677 ("[S]ignificant change in…programs and a concomitant loss of funding…constitute irreparable injuries."). As the Supreme Court has recognized, government impediments to payments with "no guarantee of eventual recovery" risks irreparable harm. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam).

Defendants' argument that these harms can be fully redressed by Plaintiffs' efforts to switch members to direct dues payments overlooks the primary reason that people join a union and pay voluntary dues: to support the exclusive representative who bargains on their behalf. *See, e.g.*, ER-119-20, ¶¶ 24, 27-28, This Court has recognized this crucial factor for union membership, explaining that "[w]hether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain its members." *Small*, 611 F.3d at 1193. As Defendants would have it, they have merely eliminated one pathway to facilitate the payment of dues. But the record shows instead that they have struck at the heart of the very reason employees join a union. The District Court was thus correct to find that Plaintiffs are likely to suffer irreparable harm.

**C.** Finally, the First Amendment harms faced by Plaintiffs and their members due to the EO provides further support that the injunction is warranted. When analyzing the merits of Plaintiffs' First Amendment claim, the District Court found

that Plaintiffs had put forward "persuasive evidence of the chilling effect of the government's challenged conduct" on their speech rights. ER-21-22; *see* SER-54 (collecting evidence of chilling effect on Plaintiffs and their members). As this Court has recognized, "[i]rreparable harm is relatively easy to establish in a First Amendment case," only requiring showing "the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022). Plaintiffs' and their members' "loss of First Amendment freedoms…unquestionably constitutes irreparable injury." *Id.* at 477 (quoting *Elrod*, 427 U.S. at 373).

## V.    The Balance of Harms and Public Interest Weigh Strongly In Favor of Injunctive Relief

The District Court correctly found that the "balance of hardships tips sharply in [Plaintiffs'] favor, and that an injunction would be in the public interest." ER-6. As described in Part IV *supra*, there is extensive record evidence showing the harms that Plaintiffs and their members face from the elimination of their labor rights. Defendants, in contrast, produced no evidence at the preliminary injunction stage. Instead, they claimed without elaboration that the injunction would harm national security. The District Court was correct to find that Defendants' arguments were "purely conclusory and unsupported by any evidence" and that Defendants failed to articulate "a good reason to conclude" that collective bargaining would not serve the public interest. ER-29.

Defendants now turn to *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581-82 (2017) (per curiam) to note that "[t]he interest in preserving national security is an urgent objective of the highest order," claiming that temporarily pausing the Executive Order "would appreciably injure [the Nation's] interests." But *IRAP* does not hold that once national security is invoked, the equities automatically favor the Government. *Cf. Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 26 (2008) ("[M]ilitary interests do not always trump other considerations, and we have not held that they do."). There, the Government sought to stay preliminary injunctions enjoining the enforcement of an executive order which, inter alia, barred entry to certain foreign nationals on purportedly national security grounds. *IRAP*, 582 U.S. at 573-74. The Court allowed the preliminary injunction to *remain in place* as applied to foreign nationals with connections to people and entities within the United States, noting that the courts below had identified "concrete burdens" faced by plaintiffs in those instances. *Id.* at 580-81. The Court only stayed the injunction as it applied to those with "no connection to the United States at all" because there, preventing the Government from enforcing the EO "would appreciably injure its interests, *without alleviating obvious hardship to anyone else.*" *Id.* at 581-82

(emphasis added). As the District Court found, here there are clear hardships faced by Plaintiffs that would be alleviated by the preliminary injunction.[25]

Likewise, this Court has recently recognized that one can "acknowledge the harms involved in denying the duly elected branches the policies of their choice" while still concluding the equities favor those challenging government action and support preliminary relief. *See Immigrant Defs. L. Ctr. v. Noem*, 2025 WL 2017247, at *13-14 (9th Cir. 2025) (citing *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025)). Here, the concrete harms that Plaintiffs have identified heavily outweigh the Government's interest in immediately ending bargaining for Plaintiffs. Defendants have failed to demonstrate how maintaining the labor relations framework under which they have operated for decades results in harm outweighing the tangible, immediate, and existential harms faced by Plaintiffs and their members, particularly given the substantial flexibility agencies already have to respond to national security needs and emergency situations. *See* 5 U.S.C. §§ 7106(a)(2)(D), 7112(b)(6), 7532. Indeed, as the District Court found, the fact that the Government had advised agencies not to terminate CBAs casts doubt on the assertion that immediate implementation of the EO is necessary to prevent harm to those agencies. ER-28-29.

