**Nos. 25-4014**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,
*Defendants-Appellants*.

———————

On Appeal from the United States District Court
for the Northern District of California

———————

## BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION & AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA IN SUPPORT OF PLAINTIFFS-APPELLEES

———————

KATHLEEN L. MILLIAN
NICHOLAS F. SOARES
MOLLY BERNSTEIN
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, NW, Suite 303
Washington, DC 20009
(202) 682-2100

August 29, 2025                    *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, Amici Curiae state that they are non-profit entities that do not have parent corporations and that no publicly held corporation owns 10 percent or more of any stake or stock in amici curiae.

*/s/ Nicholas F. Soares*
*Counsel for Amici Curiae*

August 29, 2025

i

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS................................................................................. ii

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

INTEREST OF AMICI CURIAE.......................................................................... 5

ARGUMENT ..................................................................................................... 6

 **I.** THE EXECUTIVE ORDER UNCONSTITUTIONALLY RETALIATES AGAINST PLAINTIFFS FOR PROTECTED SPEECH ................................................................................. 7

  A. Plaintiffs Engaged in Core First Amendment-Protected Speech ........................................................................... 9
  B. The Executive Order Is an Adverse Action Sufficient to Chill Protected Speech .......................................... 12
  C. The Executive Order Was Issued to Punish Plaintiffs for Their Constitutionally Protected Speech ................... 13
  D. The Government Has Failed to Establish that Retaliation Was Not the Motivation for the Executive Order .................... 16

 **II.** MERE INVOCATION OF NATIONAL SECURITY CONCERNS CANNOT BE PERMITTED TO CIRCUMVENT THE GUARANTEES OF THE FIRST AMENDMENT ................... 18

  A. The Court Must Review the Government's Invocation of a National Security Concern ...................................... 18
  B. Meaningful Judicial Review Is Especially Necessary, When, as Here, the Government Invokes an Expansive Conception of National Security ............................................. 20

CONCLUSION .................................................................................................. 23

ii

# TABLE OF AUTHORITIES

PAGE

## Cases

*Al-Haramain Islamic Found., Inc. v. Bush,*
  507 F.3d 1190 (9th Cir. 2007) ...........................................................18

*Allen v. Iranon,*
  283 F.3d 1070 (9th Cir. 2002) ...........................................................16

*Am. Fed'n of Gov. Emp., AFL-CIO v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ...........................................................19

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
  No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025) ..............*passim*

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011) ...........................................................................10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
  824 F.3d 858 (9th Cir. 2016) ...............................................................7

*Bello-Reyes v. Gaynor,*
  985 F.3d 696 (9th Cir. 2021) ........................................................8, 16

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ...........................................................................11

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ...........................................................14

*Cole v. Young,*
  351 U.S. 536 (1956) .....................................................................22, 23

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ...........................................................................20

*Hartman v. Moore,*
  547 U.S. 250 (2006) .............................................................................7

iii

*Heffernan v. City of Paterson, N.J.*,
    578 U.S. 266 (2016)................................................................7

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010)............................................................18, 19

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018)..................................................6, 7, 8, 11

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)..............................................................13

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)..............................................................11

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018)................................................................10

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)..........................................................8, 16

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..............................................................10

*N.Y. Times Co. v. United States* (Pentagon Papers),
    403 U.S. 713 (1971)..........................................................4, 20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)......................................................6, 8, 14

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)........................................................16, 17

*Ulrich v. City and Cnty. of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) ...............................................13

*United States v. Robel*,
    389 U.S. 258 (1967)..............................................................22

*In re Washington Post Co.*,
    807 F.2d 383 (4th Cir. 1986) ...............................................19

iv

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ............................................................... 18

*Witt v. Dep't of Air Force*,
   527 F.3d 806 (9th Cir. 2008) ................................................................. 19

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ............................................................................... 19

**Statutes**

5 U.S.C. §§ 7101 *et seq.* .............................................................................. 3

5 U.S.C. § 7103 ......................................................................................... 3, 20

# INTRODUCTION

On March 27, 2025, President Donald J. Trump signed *Exclusions from Federal Labor-Management Relations Programs*, Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order") revoking collective bargaining rights for nearly two-thirds of the federal workforce, including those federal workers represented by the Plaintiff-Appellee unions (Plaintiffs). The President's action not only represented a dramatic and unprecedented reshaping of the federal labor relations landscape established by statute nearly five decades ago, it explicitly punished Plaintiffs because of their political opposition to his agenda in violation of fundamental First Amendment protections against retaliation for protected speech.

