No. 25-4014

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
*et al.*,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.,*

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California

## REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
TYLER J. BECKER
  *Attorneys*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5364*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION AND SUMMARY ............................................1

ARGUMENT .................................................................................2

I.    The Government Is Likely To Prevail On The Merits..........................2

    A.    Plaintiffs Identify No Reason Their Claims Evade The FSLMRS's Preclusion Of District-Court Jurisdiction. ......................................2

    B.    Plaintiffs Fail To Show The Requisite Chance Of Success On Their First Amendment–Retaliation Claim. ..................................9

        1.    The Court Should Apply A Deferential Retaliation Standard To This National-Security Matter.....................................9

        2.    Plaintiffs Have Not Established A *Prima Facie* Retaliation Claim. ............................................................15

        3.    The President Would Have Issued The Executive Order Regardless Of Plaintiffs' Allegations..................................16

II.    Plaintiffs Did Not Establish That They Would Likely Suffer Irreparable Harm. ..................................................................19

III.    The Balance Of The Equities And Public Interest Weigh In Defendants' Favor..................................................................21

CONCLUSION .................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases:**                                                                                                       **Page(s)**

*AFGE v. Loy,*
  367 F.3d 932 (D.C. Cir. 2004) ................................................................. 4, 5, 8

*AFGE v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ........................................................ 10, 18, 19

*AFGE v. Trump,*
  139 F.4th 1020 (9th Cir. 2025) ................................................................. 5, 6

*AFGE v. Trump,*
  No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025) ........................... 7, 19

*AFGE v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ................................................................. 2, 7

*AFGE v. Trump,*
  148 F.4th 648 (9th Cir. 2025) ........................... 1, 7, 9, 13, 14, 15,
                                                                    16, 18, 19, 20, 21, 22

*AFGE Loc. 446 v. Nicholson,*
  475 F.3d 341 (D.C. Cir. 2007) ................................................................. 5

*AFGE Loc. 2118 & Dep't of Energy, Albuquerque Operations, Los Alamos Area Off.,*
  2 F.L.R.A. 916 (1980) ................................................................. 5

*AFSA v. Trump,*
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ........................... 1

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ................................................................. 22

*Arcamuzi v. Continental Air Lines, Inc.,*
  819 F.2d 935 (9th Cir. 1987) ................................................................. 21

*Axon Enter., Inc. v. Federal Trade Comm'n,*
  598 U.S. 175 (2023) ................................................................. 6, 7

*Boquist v. Courtney,*
  32 F.4th 764 (9th Cir. 2022) ................................................................. 10

*CarePartners, LLC v. Lashway,*
  545 F.3d 867 (9th Cir.2008) ................................................................. 17

*Cruz v. Bondi,*
  146 F.4th 730 (9th Cir. 2025) ...................................................... 14

*Department of Energy, Oak Ridge Operations & NAGE Loc. R5-181,*
  4 F.L.R.A. 644 (1980) ............................................................... 8

*Department of the Navy, Naval Telecomms. Ctr. & Navtelcom Unit Loc. No. 1,*
  6 F.L.R.A. 498 (1981) ............................................................... 4

*Elgin v. Department of Treasury,*
  567 U.S. 1 (2012) .................................................................... 9

*Eng v. Cooley,*
  552 F.3d 1062 (9th Cir. 2009) ................................................... 17

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ........................................................ 12, 13, 19

*Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,*
  572 F.3d 644 (9th Cir. 2009) .................................................... 20

*Kerry v. Din,*
  576 U.S. 86 (2015) ................................................................. 12

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ............................................................... 12

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977) ............................................................... 18

*Nieves v. Bartlett,*
  587 U.S. 391 (2019) ............................................................... 10

*NTEU v. Trump*:
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .............. 1, 7, 21
  780 F. Supp. 3d 237 (D.D.C. 2025) ............................................ 14

*Reichle v. Howards,*
  566 U.S. 658 (2012) ............................................................... 10

*Rostker v. Goldberg,*
  453 U.S. 57 (2008) ................................................................. 13

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ......................................... 20

*Southwest Voter Registration Educ. Proj. v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) .......................................... 21

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ...................................................... 7

*Trump v. AFGE*,
    145 S. Ct. 2635 (2025) ................................................... 6

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ................................................. 22

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ....................................... 9–10, 12, 13, 16

*Twitter, Inc. v. Garland*,
    61 F.4th 686 (9th Cir. 2023) ...................................... 12, 13

*U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*,
    57 F.L.R.A. 750 (2002) ............................................... 4, 5

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*,
    60 F.L.R.A. 202 (2004) .............................................. 8-9