---

[25] The actions taken by Defendants soon after the injunction was stayed only reinforce that fact. *See supra* at 8 & n.5.

57

The District Court did not err in finding Defendants' equities arguments "conclusory" and "unsupported by any evidence." ER-29.

Additionally, as explained in Part III *supra*, Plaintiffs have demonstrated that the EO was issued to retaliate against Plaintiffs for their First Amendment-protected activity and is therefore unlawful. It is well-settled that the Government is not harmed "from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Plaintiffs' meritorious First Amendment claim "tips the public interest sharply in [their] favor because it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quotation omitted).

## CONCLUSION

For the foregoing reasons, the District Court's preliminary injunction to maintain the status quo pending resolution of Plaintiffs' claims should be affirmed.

Dated: August 22, 2025

Respectfully submitted,

*/s/ Ramya Ravindran*
Abigail V. Carter
Ramya Ravindran
Lane M. Shadgett
J. Alexander Rowell
BREDHOFF & KAISER P.L.L.C.
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888

acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com

*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-4014

I am the attorney or self-represented party.

**This brief contains** | 13,959 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Ramya Ravindran | **Date** | August 22, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

# ADDENDUM

# **TABLE OF CONTENTS**

**Page**

5 U.S.C. § 7101 .................................................................. A1

5 U.S.C. § 7103(a)(4) ......................................................... A1

5 U.S.C. § 7106 .................................................................. A2

5 U.S.C. § 7112 .................................................................. A3

5 U.S.C. § 7117(c) .............................................................. A4

U.S.C. § 7118(a)(6)–(8) ..................................................... A5

U.S.C. § 7532 .................................................................... A6

## 5 U.S.C. § 7101. Findings and purpose

(a) The Congress finds that—

(1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—

(A) safeguards the public interest,

(B) contributes to the effective conduct of public business, and

(C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment; and

(2) the public interest demands the highest standards of employee performance and the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government.

(b) It is the purpose of this chapter to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government. The provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government.

## 5 U.S.C. § 7103. Definitions; application

(a) For the purpose of this chapter— . . .

(4) "labor organization" means an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment, but does not include—

(A) an organization which, by its constitution, bylaws, tacit agreement among its members, or otherwise, denies membership because of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition;

(B) an organization which advocates the overthrow of the constitutional form of government of the United States;

A1

(C) an organization sponsored by an agency; or

(D) an organization which participates in the conduct of a strike against the Government or any agency thereof or imposes a duty or obligation to conduct, assist, or participate in such a strike;

## 5 U.S.C. § 7106. Management rights

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from—

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

A2

**5 U.S.C. § 7112. Determination of appropriate units for labor organization representation**

(a) The Authority shall determine the appropriateness of any unit. The Authority shall determine in each case whether, in order to ensure employees the fullest freedom in exercising the rights guaranteed under this chapter, the appropriate unit should be established on an agency, plant, installation, functional, or other basis and shall determine any unit to be an appropriate unit only if the determination will ensure a clear and identifiable community of interest among the employees in the unit and will promote effective dealings with, and efficiency of the operations of the agency involved.

(b) A unit shall not be determined to be appropriate under this section solely on the basis of the extent to which employees in the proposed unit have organized, nor shall a unit be determined to be appropriate if it includes—

(1) except as provided under section 7135(a)(2) of this title, any management official or supervisor;

(2) a confidential employee;

(3) an employee engaged in personnel work in other than a purely clerical capacity;

(4) an employee engaged in administering the provisions of this chapter;

(5) both professional employees and other employees, unless a majority of the professional employees vote for inclusion in the unit;

(6) any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security; or

(7) any employee primarily engaged in investigation or audit functions relating to the work of individuals employed by an agency whose duties directly affect the internal security of the agency, but only if the functions are undertaken to ensure that the duties are discharged honestly and with integrity.

(c) Any employee who is engaged in administering any provision of law relating to labor-management relations may not be represented by a labor organization—

(1) which represents other individuals to whom such provision applies; or

(2) which is affiliated directly or indirectly with an organization which represents other individuals to whom such provision applies.