To conclude that the Executive Order was motivated by retaliation simply requires taking the Administration at its word. In a White House Fact Sheet ("Fact Sheet") issued contemporaneously with the Executive Order, the government explained the President's justification. Specifically, the Fact Sheet explained that the President was taking action against what it called "hostile" federal unions, asserting that "[c]ertain Federal unions have declared war on President Trump's agenda" by "filing grievances"—an activity permitted by law and contract and protected by the First Amendment—"to block Trump policies." Excerpts of Record, Dkt. No. 28, ER-162-63. The Fact Sheet specifically calls out the "VA's [Veterans Affairs] unions"— i.e., Plaintiff unions American Federation of Government Employees, AFL-CIO

(AFGE), National Nurses Organizing Committee/National Nurses United (NNOC/NNU), Service Employees International Union (SEIU), and National Associate of Government Employees (NAGE)—for "fil[ing] 70 national and local grievances over President Trump's policies." ER-163. To remove any doubt that it was Plaintiffs' protected speech that the President found objectionable, the Fact Sheet further stated that "President Trump supports constructive partnerships with unions who work with him" but that "he will not tolerate mass obstruction …." *Id.*

Similarly, following this Court's August 1, 2025 stay of the preliminary injunction, pursuant to the no-longer-stayed Executive Order, the Department of Veterans Affairs (VA) terminated the contracts of the Plaintiff unions. *See* Department of Veterans Affairs, VA Terminates Union Contracts for Most Bargaining-Unit Employees (August 6, 2025).[1] As justification for its action, the VA explicitly pointed to free speech activities by Plaintiffs, including their opposition to the MISSION Act, support for rescinding the VA Accountability and Whistleblower Protection Act, and the fact that AFGE had "worked hand-in-hand with the Biden Administration" to obtain reinstatement and backpay for VA employees fired during the first Trump Administration. *Id.*

---

[1] Available at https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/ (archived here on August 28, 2025).

2

If the Administration's own words were not enough to demonstrate its retaliatory motive, the unprecedented scope and uneven implementation of the Executive Order would suffice. The Executive Order invoked a provision of the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101 *et seq.*, allowing the President to remove FSLMRS protections from agencies or subdivisions upon determining that they have as a "primary function" "intelligence, counterintelligence, investigative, or national security work" and further determining that the FSLMRS "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). Consistent with this statutory text, prior Administrations have invoked § 7103(b)(1) to exclude subdivisions of agencies from coverage in a limited and targeted fashion, where the connection to national security was obvious and undisputed. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03070, 2025 WL 1755442, at *5 (N.D. Cal. June 24, 2025) (noting that Executive Order 12171, signed by President Carter, excluded "agency subdivisions … most of which were in the Departments of the Army, Navy, and Air Force, with a number of subdivisions specified at a high level of granularity, such as the 'Project Office at El Segundo, California' ….").

By contrast, the Executive Order here designated a list of over 40 agencies and subdivisions that it purported to have determined were "national security"

focused and hence excluded from coverage. Moreover, unlike the granular determinations of prior administrations, the Executive Order excludes entire cabinet-level departments. *See* ER-145-47; *Am. Fed'n of Gov't Emps.*, 2025 WL 1755442, at \*5. Many of the excluded agencies and subdivisions have no clear connection to national security. For example, the Executive Order includes Animal and Plant Health Inspection Services, the General Services Administration, the Treasury Department, and the Office of the General Counsel of the Department of Health and Human Services. ER-145-47. Indeed, as the district court noted, the "government itself had a hard time saying why an agency like the National Institute of Allergy and Infectious Diseases might be properly regarded as having a primary mission of national security." *Am. Fed'n of Gov't Emps.*, 2025 WL 1755442, at \*12 (citing Transcript of June 18, 2025 Proceedings, Dkt. No. 58, 13:3-16). But just as "when everything is classified, then nothing is classified," *N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713, 729 (1971) (Stewart, J., concurring), if every agency is defined to have a national security mission, the term itself becomes devoid of any legitimate meaning.