*U.S. Dep't of Homeland Sec. & AFGE*,
    59 F.L.R.A. 423 (2003) ................................................. 8

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................... 12

**Statutes:**

5 U.S.C. § 7101 ............................................................ 11

5 U.S.C. § 7103(b)(1) .................................................. 2, 11

5 U.S.C. § 7103(b)(1)(B) ......................................... 10, 11, 14

5 U.S.C. § 7105(a)(2)(I) .................................................. 2

5 U.S.C. § 7112(b)(6) ..................................................... 8

5 U.S.C. § 7116 .................................................................................... 11

5 U.S.C. § 7116(a) ................................................................................. 3

5 U.S.C. § 7116(b)(7)(A) ...................................................................... 20

5 U.S.C. § 7118 ..................................................................................... 3

5 U.S.C. § 7121 ................................................................................ 3, 11

5 U.S.C. § 7123 ................................................................................. 3, 5

5 U.S.C. § 7123(a) ................................................................................. 3

38 U.S.C. § 7422(d) ............................................................................... 5

## Other Authority:

Exec. Order No. 14,251,
    90 Fed. Reg. 14,553 (Apr. 3, 2025) ........................................... 18–19

90 Fed. Reg. 16,427 (Apr. 17, 2025) ............................................... 16

## INTRODUCTION AND SUMMARY

Since the government submitted its opening brief, this Court stayed the district court's preliminary injunction pending appeal, determining that plaintiffs are unlikely to succeed on the merits of their retaliation claim and that the equitable factors weigh in the government's favor. *See AFGE v. Trump*, 148 F.4th 648 (9th Cir. 2025) (per curiam). This Court's conclusion is consistent with the D.C. Circuit's conclusion in two parallel cases challenging the same executive order. *See id.* at 654 n.1 (first citing *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) (per curiam); and then citing *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam)). Nevertheless, plaintiffs' answering brief scarcely acknowledges this Court's order or reasoning. Instead, plaintiffs reprise the same arguments that this Court rejected in staying the preliminary injunction. For the reasons this Court issued a stay and others, the preliminary injunction should be reversed.

First, the district court lacked jurisdiction over plaintiffs' claims, which Congress intended to be channeled through the review scheme of the Federal Service Labor–Management Relations Statute (FSLMRS). Second, plaintiffs are unlikely to succeed on their retaliation claim. Plaintiffs' invitation to abandon deferential review of the President's national-security determination is at odds with well-established principles: plaintiffs' prima facie case of retaliation turns such deference on its head, asking this Court to endorse the same *adverse* inferences that the district court

1

repeatedly drew in issuing the preliminary injunction. And even if plaintiffs established a prima facie case, they cannot rehabilitate the district court's failure to recognize that (or even to decide whether) the President would have issued the executive order absent any unconstitutional motives. Third, as this Court also concluded in granting a stay, the equitable factors weigh in favor of the government. Plaintiffs' asserted bargaining-power and monetary harms are not irreparable, and they do not outweigh the government's national-security interests in any event.

## ARGUMENT

## I.    The Government Is Likely To Prevail On The Merits.

### A.    Plaintiffs Identify No Reason Their Claims Evade The FSLMRS's Preclusion Of District-Court Jurisdiction.

Plaintiffs' claims must be brought through the FSLMRS's review scheme, which is "exclusive with respect to claims within its scope," including "constitutional claims." *AFGE v. Trump*, 929 F.3d 748, 755–59 (D.C. Cir. 2019); *see* Opening Br. 14–22. Accordingly, the district court lacked jurisdiction.

1.    Plaintiffs assert that Congress empowered the Federal Labor Relations Authority (FLRA) to adjudicate only "compliance with the substantive requirements of the [FSLMRS]," not the validity of the President's determination under the FSLMRS provision at issue here, 5 U.S.C. § 7103(b)(1). *See* Answering Br. 16–20. But the FSLMRS empowers the FLRA to take "actions as are necessary and appropriate to effectively administer" any "provisions" of the statute, 5 U.S.C. § 7105(a)(2)(I),

2

which includes an assessment of its jurisdiction following a § 7103(b)(1) determination. And Congress channeled judicial review of FLRA orders directly to the courts of appeals. *Id.* § 7123. Plaintiffs point to no limitations precluding the FLRA from reviewing a § 7103(b)(1) determination to assess its jurisdiction or any other indication that Congress intended some FSLMRS provisions to be reviewed by the channels set out in the FSLMRS, while some unspecified set of other FSLMRS provisions are reviewed through district court actions.