(d) Two or more units which are in an agency and for which a labor organization is the exclusive representative may, upon petition by the agency or labor

A3

organization, be consolidated with or without an election into a single larger unit if the Authority considers the larger unit to be appropriate. The Authority shall certify the labor organization as the exclusive representative of the new larger unit.

### 5 U.S.C. § 7117. Duty to bargain in good faith; compelling need; duty to consult

(c)(1) Except in any case to which subsection (b) of this section applies, if an agency involved in collective bargaining with an exclusive representative alleges that the duty to bargain in good faith does not extend to any matter, the exclusive representative may appeal the allegation to the Authority in accordance with the provisions of this subsection.

(2) The exclusive representative may, on or before the 15th day after the date on which the agency first makes the allegation referred to in paragraph (1) of this subsection, institute an appeal under this subsection by—

    (A) filing a petition with the Authority; and

    (B) furnishing a copy of the petition to the head of the agency.

(3) On or before the 30th day after the date of the receipt by the head of the agency of the copy of the petition under paragraph (2)(B) of this subsection, the agency shall—

    (A) file with the Authority a statement—

        (i) withdrawing the allegation; or

        (ii) setting forth in full its reasons supporting the allegation; and

    (B) furnish a copy of such statement to the exclusive representative.

(4) On or before the 15th day after the date of the receipt by the exclusive representative of a copy of a statement under paragraph (3)(B) of this subsection, the exclusive representative shall file with the Authority its response to the statement.

(5) A hearing may be held, in the discretion of the Authority, before a determination is made under this subsection. If a hearing is held, it shall not include the General Counsel as a party.

(6) The Authority shall expedite proceedings under this subsection to the extent practicable and shall issue to the exclusive representative and to the agency a written decision on the allegation and specific reasons therefor at the earliest practicable date.

**5 U.S.C. § 7118. Prevention of unfair labor practices**

(6) The Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) shall conduct a hearing on the complaint not earlier than 5 days after the date on which the complaint is served. In the discretion of the individual or individuals conducting the hearing, any person involved may be allowed to intervene in the hearing and to present testimony. Any such hearing shall, to the extent practicable, be conducted in accordance with the provisions of subchapter II of chapter 5 of this title, except that the parties shall not be bound by rules of evidence, whether statutory, common law, or adopted by a court. A transcript shall be kept of the hearing. After such a hearing the Authority, in its discretion, may upon notice receive further evidence or hear argument.

(7) If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the agency or labor organization an order—

> (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;

> (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;

> (C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

> (D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the agency (as provided in section 5596 of this title) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

(8) If the individual or individuals conducting the hearing determine that the preponderance of the evidence received fails to demonstrate that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor

practice, the individual or individuals shall state in writing their findings of fact and shall issue an order dismissing the complaint.

### 5 U.S.C. § 7532. Suspension and removal

(a) Notwithstanding other statutes, the head of an agency may suspend without pay an employee of his agency when he considers that action necessary in the interests of national security. To the extent that the head of the agency determines that the interests of national security permit, the suspended employee shall be notified of the reasons for the suspension. Within 30 days after the notification, the suspended employee is entitled to submit to the official designated by the head of the agency statements or affidavits to show why he should be restored to duty.

(b) Subject to subsection (c) of this section, the head of an agency may remove an employee suspended under subsection (a) of this section when, after such investigation and review as he considers necessary, he determines that removal is necessary or advisable in the interests of national security. The determination of the head of the agency is final.

(c) An employee suspended under subsection (a) of this section who—

　(1) has a permanent or indefinite appointment;

　(2) has completed his probationary or trial period; and

　(3) is a citizen of the United States;

is entitled, after suspension and before removal, to—

　(A) a written statement of the charges against him within 30 days after suspension, which may be amended within 30 days thereafter and which shall be stated as specifically as security considerations permit;

　(B) an opportunity within 30 days thereafter, plus an additional 30 days if the charges are amended, to answer the charges and submit affidavits;

　(C) a hearing, at the request of the employee, by an agency authority duly constituted for this purpose;

　(D) a review of his case by the head of the agency or his designee, before a decision adverse to the employee is made final; and

　(E) a written statement of the decision of the head of the agency.