Though most of the excluded agencies have nothing to do with any conventional notion of national security, what they *do* have in common is that their employees are represented by those unions, including Plaintiffs, that, in the words

4

of the Fact Sheet and the view of the President, are "hostile" to and "have declared war on President Trump's agenda." ER-162-63.

Because the Executive Order explicitly retaliates against Plaintiffs for their constitutionally protected speech, it violates the First Amendment. It sends the message to Plaintiffs and to any other entity that interacts or does business with the federal government that voicing any concerns or opposition to the Presidential Administration's agenda will risk massive, potentially ruinous, retaliation. To permit the government's action to stand under these circumstances would not only condone the violation of Plaintiffs' First Amendment rights, it would also provide the Executive Branch a roadmap to retaliate against perceived adversaries with impunity.

The district court properly found that Plaintiffs were likely to succeed on the merits of their claim that the government's actions amounted to unconstitutional retaliation. This Court should do the same.

## INTEREST OF AMICI CURIAE[2]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties of all Americans.

---

[2] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party or party's counsel authored this brief in whole or in part or contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E). No one other than Amici, their members, or their counsel contributed money intended to fund preparation or submission of this brief.

5

The ACLU of Northern California is an affiliate of the ACLU. Both organizations have frequently appeared in this Court, as counsel to parties or as amicus, in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. They have also participated as counsel or amici curiae in many consequential First Amendment cases, including those involving retaliation. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) (counsel); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, — F. Supp. 3d —, No. 25-cv-917, 2025 WL 1502329 (D.D.C. May 27, 2025) (amicus); *Nat'l Public Radio, Inc. v. Trump*, No. 25-cv-1674, D.D.C. (June 20, 2025) (amicus); *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-716, D.D.C. (April 3, 2025) (amicus); *President and Fellows of Harvard College v. United States Dep't of Health and Human Services,* No. 25-cv-11048, D. Mass. (June 9, 2025) (amicus).

## ARGUMENT

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943)) (emphasis removed). "Official reprisal for protected speech 'offends the

Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton,* 523 U.S. 574, 588 n.10 (1998)).

The Executive Order violates these fundamental principles. In issuing and acting upon the Executive Order, the President and his Administration have unconstitutionally retaliated against Plaintiffs because they do not accept the President's view of "what shall be orthodox in politics." *Janus*, 585 U.S. at 892. Plaintiffs are being subjected to "official reprisal" (*Hartman,* 547 U.S. at 256) because they have engaged in constitutionally protected speech that the President deems insufficiently supportive of his political agenda. The First Amendment does not allow such retaliation, even when it is accompanied by a rote and conclusory invocation of "national security." This Court should reject the President's attempt to circumvent the First Amendment. The consequences of failing to do so will reverberate beyond the federal unions and employees they represent because allowing speech-based retaliation against "one [speaker] tells the others that they engage in protected activity at their peril." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016).

## I.  THE EXECUTIVE ORDER UNCONSTITUTIONALLY RETALIATES AGAINST PLAINTIFFS FOR PROTECTED SPEECH

The First Amendment forbids government officials from subjecting individuals to adverse actions for having engaged in protected speech. *See Ariz.*

*Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Where the government retaliates based on the speaker's viewpoint, the violation is perhaps most egregious. *See Vullo*, 602 U.S. at 187 ("At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society.").

To succeed on a retaliation claim, plaintiffs must first make out a prima facie case by showing that 1) they engaged in protected expression, 2) the government responded with an adverse action that would deter a person of ordinary firmness from continuing to engage in the protected activity, and 3) the protected speech was a substantial or motivating factor in the government's conduct. *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021). Upon that showing, the burden shifts to the government to show that it would have taken the same action even in the absence of the protected speech. *See id.* at 702; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Plaintiffs easily satisfy all three elements of the prima facie case and the government cannot, on the record before the Court, show that it would have taken the same action if the unions had not engaged in protected speech and political advocacy that differs from the President's view of "what shall be orthodox in politics [and] nationalism." *Janus*, 585 U.S. at 892.