Plaintiffs respond that § 7105(a) does not provide "a freestanding grant of authority" that would allow the FLRA to review claims arising from excluded agencies. *See* Answering Br. 19. But the FSLMRS contains specific mechanisms that allow plaintiffs to seek judicial review of the executive order's legality. *See* Opening Br. 15–17. Specifically, plaintiffs can bring a dispute before the FLRA through a grievance or an unfair-labor-practice charge, asserting that defendant-agencies have violated CBA provisions or the statute's substantive rules. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. To resolve either new disputes or already-pending cases, the FLRA could consider the executive order's validity and thus whether the agency falls within the FSLMRS's provisions. If the FLRA found the executive order valid—or even if it concludes it cannot review the order and dismisses a claim against an excluded agency for that or any other reason—that would be a "final order of the [FLRA]" subject to judicial review in a court of appeals, which undoubtedly could then entertain any objection to the executive order's validity. *Id.* § 7123(a).

3

Plaintiffs criticize defendants for not citing a "case that involves parties removed from [Civil Service Reform Act] coverage." Answering Br. 19–20. But the pertinent channeling question is whether plaintiffs' claims are of the variety that Congress intended to be brought before the FLRA and judicially reviewed upon issuance of the FLRA's final order. And defendants cited two cases—*U.S. Attorney's Office Southern District of Texas & AFGE Local 3966*, 57 F.L.R.A. 750 (2002), and *Department of the Navy, Naval Telecommunications Center & Navtelcom Unit Local No. 1*, 6 F.L.R.A. 498 (1981)—demonstrating that Congress's review scheme enables the FLRA to issue final orders construing the scope of an exclusion order to determine the FLRA's jurisdiction. *See* Opening Br. 21. Similarly, plaintiffs can bring their claims to the FLRA and then the relevant court of appeals. They simply may not bring their claims directly to federal district courts, which lack "concurrent jurisdiction over matters within the [FLRA's] exclusive purview." *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004).[1]

---

[1] Plaintiffs assert that defendants "mischaracterize" *Loy* because the Transportation Security Administration prohibited only collective bargaining; it did not exclude federal workers from FSLMRS coverage. *See* Answering Br. 20 n.6. But plaintiffs miss the point. The D.C. Circuit held that despite the Transportation Security Administration's determination that airport screeners could not collectively bargain, the union-plaintiffs' only pathway to assert their bargaining rights in federal court was through the FLRA. *See Loy*, 367 F.3d at 935. The same holds true here. Even though the President has excluded certain agencies from FSLMRS coverage, plaintiffs' only pathway to assert their FSLMRS rights in federal court is through the FLRA.

This case bears no resemblance to *AFGE Local 446 v. Nicholson*, where an agency-specific statute prohibited review of the relevant decision "'by any other agency,'" including the FLRA. 475 F.3d 341, 347–48 (D.C. Cir. 2007) (quoting 38 U.S.C. § 7422(d)); *but see* Answering Br. 17. The rule that "district courts do not have concurrent jurisdiction over matters within the [FLRA's] exclusive purview" did not apply there because Congress "expressly" brought challenges to the relevant determination "outside the FLRA's purview." *Id.* (quoting *Loy*, 367 F.3d at 935). Here, by contrast, nothing in the FSLMRS or any other statute precludes the FLRA from entertaining challenges to § 7103(b)(1)'s application. That the FLRA has "repeatedly" declined to exercise jurisdiction where the President excluded agencies and subdivisions from FSLMRS coverage, Answering Br. 17, only reinforces the government's position. An FLRA order dismissing a claim for lack of jurisdiction is a final order, reviewable in the court of appeals. *See* 5 U.S.C. § 7123. And at any rate, it is unclear whether a summary dismissal would result if plaintiffs brought their claim before the FLRA, as plaintiffs suggest. *See* Answering Br. 17 (first citing *U.S. Att'ys Off.*, 57 F.L.R.A. 750; and then citing *AFGE Local 2118 & Dep't of Energy, Albuquerque Operations, Los Alamos Area Office*, 2 F.L.R.A. 916 (1980)). There is no indication that the union challenged the relevant executive order's validity in the cited cases.