8

### A. Plaintiffs Engaged in Core First Amendment-Protected Speech

First, there is, and can be, no dispute that the Plaintiffs' advocacy and speech is protected by the First Amendment. The Fact Sheet calls out the "largest Federal union [Plaintiff AFGE]" for "describ[ing] itself as 'fighting back' against Trump," ER-163, which references an article AFGE published to its website on March 3, 2025, entitled "What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service" that criticized the Administration. Pls.' Suppl. Addendum to Opp'n to Emergency Mot. for Stay Pending Appeal, Dkt. No. 20-2, SA 28-34. Plaintiffs consistently engaged in such public criticisms of the Administration. For example, "AFGE [was] a high-profile and vocal opponent of President Trump's administration and the administration's actions harming federal workers," with "AFGE's leadership [] quoted extensively in press articles and on national television, voicing AFGE's disapproval of the administration's actions, emphasizing AFGE's commitment to opposing those policies, and calling on others to join them." Pls.' Suppl. Excerpts of Record, Dkt. No. 38, SER-193. Similarly, Plaintiff Service Employees International Union (SEIU) published numerous press releases on its website, along with other public statements, criticizing a variety of Administration actions and policies. SER-248-49. Plaintiff American Federation of State, County and Municipal Employees (AFSCME) also took public stances,

9

including participation in a February 5, 2025 demonstration against the Administration's treatment of federal workers. SER-232-33.

Plaintiffs' public criticism of the Trump Administration and their advocacy on behalf of their members fall squarely within the core of speech protected by the First Amendment. *See Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (a plaintiff's public criticisms of government officials and actions are "high in the hierarchy of First Amendment values"); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)) (the First Amendment is designed "to protect the free discussion of governmental affairs"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (The First Amendment's protections reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]").

Alongside their public statements, Plaintiffs engaged in constitutionally protected legal advocacy, described in the AFGE article on its efforts to "fight[] back" against the Administration, which the Fact Sheet spotlights. *See* Plaintiffs' Supplemental Addendum to Opposition to Emergency Motion for Stay Pending Appeal, Dkt. No. 20.2, SA 28-34. The Fact Sheet also pointed to "certain Federal unions" that "have declared war on President Trump's agenda." ER-163. Plaintiffs obtained temporary restraining orders and preliminary injunctions against

10

Administration initiatives that the Plaintiffs concluded were unlawfully harming their members. *See, e.g.*, SER-193 ¶ 3, 195 ¶ 11, 196 ¶ 16, 198 ¶ 24, 200 ¶ 32, 201 ¶ 35, 203 ¶ 43, 204 ¶ 48. Such legal advocacy is unquestionably protected by the First Amendment. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 612 (1972); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2001) (the legal "speech and expression" of Legal Services Corporation grantees is protected under the First Amendment).

So, too, is Plaintiffs' filing of grievances a form of speech protected by the First Amendment. Collectively, Plaintiffs have filed dozens of national and individual grievances on behalf of the workers they represent. *See, e.g.*, SER-189, ¶ 8; ER-220-21, 12-13, 15. The Fact Sheet drew particular attention to Plaintiffs' grievances, asserting that "[c]ertain Federal unions have declared war on President Trump's agenda" by "filing grievances to block Trump policies" and specifically calling out the VA's unions for "fil[ing] 70 national and local grievances over President Trump's policies." ER-163. Grievances of course are the appropriate and sanctioned method of protecting workers from action by an employer that the union considers to be improper. Unions, by their very nature of representing and ensuring the rights of workers, frequently take positions and engage in speech that is contrary to the preferred speech of employers, here, the government. That is, in part, what makes grievances protected speech. *See Janus*, 585 U.S. at 909-10, 914 (holding that

11

filing of grievances constitutes employee speech and "may be of substantial public importance").

### B. The Executive Order Is an Adverse Action Sufficient to Chill Protected Speech

Second, the action taken by the government to strip large swaths of federal workers of their collective bargaining rights—and the crippling consequences for Plaintiffs (*see, e.g.*, ER-140-41, ¶¶ 9-11)—would deter an ordinary person in Plaintiffs' position (i.e., other unions) from engaging in similar speech and advocacy in the future. More broadly, the message sent by the Executive Order—that voicing any objection to or concern about a Presidential Administration's agenda will result in swift and catastrophic retaliation—will deter any organization or individual that does business or interacts with the government from voicing any such objections or concerns.