This Court's decision denying a stay in *AFGE v. Trump*, 139 F.4th 1020 (9th Cir. 2025), a case involving certain reductions-in-force in the federal government, does not support a different conclusion either. *But see* Answering Br. 20. As plaintiffs

point out, the Supreme Court reached a different result and stayed the preliminary injunction in that case without deciding whether the plaintiffs' claims needed to be channeled. *See Trump v. AFGE*, 145 S. Ct. 2635, 2635 (2025). Moreover, the channeling issues are different: some of the plaintiffs challenging the reductions-in-force are not unions and brought structural constitutional claims based on downstream effects from the agencies' employment decisions. *AFGE*, 139 F.4th at 1028, 1032–33. This Court's observation that Congress likely did not intend "for the [Civil Service Reform Act] to preclude review for parties not even covered by that statute who allege claims outside the [Merit Systems Protection Board]'s and FLRA's jurisdiction," *id.* at 1033, is therefore not strictly relevant to the channeling issues in this case, which involves a union's claim that the President unlawfully invoked an FSLMRS provision to exclude certain agencies from coverage. To be clear, the government maintains that the FSLMRS precludes AFGE's other claims challenging the reductions-in-force. But the jurisdictional reasoning is simply different here, where plaintiffs can clearly obtain a final order from the FLRA and seek review in the court of appeals, per the statutory scheme that Congress created in the FSLMRS.

 2. Applying the *Thunder Basin* factors, plaintiffs' claims are of the type that Congress intended to be reviewed within the FSLMRS's statutory structure. *See* Opening Br. 15–19.

 *First*, a finding of preclusion would not "foreclose all meaningful judicial review." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 190 (2023) (quoting

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)). As discussed, the FSLMRS grants plaintiffs several avenues to challenge the executive order before the FLRA and in the courts of appeals. *See* Opening Br. 15–17.

Plaintiffs assert that judicial review would come too late to be meaningful, contending that the executive order is "threatening their continued existence." Answering Br. 21–22. But as this Court previously observed, it is "speculative whether Plaintiffs will experience harm through 'weakened support for unions,' and paused administration of dues collection can be addressed by voluntary dues payment in the interim and by monetary damages at the end of litigation." *AFGE v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (per curiam) (quoting *AFGE v. Trump*, No. 25-cv-03070, 2025 WL 1755442, at *14 (N.D. Cal. June 24, 2025)); *see also NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (per curiam) (similar). And regardless, any monetary harms and possible delays in receiving funds are not "impossible to remedy once the proceeding is over," *Axon Enter., Inc.*, 598 U.S. at 191.

*Second*, plaintiffs contend their claims are "wholly collateral" to the FSLMRS's review provisions and "outside the [FLRA]'s expertise." Answering Br. 22 (quoting *Axon Enter., Inc.*, 598 U.S. at 186). Yet plaintiffs' claims target alleged FSLMRS violations—the type of claim "regularly adjudicated" through the statute's remedial scheme—and fall within the FLRA's expertise because they "require interpreting the FSLMRS." *AFGE*, 929 F.3d at 760–61; *see* Opening Br. 17–19.

7

Plaintiffs argue that the FLRA has never adjudicated cases against excluded agencies and therefore lacks specialized knowledge about the subject. Answering Br. 22. But the FLRA regularly adjudicates similar matters, determining whether individual employees are excluded from bargaining units because they are "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." 5 U.S.C. § 7112(b)(6); *see Department of Energy, Oak Ridge Operations & NAGE Loc. R5-181*, 4 F.L.R.A. 644, 655–56 (1980). Plaintiffs' statutory claims require the FLRA to apply similar interpretive skills. The FLRA also does not confine itself to what plaintiffs deem "substantive provisions," eschewing "antecedent question[s]" about an agency's exclusion from bargaining. Answering Br. 22. Once again, even where the FLRA "agreed" that an agency-specific statute "granted 'unfettered discretion'" to an agency official to "validly bar[]" employees "from engaging in collective bargaining," courts have held that the "FLRA had the exclusive authority to render judgment" regarding collective bargaining's availability, "subject to review only in a court of appeals." *Loy*, 367 F.3d at 934–36 (quoting *U.S. Dep't of Homeland Sec. & AFGE*, 59 F.L.R.A. 423, 430 (2003)). Here, where the source of the exclusions in the executive order is the FSLMRS itself, plaintiffs' claims even more clearly fall within the FSLMRS's review scheme.

Plaintiffs also assert that the FLRA lacks "specialized expertise" regarding their constitutional claims, Answering Br. 22 n.8, but the FLRA has "consistently" resolved constitutional claims, including First Amendment–retaliation claims. *See U.S. Dep't of*

*Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases). Moreover, constitutional claims fall within exclusive administrative-review schemes where, as here, agency resolution might "obviate the need to address the constitutional challenge" and the agency "can apply its expertise" to plaintiffs' statutory claims. *Elgin v. Department of Treasury,* 567 U.S. 1, 22–23 (2012).