As the district court found, the Executive Order's targeting of the collective bargaining agreements that protect federal workers debilitates the unions' bargaining power and removes the lion's share of their income. *Am. Fed'n of Gov't Emps.*, 2025 WL 1755442, at \*12-13 (noting that, under the Executive Order, Plaintiffs had lost access to their office space, the right to conduct union work during office hours, and that AFGE, for example, had already experienced an 82% reduction in allotted dues, a reduction in revenue that necessitated laying off a significant percentage of its staff). Thus, the Executive Order takes aim at the unions' very existence. *See also*

ER-141, ¶ 11 ("Under the Executive Order, numerous AFGE local unions or councils will likely cease to exist. Many other bargaining units will be eliminated or severely diminished in size."); *see also Am. Fed'n of Gov't Emps.*, 2025 WL 1755442, at *12-14.[3] Such an action, which "punishes many organizations and their members merely because of their political beliefs and utterances, … smacks of a most evil type of censorship. This cannot be reconciled with the First Amendment …." *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143 (1951) (Black, J., concurring).

### C. The Executive Order Was Issued to Punish Plaintiffs for Their Constitutionally Protected Speech

Third, the Administration's own statements, most notably the official Fact Sheet accompanying and explaining the Executive Order, establish the causal connection between the Executive Order and the Plaintiffs' protected speech and political advocacy, providing direct evidence of retaliatory animus. *See, e.g., Ulrich v. City and Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) (causal connection may be shown with either direct or circumstantial evidence).

---

[3] Further, the thinly veiled implication that only unions that support the President's agenda—those who "work with" the President, ER-163—will be allowed to maintain collective bargaining agreements would lead a reasonable person to conclude not just that they must refrain from speech the President finds objectionable but that they must actively engage in speech the President prefers.

13

Statements by the Administration, including the statements of the VA and those of the President in the Fact Sheet, are direct evidence of the government's retaliatory motive and are properly considered in reviewing the propriety of the government's action. *See Vullo*, 602 U.S. at 194, 197 n.6 (considering not only official "guidance letters" but also agency's press release and governor's tweets in assessing retaliation); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (in interpreting an Executive Order, the Court should "consider the public statements made by the Administration, up to and including the President. For one thing, a president's statements guide those tasked with enforcing the Executive Order. And for another, the Administration's public statements are indicative of both the object of and policy supporting the Executive Order.") (citations omitted).[4] To ignore them simply because they are not in the Executive Order itself would be to allow the government to make very clear in a public statement that disfavored speech is being and will be punished—thus maximizing the chilling effect—so long as the government is careful to proclaim its retaliatory motives in a separate document.

Moreover, an examination of the Executive Order and its implementation to date demonstrates that it was motivated by retaliation for Plaintiffs' protected

---

[4] The government effectively conceded as much below, embracing the Fact Sheet as "relevant" to the interpretation of the Executive Order and referring to statements in the Fact Sheet as "the President's claim." *See Am. Fed'n of Gov't Emps.*, 2025 WL 1755442, at *11 (citing Transcript of June 18, 2025 Proceedings, Dkt. No. 58, 12:15-17, 9:15-10:7).

14

speech, rather than by any legitimate motive. First, despite claiming that the Executive Order is motivated by national security concerns, the Executive Order includes numerous agencies—including the Animal and Plant Health Inspection Services, the General Services Administration, and the Office of the General Counsel of the Department of Health and Human Services—that have only the most tenuous, indirect connection to national security. *See* ER-145-47. Further, while the Executive Order generally (and somewhat incongruously, given its breadth) excludes law enforcement agencies, it does apply to the Bureau of Prisons. This arbitrary carve-out makes sense only with the knowledge that Bureau of Prisons employees are represented exclusively by Plaintiff AFGE. *See* SER-257, ¶ 5. Similarly, when the Secretary of Veterans Affairs took action, through authority delegated to him under Section 4 of the Executive Order, to "issue orders suspending the application of [the Executive Order] to any subdivisions of the departments [he] supervise[s], thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute," ER-149, he did so by union (excluding the Plaintiffs here from collective bargaining), rather than by agency subdivision. *See* Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025).

The statements and actions of the Administration, as well as the Executive Order's incongruous exceptions and exceptions-to-exceptions, all demonstrate that

the real motivation was punishing those unions of whose political speech the Administration does not approve. *See Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (government action is retaliatory where the "reasons proffered … were false and pretextual").