### B. Plaintiffs Fail To Show The Requisite Chance Of Success On Their First Amendment–Retaliation Claim.

Even if the district court had jurisdiction, it erred in concluding that plaintiffs made out a sufficient case on the merits of their First Amendment claim to support a preliminary injunction. In granting a stay pending appeal, this Court correctly "conclude[d] the government has shown that it is likely to succeed on the merits of the retaliation claim." *AFGE*, 148 F.4th at 654. Plaintiffs failed to establish any constitutional defect in the President's national-security-related executive order, which is subject only to highly deferential review.

#### 1. The Court Should Apply A Deferential Retaliation Standard To This National-Security Matter.

As this Court previously recognized, courts must be especially cautious when invited "to assess whether the President's stated reasons for exercising national security authority—clearly conferred to him by statute—were pretextual." *AFGE*, 148 F.4th 655. Special deference is owed to the government in national-security matters, as the Supreme Court has recognized in addressing claims that a President's motivations violate the First Amendment, *see Trump v. Hawaii*, 585 U.S. 667, 685–86

(2018), and as the D.C. Circuit has recognized in affording a strong presumption of regularity to the President's § 7103(b)(1) exclusion determinations, *see AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). *See* Opening Br. 25–29. Plaintiffs offer no reason for this Court to deviate from the deferential standard that it correctly applied in its stay order.

    **1.**    Plaintiffs first express concern that § 7103(b)(1)'s broad authority would permit the President to make exclusion determinations based on First Amendment activity. *See* Answering Br. 39–42. As an initial matter, it is hardly unprecedented for "protected speech" to serve as a "'wholly legitimate consideration'" in government officials' actions. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)). Plaintiffs' attempt (at 39–40 & 39 n.17) to confine this principle to retaliatory arrest and prosecution cases is unavailing; this Court has clearly applied this principle in other contexts as well. *See Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (applying *Nieves* in a case regarding "security measures" in a state capitol building taken "in response to information conveyed by the plaintiff's speech" as a state lawmaker).

    Here, there can be no doubt that First Amendment–protected activity is a legitimate consideration in the President's § 7103(b)(1) determination. Congress explicitly authorized the President to consider how "the provisions of this chapter" interact with "national security requirements and considerations." *See* 5 U.S.C. § 7103(b)(1)(B). Those provisions authorize the very activity about which plaintiffs are

concerned. Specifically, Congress deemed it entirely appropriate for the President to exclude agencies based on his determination that unfair labor practice charges, *id.* § 7116, or grievances, *id.* § 7121, would interfere with "national security requirements and considerations," *id.* § 7103(b)(1)(B). Furthermore, in making these determinations, the President does not "re-define 'national security,'" Answering Br. 40; rather, Congress delegated that definitional authority to the President in the first instance. *See* 5 U.S.C. § 7103(b)(1) (providing that the President may issue exclusion orders if *he* determines that the conditions are met).

Congress's deference to the President on this score makes sense. At the same time that Congress found "that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" is desirable, Congress also recognized that those procedures must be tailored "to meet the special requirements and needs of the Government," including national security. *See* 5 U.S.C. § 7101. As part of that balance, Congress delegated broad exclusion authority to the President, who is best positioned to assess national-security requirements. The President's consideration of how FSLMRS provisions, including those governing grievances, affect national security is not abhorrent to the First Amendment; rather, it reflects a careful balancing that this Court properly respected in staying the district court's preliminary injunction.

**2.**    Plaintiffs next argue that the national-security dimension of this case does not alter the First Amendment analysis. *See* Answering Br. 42–47. Their view of

cases applying deference to national-security determinations, however, is too blinkered. *Trump* and *Kleindienst v. Mandel*, 408 U.S. 753 (1972), two of many Supreme Court and Ninth Circuit cases articulating the special deference that the government enjoys in the national-security context, indeed arose in the immigration context. But the Supreme Court did not cabin its analysis to that context. In fact, in response to a similar criticism by one of the dissents, the majority explained that the Court's "opinions have reaffirmed and applied its deferential standard of review across different contexts and constitutional claims," referring to its "narrow standard of review" as having "'*particular* force' in admission and immigration cases that overlap with 'the area of national security.'" *Trump*, 585 U.S. at 703–04 (emphasis added) (quoting *Kerry v. Din*, 576 U.S. 86, 104 (2015) (Kennedy, J., concurring in the judgment)). Indeed, the Supreme Court cited several non-immigration cases to support its deferential standard. *See id.* at 704 (first citing *Ziglar v. Abbasi*, 582 U.S. 120 (2017); and then citing *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)).