### D.   The Government Has Failed to Establish that Retaliation Was Not the Motivation for the Executive Order

Finally, on this record and in light of its own statements, the government has not met and cannot meet its burden to show that it would have taken the same action in the absence of Plaintiffs' protected speech. *See Mt. Healthy*, 429 U.S. at 287. *See also Bello-Reyes*, 985 F.3d at 702 (citing *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). To carry this burden, the government "must show more than that they '*could* have' punished the plaintiffs in the absence of the protected speech; instead, 'the burden is on the defendants to show' through evidence that they '*would* have' punished the plaintiffs under those circumstances." *Bello-Reyes*, 985 F.3d at 702 (quoting *Pinard*, 467 F.3d at 770) (emphases in original).

The government cites the Supreme Court's decision in *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019), for the proposition that protected speech can be a "'wholly legitimate consideration' underlying official action." App. Opening Br., Dkt. No. 27, pp. 23, 31. As a preliminary matter, *Mt. Healthy*, not *Nieves*, governs here. *Nieves* involved a Section 1983 damages claims for retaliatory arrests, a context that

16

involves "complex causal inquiries" that make it "particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." 587 U.S. at 392. Those considerations do not arise outside the contexts of arrest or prosecution and are inapplicable to this case where no criminal conduct is at issue. *See Nieves*, 587 U.S. at 401-02. Moreover, even if *Nieves* was somehow deemed relevant, it does not help the government's case. In the context of a split-second judgment about whether to arrest, "the content and manner of a suspect's speech may convey vital information—for example, if he is ready to cooperate or rather presents a continuing threat," *Nieves*, 587 U.S. at 401 (cleaned up), but the content and manner of the protected speech of a public employee union when criticizing the President or opposing his agenda has no legitimate, much less vital, bearing on whether it is proper to revoke collective bargaining rights.

The government has offered no evidence beyond its assertion that it would have taken the same action in the absence of the retaliatory motive. Nor has it made a serious effort to dispute or otherwise explain the evidence provided by Plaintiffs and relied upon by the district court—much of which consists of the government's own official statements—showing that retaliation for protected speech was its motivation. Instead, the government has simply pointed to its conclusory assertion that the revocation of collective bargaining rights was taken to advance national

17

security and asserted that its invocation of national security concerns must be afforded an (apparently) un-rebuttable presumption of regularity and must be reflexively deferred to by the Court. App. Opening Br., Dkt. No. 27, p. 33. But deference and presumptions alone cannot carry the government's burden. *See also Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,' 'national security' or 'terrorist threat' ... is insufficient to [carry the government's burden].").

## II.     MERE INVOCATION OF NATIONAL SECURITY CONCERNS CANNOT BE PERMITTED TO CIRCUMVENT THE GUARANTEES OF THE FIRST AMENDMENT

### A.     The Court Must Review the Government's Invocation of a National Security Concern

While the government argues for unquestioned deference to its stated determination that the government's actions here further national security, "neither the Supreme Court nor [this Court] has ever held that courts lack the authority to review executive action in those arenas for compliance with the Constitution." *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017). Blind deference to a patently pretextual "national security" justification would abdicate the judicial role in securing the protections enshrined in the Constitution. As the Supreme Court has emphasized, "[o]ur precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). And even legitimate "national-

18

security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins,'" especially "given the difficulty of defining the 'security interest' in domestic cases." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). And that is all especially true when it comes to cases involving speech. *See Holder*, 561 U.S. at 34 ("We do not defer to the Government's reading of the First Amendment, even when [national security and foreign relations] interests are at stake.").

Fulfilling the independent role of the judicial branch, the district court properly applied scrutiny to the government's proffered justifications, finding that the record evidence before it presented "a serious and plausible First Amendment question." *Am. Fed'n of Gov't Emps.,* 2025 WL 1755442, at *12.

Invoking "national security" does not insulate the government's claim from meaningful review. Although courts are often deferential to the President's determinations concerning national security (*see Am. Fed'n of Gov. Emp., AFL-CIO v. Reagan*, 870 F.2d 723, 724 (D.C. Cir. 1989)), that deference is not absolute. "[D]eference does not mean abdication." *See Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (even in the area of military affairs, legislation is still subject to the strictures of constitutional Due Process); *In re Washington Post Co.*, 807 F.2d 383, 391-392 (4th Cir. 1986) (finding "troubl[ing] … the notion that the judiciary should abdicate its decisionmaking responsibility to the executive branch whenever

19

national security concerns are present. History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions."). Indeed, even "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)).