Plaintiffs also err in suggesting that First Amendment–retaliation claims uniquely demand that courts abandon deference to a President's national-security determination. *See* Answering Br. 43–44. Courts have consistently applied a deferential standard to other First Amendment claims in the national-security context. *See, e.g.,* *Twitter, Inc. v. Garland*, 61 F.4th 686, 698–99 (9th Cir. 2023). And the principles underlying that deference—that "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is

marked,'" *Humanitarian L. Project*, 561 U.S. at 34 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (2008))—apply whether the claim is a content-based restriction, *Twitter, Inc.*, 61 F.4th at 698 ("The government is entitled deference when it comes to factual judgments bearing on national security."), or alleged retaliation.

Indeed, the First Amendment challenge in *Trump* closely resembles plaintiffs' First Amendment challenge: there, as here, the plaintiffs asked courts "to probe the sincerity of the stated justifications" for "a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility" concerning national security, and to declare that consideration at odds with the First Amendment in fact motivated the President. 585 U.S. at 701–02. It was "[t]hese various aspects of plaintiffs' challenge" that "inform[ed]" the deferential "standard of review" that the Court announced, not only the immigration context. *Id.* at 702. Plaintiffs offer no reason why applying this appropriate standard of review to the President's objectives underlying the national-security determination here would "upend First Amendment retaliation jurisprudence," Answering Br. 45, when it accorded with First Amendment Establishment Clause jurisprudence in *Trump*. This Court therefore correctly cited *Trump* in articulating the standard of review in this case. *See AFGE*, 148 F.4th at 655 (citing *Trump* for the proposition that it is uncertain whether the court may look beyond the executive order's facial neutrality).

3.      Plaintiffs last argue, contrary to long settled law, that the executive order is not entitled to a presumption of regularity. Answering Br. 47–49. Well-established

case law contradicts their suggestion (at 47) that the presumption does not apply to constitutional claims. *See Cruz v. Bondi*, 146 F.4th 730, 739–40 (9th Cir. 2025) (applying presumption of regularity to due process claim). And although the presumption may be rebutted, the evidence in this record fails to do so. The only evidence that plaintiffs point to is the White House fact sheet's focus on "protected speech," which in plaintiffs' view demonstrates that the President was "'indifferent to the purposes and requirements' of the statute or 'acted deliberately in contravention of them.'" Answering Br. 48 (quoting *NTEU v. Trump*, 780 F. Supp. 3d 237, 253 (D.D.C. 2025)). But this Court rightfully concluded that "the Fact Sheet conveys an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities." *AFGE*, 148 F.4th at 655. And as discussed above, the alleged "protected speech" (*i.e.*, filing of grievances) is precisely what Congress instructed the President to consider when making exclusion determinations. *See* 5 U.S.C. § 7103(b)(1)(B). The President's faithful adherence to that statutory directive in considering how excessive grievances and unfair labor practices charges are inconsistent with national-security requirements is hardly a basis on which to conclude plaintiffs have rebutted the presumption of regularity.

14

### 2.    Plaintiffs Have Not Established A *Prima Facie* Retaliation Claim.

Plaintiffs have not established the requisite causal connection between constitutionally protected activity and the executive order. Instead, they rehash the arguments that this Court rejected when staying the preliminary injunction, without meaningfully responding to many of the government's points in its opening brief. Specifically, plaintiffs point once again to the fact sheet, the number of agencies excluded relative to prior executive orders, and the timing of the executive order relative to an unrelated lawsuit that AFGE filed. *See* Answering Br. 25–29. Plaintiffs notably do not contend with this Court's contrary conclusions, among them that "the Fact Sheet, taken as a whole, … demonstrates the President's focus on national security" and that it may be improper "to assess whether the President's stated reasons for exercising national security authority—clearly conferred to him by statute—were pretextual." *AFGE*, 148 F.4th at 655. Nor do plaintiffs contend with the government's argument, captured in cases like *Trump v. Hawaii*, *Holder v. Humanitarian Law Project*, and *AFGE v. Reagan*, that the deferential standard of review and presumption of regularity prohibit courts from drawing the negative inferences that the district court embraced and on which plaintiffs rely. *See* Opening Br. 30–34.