### B. Meaningful Judicial Review Is Especially Necessary, When, as Here, the Government Invokes an Expansive Conception of National Security

The need for meaningful judicial review is heightened here given the extremely broad conception of national security being advanced by the government. *See Pentagon Papers*, 403 U.S. at 719 (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."). The FSLMRS allows the President to remove collective bargaining protections from agencies or subdivisions upon determining that they have as a "primary function" "intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1). In the government's view, "national security" work includes, among other concerns, healthcare, energy production, environmental protection, trade policy, the collection of taxes, and the "protect[ion] of America's economic and productive strength."

20

ER-162. If those government functions are "national security" work, it is difficult to imagine any government function that is not.[5]

Indeed, the government's conception of national security work is not limited to direct effects; any tenuous connection to the efficiency of the federal government in implementing the President's agenda is, in the government's view, a matter of "national security work." *See* ER-162-63 (the Fact Sheet section entitled "Ensuring that Agencies Operate Effectively" states that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management"); *see also* ER-158-59 (one of two sections in the Office of Personnel Management guidance memorandum issued in conjunction with the Executive Order is titled "Effective and Efficient Government" and instructs agencies that "[i]t is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently.").

If courts must unquestioningly accept not only the Executive Branch's determinations in all areas of national security—including its determination that those purported national security concerns justify the abrogation of citizens'

---

[5] We note that on August 28, 2025, President Trump signed an additional executive order that amended his March 27, 2025 Executive Order and stripped collective bargaining rights from another seven agencies and subdivisions determined to have "national security" as their primary function. *Further Exclusions from the Federal Labor-Management Relations Program*, https://www.whitehouse.gov/presidential-actions/2025/08/further-exclusions-from-the-federal-labor-management-relations-program/.

21

constitutional rights—but also its determinations as to what even constitutes an area of national security to begin with (however implausible), it would seriously threaten all of the freedoms guaranteed by the Constitution. As the Supreme Court has aptly noted, "[i]t would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967).

The Supreme Court recognized this concern nearly 70 years ago. In *Cole v. Young*, 351 U.S. 536, 547-48 (1956), the Court reviewed a statute that gave "to the heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary 'in the interest of the national security of the United States.'" *Cole*, 351 U.S. at 538 (citing the Act to Protect the National Security of the United States by Permitting the Summary Suspension of Employment of Civilian Officers and Employees of Various Departments and Agencies of the Government, Pub. L. 81-733, 64 Stat. 476, H.R. 7439, enacted August 26, 1950 ("1950 Act")). The Court warned against allowing the government to broadly define "national security" to include concerns about loyalty and trustworthiness, reasoning that "if Congress intended the term to have such a broad meaning … the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." *Id.* To make its point, the Court asked, "[W]hy

22

could it not be said that national security … requires not merely loyal and trustworthy employees but also those that are industrious and efficient?" *Id.* That hypothetical—offered by the Court to emphasize the absurdity and breadth of the government's loyalty-based argument in *Cole*—in large part mirrors the government's apparent conception of "national security" here. As in *Cole*, allowing the term "national security" to have such a broad meaning, and thus justify the Executive Order, would effectively supersede the FSLMRS, a "general personnel law."

To protect the rights set forth in the First Amendment from being chilled through retaliatory action, the courts must engage in meaningful scrutiny even when the President invokes national security to justify an action.

## CONCLUSION

The Executive Order is an unconstitutional attempt to punish federal unions for their protected speech and advocacy on behalf of the workers they represent and to chill protected speech and advocacy critical of the President's agenda by unions and other organizations and individuals.

Amici respectfully submit that the Court should conclude, as the district court did, that Plaintiffs are likely to succeed on the merits of their retaliation claim.

23

Respectfully submitted,

*/s/ Nicholas F. Soares*
KATHLEEN L. MILLIAN
NICHOLAS F. SOARES
MOLLY BERNSTEIN
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, NW, Suite 303
Washington, DC 20009
(202) 682-2100

August 29, 2025                          *Counsel for Amici Curiae*

24

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-4014

I am the attorney or self-represented party.

**This brief contains** | 5,307 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Nicholas F. Soares | **Date** | 08/29/2025

*(use "s/[typed name]" to sign electronically-filed documents)*