Plaintiffs raise only two new arguments, neither of which has merit. First, plaintiffs argue that certain actions by the Department of Veterans Affairs (VA) following the executive order—namely, the Secretary's decision to suspend the

executive order's application to certain unions—are evidence of retaliatory motive. *See* Answering Br. 28–29. Setting aside that the VA notice contains no retaliatory statements, *see* 90 Fed. Reg. 16,427 (Apr. 17, 2025), these actions took place *after* the executive order was issued and were not taken by the President, as plaintiffs acknowledge (at 28). They therefore cannot be evidence of the *President's* motivation to issue the executive order. Second, plaintiffs argue that the Court should not deem the fact sheet to be extrinsic evidence. *See* Answering Br. 29–30. Even if true, this point is immaterial; this Court has already explained why the fact sheet demonstrates the President's focus on national security. *See AFGE*, 148 F.4th at 655. And regardless, the fact sheet was issued separately from the facially neutral executive order; it is therefore extrinsic. *See Trump*, 585 U.S. at 702 (considering statements by the President not included in the executive order to be extrinsic); *see AFGE*, 148 F.4th at 655 (only "assum[ing]" "it may be appropriate" to look "beyond the facial neutrality of the order" (quoting *Trump*, 585 U.S. at 704)).

### 3. The President Would Have Issued The Executive Order Regardless Of Plaintiffs' Allegations.

Plaintiffs are also unlikely to succeed on their First Amendment claim because, as this Court correctly concluded in staying the preliminary injunction, "on the balance of the record before [the Court], the Order reflects that the President would have taken the same action even in the absence of the protected conduct." *AFGE*, 148 F.4th at 655.

As an initial matter, the district court's failure to address this issue, and thus complete the First Amendment analysis, is reason enough to vacate the preliminary injunction. *See* Opening Br. 35. Plaintiffs' only response is that the district court should be excused from this oversight because of how the government organized its brief. *See* Answering Br. 32–33. But plaintiffs had no trouble identifying the government's argument and responding to it in their brief. *See* Dkt. No. 47, at 6. The district court's failure to consider the parties' dispute is reason alone to reverse.

Proceeding as if the district court had completed this analysis, Plaintiffs suggest that this Court's review should be for "clear error." *See* Answering Br. 33. But there is nothing for the Court to review: the district court did not decide whether the President would have issued the executive order regardless of alleged retaliatory motives. Instead, it stopped at its determination that plaintiffs "established that there is a serious question whether the protected activity was a substantial motivating factor in the defendant's conduct," failing to consider the government's rebuttal. ER-22–25. At any rate, this Court's hypothetical review would not be clear error. Plaintiffs appear to derive this standard of review from "the context of an interlocutory appeal of a qualified immunity decision," under which courts assume that the plaintiff's "version of the material facts is correct." *Eng v. Cooley*, 552 F.3d 1062, 1064 (9th Cir. 2009) (quoting *CarePartners, LLC v. Lashway*, 545 F.3d 867, 878 (9th Cir.2008)). And to the extent that courts "assume the truth of the plaintiff's allegations" regarding causation at some stages of a workplace retaliation case, *id.*, 552 F.3d at 1072, that approach

17

should not apply when determining whether to enjoin presumptively valid presidential exclusion determinations, *see AFGE*, 870 F.2d at 727–28.

Regardless, plaintiffs offer no reason to disturb this Court's stay-stage conclusion that the President would have issued the executive order regardless of the alleged retaliatory motive. Instead, plaintiffs suggest that the government argued only that it could, not would, have issued the executive order absent a retaliatory motive and failed to produce evidence to that effect. *See* Answering Br. 30–35. But the government has consistently argued that the President *would* have issued the executive order irrespective of plaintiffs' baseless allegations. *See* Dkt. No. 44, at 24 (stating that a retaliation claim fails if the government "would have taken the challenged action" anyway and citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977)); Opening Br. 35 (similar). And plaintiffs' suggestion ignores the very evidence on which they rely, which supports the government's argument on this point: "The Order itself and the Fact Sheet fairly indicate that the President would have issued the Order, regardless of Plaintiffs' speech, based on the perceived impact of union activities and collective bargaining on the sound operation of agencies and subdivisions with national security-related missions." *AFGE*, 148 F.4th at 655. The text of the executive order and the fact sheet continue to evidence the President's legitimate interest in safeguarding national security.

Plaintiffs reprise various other arguments, including that the exclusion of certain subdivisions but not others, Exec. Order No. 14,251, 90 Fed. Reg. 14,553,

14,554 (Apr. 3, 2025), is evidence of retaliatory motive. *See* Answering Br. 35–36. But this type of negative inference is flatly inconsistent with the deference owed to the President's national-security determinations. The President need not explain why he excluded certain subdivisions but not others; "demanding hard proof—with 'detail,' 'specific facts,' and 'specific evidence' … would be a dangerous requirement." *Humanitarian L. Project*, 561 U.S. at 34 (citation omitted). And § 7103(b)(1) notably contains no such requirement. *See AFGE*, 870 F.2d at 727 (holding that the President need not "insert written findings into an exempting order, or indeed to utilize any particular format for such an order"). Plaintiffs also return to actions taken by the VA after the executive order was issued (at 37), but again, the VA's *post hoc* actions are irrelevant to the President's motives.

## II.    Plaintiffs Did Not Establish That They Would Likely Suffer Irreparable Harm.

Just as plaintiffs fail to address this Court's conclusion that they are unlikely to succeed on their retaliation claim, plaintiffs also fail to address this Court's explanation that the harms on which plaintiffs rely are reparable or speculative. With respect to plaintiffs' asserted loss of bargaining power, this Court reasoned that it is "speculative whether Plaintiffs will experience harm through 'weakened support for unions.'" *AFGE*, 148 F.4th at 656 (quoting *AFGE*, 2025 WL 1755442, at *14). And with respect to the asserted loss of revenue, this Court reasoned that the "paused

administration of dues collection can be addressed by voluntary dues payment in the interim and by monetary damages at the end of litigation." *Id.*

Plaintiffs offer no reason to deviate from these conclusions. Instead, plaintiffs assert that their bargaining power has worsened because some agencies have terminated their collective bargaining agreements. *See* Answering Br. 51. But as this Court observed, "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE*, 148 F.4th at 656. Plaintiffs also rely on this Court's observation in another case that a private-sector union's loss of bargaining power can amount to irreparable harm. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191–93 (9th Cir. 2011). But such harms are not portable to public-sector unions. Whereas "a failure to bargain in good faith threatens industrial peace" in the private sector, *id.* at 1192, a public-sector union may not "call, or participate in, a strike, work stoppage, or slowdown," 5 U.S.C. § 7116(b)(7)(A), so there is no corollary harm to a public-sector union's bargaining power if the government fails to bargain in good faith.

Plaintiffs also have not further substantiated their economic harm. Instead, plaintiffs insist that this Court may review the district court's conclusion that plaintiffs' economic loss is irreparable only for clear error. *See* Answering Br. 53. That is incorrect. Although the district court's factual findings, such as how much money plaintiffs have lost, is reviewed for clear error, "[t]he district court's interpretation of the underlying legal principles … is subject to de novo review." *Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009) (second alteration in

original) (quoting *Southwest Voter Registration Educ. Proj. v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam)). The district court incorrectly applied the well-established legal principle that "temporary economic loss alone generally is not a basis for injunctive relief." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987). Plaintiffs' assertion that their revenue has declined following the executive order (at 53–54) is precisely this sort of temporary economic loss. And plaintiffs still do not explain why the FLRA could not make them whole at the end of litigation by ordering defendants to pay for improperly withheld dues. *See* Opening Br. 39.

Plaintiffs also briefly assert that their First Amendment harms are irreparable. *See* Answering Br. 54–55. But for all of the reasons that plaintiffs are unlikely to succeed on their retaliation claim, *see AFGE*, 148 F.4th at 654–55, they also have not established irreparable harm based on that unsubstantiated claim.

## III. The Balance Of The Equities And Public Interest Weigh In Defendants' Favor.

Finally, this Court correctly concluded that "[t]he government has also established a likelihood that it will suffer irreparable harm absent a stay." *AFGE*, 148 F.4th at 655. As this Court and the D.C. Circuit have explained, enjoining the executive order "ties the government's hands … in the national security context." *Id.* (alteration in original) (quoting *NTEU*, 2025 WL 1441563, at *2. And "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its

21

people, it suffers a form of irreparable injury." *Id.* (alteration in original) (quoting *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025)).

Plaintiffs once again sidestep this Court's prior reasoning. Instead, they assert that the government has not produced evidence substantiating its harm and that their harms outweigh the government's harms. *See* Answering Br. 55–58. But this Court previously recognized that the government faced irreparable harm by the very terms of the preliminary injunction, which on its face hamstrings the President's determinations regarding the demands of national security. *See AFGE*, 148 F.4th at 655–56. And at any rate, this Court also recognized that "[t]he government's supporting declarations reinforce its assertions of irreparable harm." *Id.* at 656.

Plaintiffs also fail to address the government's argument that the district court applied the wrong legal standard to the balance of the equities. *See* Opening Br. 42–43. To issue a preliminary injunction after determining that plaintiffs raised only a serious question as to the merits, the district court was required to find that the "balance of hardships … tips sharply towards the plaintiff." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Its failure to make such a finding is itself reversible error.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
*s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO
TYLER J. BECKER
  *Attorneys*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5364*
  *benjamin.takemoto@usdoj.gov*

September 2025

23

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,515 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.


*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO