No. 25-4014

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO;
*et al.,*
*Plaintiff-Appellees,*
v.
DONALD J. TRUMP, *in his official capacity as President of the United States,*
*et al.,*
*Defendant-Appellants.*

---

On Appeal from Order of the United States District Court
for the Northern District of California,
U.S. District Court Action No. 3:25-CV-03070-JD

---

## BRIEF OF AMICI CURIAE FORMER CABINET SECRETARIES, AGENCY HEADS AND OTHER FEDERAL OFFICERS AND EMPLOYEES IN SUPPORT OF PLAINTIFF-APPELLEES AND REHEARING OF THE PETITION FOR A STAY EN BANC

---

Harold Craig Becker
Norman L. Eisen
Democracy Defenders Fund
600 Pennsylvania Ave., S.E., No. 15180
Washington, D.C. 20003
(202) 594-9958

Counsel for the Amici Curiae

## Table of Contents

THE  AMICI CURIAE AND THEIR INTEREST IN THE CASE ..................... 1

SUMMARY OF THE ARGUMENT ........................................................ 2

ARGUMENT ...................................................................................... 3

   I.   The extraordinary overbreadth of the Order is evidence that the asserted national security rationale for the Order was a pretext ..................... 3

    A.  The extraordinary overbreadth of the Order is illustrated by its contrast with all those issued by prior presidents .......................................... 4

    B.  The extraordinary overbreadth of the Order is demonstrated by the statutes defining the functions of the covered departments and agencies and the entities' self-descriptions ................................................. 11

   CONCLUSION ................................................................................ 19

i

# Table of Authorities

## Cases

*Brown v. Ent. Merchants Ass'n.*, 564 U.S. 786 (2011). .............................................3

*Esteras v. United States*, 145 S. Ct. 2031 (2025).......................................................10

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .................3

*N.L.R.B. v. Noel Canning* 573 U.S. 513 (2014) .........................................................11

*Nat'l Treasury Emp. Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025) .......... 5-6

*United States v. Robel*, 389 U.S. 258 (1967). ...........................................................1

## Statutes

5 U.S.C. § 3021 .............................................................................................19

5 U.S.C. § 7101 ...............................................................................................6

5 U.S.C. § 7103 ..........................................................................................2, 11

5 U.S.C. § 7112 .............................................................................................10

6 U.S.C. § 231 ...............................................................................................16

7 U.S.C. § 1901 .............................................................................................16

21 U.S.C. § 355 .............................................................................................17

22 U.S.C. § 4103 ...........................................................................................11

29 U.S.C. §§ 651 ...........................................................................................18

29 U.S.C. § 669 .............................................................................................18

29 U.S.C. § 670 .............................................................................................18

29 U.S.C. § 671 .............................................................................................18

33 U.S.C. §§ 1251 .........................................................................................13

38 U.S.C. § 7422 ...........................................................................................12

38 U.S.C. §301 ..............................................................................................12

40 U.S.C. § 101 .............................................................................................14

40 U.S.C. § 301 .............................................................................................13

40 U.S.C. § 501 .............................................................................................14

42 U.S.C §§ 7401 ..........................................................................................13

Act to Establish the Treasury Department, 1 Stat. 65 (September 2, 1789)............14

Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (July 9, 1970)...........................13

## Regulations

40 C.F.R. § 1.1 ...............................................................................13
40 C.F.R. § 1.3 ...............................................................................13
40 C.F.R. § 1.43 .............................................................................13

## Executive Orders

Executive Order 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979) ...................... passim
Executive Order 12,338, 47 Fed. Reg. 1369 (Jan. 11, 1982)...................................4,6
Executive Order 12,410, 48 Fed. Reg. 13143 (March 28, 1983) ..........................4,5
Executive Order 12,559, 51 Fed. Reg. 18761 (May 20, 1986) ...............................4
Executive Order 12,632, 53 Fed. Reg. 9852 (March 23, 1988) ...............................4
Executive Order 12,666, 54 Fed. Reg. 1921 (Jan. 12, 1989)...................................4
Executive Order 12,671, 54 Fed. Reg. 11157 (March 14, 1989)...............................4
Executive Order 12,681, 54 Fed. Reg. 28997 (July 6, 1989) ...................................4
Executive Order 12,693, 54 Fed. Reg. 40629 (Sept. 29, 1989)...............................4
Executive Order 13,039, 62 Fed. Reg. 12529 (March 11, 1997)...............................4
Executive Order 13,252, 67 Fed. Reg. 1601 (Jan. 7, 2002)...................................4
Executive Order 13,381, 70 Fed. Reg. 37953 (June 27, 2005) ...............................4
Executive Order 13,467, 73 Fed. Reg. 38103 (June 30, 2008) ...............................4
Executive Order 13,480, 73 Fed. Reg. 73991 (Nov. 26, 2008) ...................... 4, 6, 7
Executive Order 13,741, 81 Fed Reg. 68289 (Sept. 29, 2016)...............................4
Executive Order 13,760, 82 Fed. Reg. 5325 (Jan. 12, 2017)...................................4
Executive Order 13,869, 84 Fed. Reg. 18125 (April 24, 2019) ...............................4
Executive Order 14,251, 90 Fed. Reg. 14553 (March 27, 2025) .................. passim

## Other Authorities

Centers for Disease Control and Prevention, *CDC Organization and Leadership* .17
Centers for Medicare & Medicaid Services, *Fiscal Year 2024 Financial Report I*
    (Nov. 2024) ...............................................................................18
Department of Agriculture, Animal and Plant Health Inspection Service, *Laws and Regulations* ...............................................................................16
Department of Agriculture, *Memorandum of Agreement Between DHS and USDA*
    (last modified: July 30, 2025), ...............................................................................16

iii

Department of Energy , *About the Office of Indian Energy Policy and Programs* ...7

Department of Health and Human Services , *About HHS* ......................................18

Department of the Treasury, *Bureaus* ......................................................................15

Department of the Treasury*, Role of Treasury* ........................................................15

Department of Veterans Affairs, *About the Department* ..........................................12

Department of Veterans Affairs, *VA to reduce staff by nearly 30K by end of FY2025* ......................................................................................................................9

Department of Veterans Affairs, *Veterans Health Administration* ..........................12

Department of Veterans Affairs, *Veterans Health Administration, About the VHA* ..9

Food and Drug Administration, *FDA Organizational Charts* .................................17

Food and Drug Administration , *Oncology Center of Excellence* ..........................17

General Service Administration, *Delivering Value. Delivering Impact. 2024 Agency Financial Report* ........................................................................................8

General Service Administration*, Fiscal Year 2026 Annual Performance Plan* ......14

Glass, Aurelia, *The Trump Administration Ended Collective Bargaining for 1 Million Federal Workers*, CAP, (May 22, 2025) ....................................................9

Indian Health Service, *Fact Sheet* (Oct. 2024) ......................................................18

Kanu, Hassan Ali, *Trump moves to strip unionization rights from most federal workers*, Politico (March 28, 2025) ........................................................................6

National Institutes of Health, *List of Institutes and Centers* ..................................18

USAID, *USAID Primer What We Do and How We Do It*, at 29 (Revised Jan. 2006) ......................................................................................................................8

White House, *Organization of the National Security Council and Subcommittees, NSPM-1* (Jan. 20, 2025), ......................................................................................19

## THE AMICI CURIAE AND THEIR INTEREST IN THE CASE

Amici curiae are seven former cabinet secretaries and five Senate-confirmed leaders of agencies, appointed by Republican and Democratic Presidents, and other high-level officers and employees of departments and agencies covered by the Executive Order at issue, Exclusions from Federal Labor-Management Relations Programs, Executive Order 14,251, 90 Fed. Reg. 14553 (March 27, 2025) (the "Order").[1]  (Appendix 1 lists the Amici.)

Amici are committed to the protection of national security, but also of the constitutional rights to speak, associate, and protest. Amici believe the Order infringes those fundamental rights in a manner that is not plausibly related to protection of national security and that it would be tragic "if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967).

Amici believe the Order is grossly overbroad and either should not cover their former departments and agencies at all or, like all orders issued by prior presidents, should only cover the specific components that have "as a primary

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amici curiae and their counsel—contributed money that was intended to fund preparing or submitting this brief.

function intelligence, counterintelligence, investigative, or national security work."
5 U.S.C. § 7103(b)(1)(A). Amici led and worked at those departments and agencies
at a time when they successfully engaged in collective bargaining "in a manner
consistent with national security requirements and considerations." *Id.*, §
7103(b)(1)(B). They submit this brief to explain to the Court the overbreadth of the
Order.

## SUMMARY OF THE ARGUMENT

The extraordinary overbreadth of the Order is evidence of the President's
retaliatory intent. That overbreadth is revealed in two ways.

First, all prior presidents, Republican and Democratic, who have utilized the
statutory authority at issue have done so with scalpel-like precision, excluding
from collective bargaining only those specific components of departments and
agencies that have, as a primary function, protection of national security.[2]  In
contrast, President Trump, for the first time, has excluded entire departments and
agencies and, in other respects, has issued an order that is vastly more extensive
than those of his predecessors.

Second, the statutes creating the departments and agencies at issue and
vesting them with authority as well as their own self-descriptions make clear that

---

[2] The statutory language is "intelligence, counterintelligence, investigative, or
national security work," 5 U.S.C. § 7103(b)(1)(A). We use the term "national
security" as shorthand.

2

most of those entities do not have a primary function of protecting national security and the vast bulk of the work of even those agencies that touch on national security is unrelated to national security.

## ARGUMENT

### I. The extraordinary overbreadth of the Order is evidence that the asserted national security rationale for the Order was a pretext

The District Court concluded that the overbreadth of the Order "is evidence . . . of a serious and plausible First Amendment question." ER 24. That was correct because the poor fit of the rationale for government action with the scope of that action "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n.*, 564 U.S. 786, 802 (2011). Relying on both the over- and underinclusiveness of the Order as well as direct evidence of retaliatory motive, the Court correctly concluded that it is likely that the adversely affected unions' protected expressive activities were a "substantial" or "motivating factor" in the issuance of the Order. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 275 (1977).

We focus on overbreadth.

## A. The extraordinary overbreadth of the Order is illustrated by its contrast with all those issued by prior presidents

The actions of prior presidents, Republican and Democratic, all no less committed to protecting national security than President Trump, including one former Director of the Central Intelligence Agency (George H.W. Bush), stand in stark contrast to President Trump's action.

The overbreadth of the Order is highlighted by the scalpel-like precision of all prior orders, i.e., those issued by Presidents Carter, Reagan, George H.W. Bush, Clinton, George W. Bush, Obama, and even President Trump during his first term. *See* Executive Orders 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979); 12,338, 47 Fed. Reg. 1369 (Jan. 11, 1982); 12,410, 48 Fed. Reg. 13143 (March 28, 1983); 12,559, 51 Fed. Reg. 18761 (May 20, 1986); 12,632, 53 Fed. Reg. 9852 (March 23, 1988); 12,666, 54 Fed. Reg. 1921 (Jan. 12, 1989); 12,671, 54 Fed. Reg. 11157 (March 14, 1989); 12,681, 54 Fed. Reg. 28997 (July 6, 1989); 12,693, 54 Fed. Reg. 40629 (Sept. 29, 1989); 13,039, 62 Fed. Reg. 12529 (March 11, 1997); 13,252, 67 Fed. Reg. 1601 (Jan. 7, 2002); 13,381, 70 Fed. Reg. 37953 (June 27, 2005); 13,467, 73 Fed. Reg. 38103 (June 30, 2008); 13,480, 73 Fed. Reg. 73991 (Nov. 26, 2008); 13,741, 81 Fed Reg. 68289 (Sept. 29, 2016); 13,760, 82 Fed. Reg. 5325 (Jan. 12, 2017); and 13,869, 84 Fed. Reg. 18125 (April 24, 2019). While prior presidents have used the statutory authority at issue to exempt specific groups of employees, *no* prior president has used it to strip *all* employees of *any* department or agency of

4

their right to engage in collective bargaining—not even employees of the Departments of Defense ("DOD") or Homeland Security ("DHS"). Rather, only specific components of even those departments were excluded by prior presidents. *See, e.g.*, Executive Order 12,410 (excluding DOD's Joint Special Operations Command) (issued by President Reagan).

President Trump is the first President to exclude an entire department or agency: DOD, Energy ("DOE") (except for the Federal Energy Regulatory Commission), Justice, State, Treasury ("Treasury") (except for the Bureau of Engraving and Printing), Veterans Affairs ("VA") (subject to exemption by the Secretary), the Environmental Protection Agency ("EPA"), the Federal Communications Commission ("FCC"), the General Services Administration ("GSA"), the National Science Foundation ("NSF"), the Nuclear Regulatory Commission ("NRC"), the U.S. Agency for International Development ("USAID"), and the U.S. International Trade Commission.

The number of employees excluded under the Order exceeds those excluded under all prior orders combined by many fold. *See* ER-23-24. Another District Court estimated that the Order strips two-thirds of federal employees of their right to collectively bargain, *Nat'l Treasury Emp. Union v. Trump*, 780 F. Supp. 3d 237,

254-255 (D.D.C. 2025).[3]  The President is thus attempting to use an exception to a statute requiring federal departments and agencies to recognize the right of their employees to engage in collective bargaining to swallow that statutory rule, in defiance of the congressional finding that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

Moreover, the prior orders already cover the arguably national-security-related components of many of the departments and agencies wholly excluded from bargaining by the Order. For example, the Order strips all DOE employees of their right to bargain. But the orders issued by Presidents Carter, Reagan, and George W. Bush already excluded the components of the Department that are engaged in national-security-related work—specifically, the National Nuclear Security Administration; the Office of Intelligence; the Office of Counterintelligence; the Office of Intelligence and Counterintelligence; the Albuquerque, Nevada and Savannah River operations offices; and the Offices of the Assistant Secretary for Defense Programs. *See* Executive Orders 12,171 § 1-210; 12,338, § 3; 13,480, § 2. In contrast, the Order, by excluding the entire DOE,

---

[3] The Order strips collective bargaining rights from 75 percent of those employees who were represented by a union. *See* Hassan Ali Kanu, *Trump moves to strip unionization rights from most federal workers*, Politico (March 28, 2025), https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010.

strips employees whose work has nothing to do with national security of their rights, for example, employees in the Office of Indian Energy Policy and Programs who "promote Tribal energy development, efficiency and use."[4]

The Order strips all Treasury employees (except for those in the Bureau of Engraving and Printing) of their rights, but the orders issued by Presidents Carter and George W. Bush already excluded the components of the Department that are engaged in national-security-related work—specifically, the Office of Special Assistant to the Secretary (National Security); the Office of Intelligence Support; the Office of the Assistant Secretary (Enforcement Operations); the Office of Criminal Enforcement, Bureau of Alcohol, Tobacco and Firearms; the Office of Investigations, U.S. Customs Service; the Criminal Investigation Division, IRS; the Office of Terrorism and Financial Intelligence; the Financial Crimes Enforcement Network; and the Trade Analysis and Enforcement Division of the Alcohol and Tobacco Tax and Trade Bureau. *See* Executive Orders 12,171 § 1-203, 13,480, § 6.[5]  In contrast, the Order, by excluding the entire Department, strips employees whose work has nothing to do with national security of their rights, for example, employees of the Internal Revenue Service ("IRS") who provide assistance to

---

[4] *See DOE*, *About the Office of Indian Energy Policy and Programs* https://www.energy.gov/indianenergy/about-office-indian-energy- policy-and-programs (last accessed Aug. 27, 2025).
[5] Some of those components have been abolished or moved to DHS.

7

taxpayers.

Similarly, in contrast to the Order, which excludes all GSA employees, President Carter's Order excluded only the GSA's Information Security Oversight Office. *See* Executive Order 12,171 § 1-201. By excluding the entire GSA, the Order strips employees whose work has nothing to do with national security of their rights, for example, employees of the Federal Acquisition Service who procure office supplies for federal agencies. [6]

Finally, while the instant Order excludes all USAID employees, President Carter's Order excluded only the Immediate Office of the Auditor General, the Office of Inspections and Investigations, the Office of Security, and the Office of the Area Auditor General/Washington. *See* Executive Order 12,171, § 1-211. By excluding the entire USAID, the Order strips employees whose work has nothing to do with national security of their rights, for example, employees working on agricultural productivity, education reform or disaster relief in one of the headquarters technical bureaus.[7]

It is also notable that *no* prior president has excluded *any* part of the VA,

---

[6] *See* GSA, *Delivering Value. Delivering Impact. 2024 Agency Financial Report*, at 24, https://www.gsa.gov/reference/reports/budget-and-performance/annual-reports/2024-agency-financial-report.

[7] *See* USAID, *USAID Primer What We Do and How We Do It*, at 29 (Revised Jan. 2006), https://web.archive.org/web/20180716223935/https://pdf.usaid.gov/pdf_docs/PDACG100.pdf.

8

while the Order excludes the entire VA (while granting authority to the Secretary to suspend application of the Order to any subdivision of the Department). The VA is the second largest department of the federal government, after DOD, and a higher percentage of its employees have exercised their right to organize and bargain than those in any other department.[8]  By excluding the entire VA, the Order strips employees whose work has nothing to do with national security of their rights, for example, the thousands of workers who process veterans' benefits claims and work in veterans' hospitals as doctors, nurses, dieticians, etc.[9]

The consistent practice of prior presidents is also consistent with Congress' intent. When Congress adopted the federal sector collective bargaining law in 1978, it categorically excluded only four specific entities primarily engaged in national security related work: the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the Secret Service. *See* 5 U.S.C. § 7103(a)(3).[10]  All of the departments and agencies categorically

---

[8] *See* Aurelia Glass, *The Trump Administration Ended Collective Bargaining for 1 Million Federal Workers*, CAP, Fig. 2 (May 22, 2025), https://www.americanprogress.org/article/the-trump-administration-ended-collective-bargaining-for-1-million-federal-workers/.

[9] 371,100 of the VA's 484,000 employees work in hospital and clinics. *See* VA, *Veterans Health Administration, About the VHA*, *https*://www.va.gov/health/aboutvha.asp (last accessed Aug. 29, 2025); VA, *VA to reduce staff by nearly 30K by end of FY2025*, *https*://www.va.gov/wilmington-health-care/news-releases/va-to-reduce-staff-by- nearly-30k-by-end-of-fy2025/.

[10] Moreover, Congress permitted agencies to act with even more precision by providing that no bargaining unit in any department or agency may include "any

9

excluded by the Order—DOD, DOE (created in 1977), Justice, State, Treasury, VA (created as the Veterans Administration in 1930), EPA (created in 1970), FCC (created in 1934), GSA (created in 1949), NRC (created in 1975), NSF (created in 1950), USITC (created in 1916 and renamed in 1974), and USAID (created in 1961)—existed at that time, but Congress chose *not* to categorically exclude their employees from the protections of the bargaining law. The express exclusion of the four national security agencies, and no others, evidences Congress' intent not to categorically exclude other departments and agencies that existed in 1978 and all prior presidents have respected that intent under the "well-established canon of statutory interpretation: *'expressio unius est exclusio alterius'*—in plain English, "expressing one item of [an] associated group or series excludes another left unmentioned." *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) (citation omitted).

In short, until now, "the President has consistently and frequently interpreted" the statutory authority to exclude components of the federal government from collective bargaining narrowly and, as in separation of powers cases, "the longstanding 'practice of the government,'" should "inform [the

---

employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112 (b)(6), *i.e.*, even if an employee's agency or subdivision is not excluded, an individual employee engaged in national security work may be excluded.

Court's] determination of 'what the law is,'" *N.L.R.B. v. Noel Canning* 573 U.S. 513, 514, 525 (2014) (citations omitted), as well as what is plausibly a proper use of the statutory authority.

### B. The extraordinary overbreadth of the Order is demonstrated by the statutes defining the functions of the covered departments and the entities' self-descriptions

The legislative authority cited as the basis of the Order, 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), permits the President to exclude an "agency or subdivision thereof" only if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the bargaining law] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." The "primary function[s]" of departments and agencies are established by Congress. An examination of the statutes vesting authority in several of the departments, agencies, and subparts thereof excluded by the Order as well as how those entities publicly describe themselves demonstrates the overbreadth of the Order.[11]

We begin with the departments and agencies wholly excluded by the Order.

**VA.** The statutes governing the VA make clear it does not have national

---

[11] Our Brief in Support of Affirmance of the Preliminary Injunction is more comprehensive. Dkt. No. 48.2 (Aug. 29, 2025).

11

security work as a "primary function."[12]  "The purpose of the Department is to administer the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. §301(b). VA's primary component parts are the Office of the Secretary, the Veterans Health Administration, the Veterans Benefits Administration, the National Cemetery Administration, the Board of Veterans Appeals, the Veterans' Canteen Service, and the Board of Contract Appeals. 38 U.S.C. §301(c). None of those have national security as a primary function.

The VA currently describes its "mission" as "to care for those who have served in our nation's military and for their families, caregivers, and survivors."[13] The largest component of the VA is the Veterans Health Administration, which describes itself as "America's largest integrated health care system, . . . serving 9.1 million enrolled Veterans each year."[14]  Providing health care to veterans, while critically important, does not primarily protect national security.

---

[12] Moreover, Congress made clear its intention *not* to exclude all employees of the VA from the protections of the bargaining law when it adopted legislation in 1991 providing that medical professionals employed by the Veterans Health Administration have the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by them in accordance with chapter 71 of title 5." 38 U.S.C. § 7422(a).

[13] *See* VA, *About the Department*, https://department.va.gov/about/ (last accessed Aug. 28, 2025).

[14] *See* VA, *Veterans Health Administration*, https://www.va.gov/health/ (last accessed Aug. 28, 2025).

The Order is grossly overbroad as applied to the VA.

**EPA.** The EPA was established as an independent agency by Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (July 9, 1970). *See also* 40 C.F.R. §§ 1.1 and 1.3 (2025). The Reorganization "transferred to EPA a variety of research, monitoring, standard setting, and enforcement activities related to pollution abatement and control to provide for the treatment of the environment as a single interrelated system." 40 C.F.R. § 1.3. The EPA plays a key role in the enforcement of the Clean Water and Clean Air Acts, 33 U.S.C. §§ 1251 *et seq.* and 42 U.S.C §§ 7401 *et seq.* The EPA is centrally concerned with regulating domestic sources of pollution, primarily industrial and agricultural sources. To cite just one example, the Office of Pesticide Programs is responsible for "the overall pesticide activities of the Agency" including "the development of strategic plans for the control of the national environmental pesticide situation." 40 C.F.R. § 1.43(a).

The Order is grossly overbroad as applied to the EPA.

**GSA.** GSA was created by the Federal Property and Administrative Services Act of 1949. *See* 40 U.S.C. § 301. The law provides that GSA's "purpose . . . is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services . . . .
(2) Using available property.
(3) Disposing of surplus property.

13

(4) Records management.

40 U.S.C. § 101. The statutes also provide that the GSA "shall procure and supply

personal property and nonpersonal services for executive agencies to use in the

proper discharge of their responsibilities, and perform functions related to

procurement and supply." 40 U.S.C. § 501(b)(1)(A). These functions do not relate

to national security.[15]

The GSA 2026 Annual Performance Plan explains:

> The . . . GSA[] was established to promote management best practices and
> efficient operations across the government. . . .
> GSA accomplishes its mission by developing innovative, cost- effective, and
> collaborative solutions in real estate, acquisition, and technology. GSA also
> improves government operations by fostering interagency collaboration,
> promoting shared services, and developing smart policies that allow
> agencies to focus on mission delivery.[16]

These functions do not relate to national security.

The Order is grossly overbroad as applied to the GSA.

**Treasury.** Treasury was created by an act of Congress in 1789, Act to

Establish the Treasury Department, 1 Stat. 65, § 2 (Sept. 2, 1789). Today, Treasury

---

[15] Moreover, the statute provides that, whenever the Secretary of Defense
"determines that an exemption is in the best interests of national security," the
Secretary "may exempt the Department . . . from an action taken by the" GSA
"unless the President directs otherwise." 40 U.S.C. § 501(a)(2).
[16] *See* GSA*, Fiscal Year 2026 Annual Performance Plan*, at 3,
https://www.gsa.gov/reference/reports/budget-and-performance/annual-
reports?footer=gsa (last accessed Aug. 28, 2025).

14

describes it duties as:

- Managing federal finances;
- Collecting taxes, duties and monies paid to and due to the U.S. and paying all bills of the U.S.;
- Currency and coinage;
- Managing Government accounts and the public debt;
- Supervising national banks and thrift institutions;
- Advising on domestic and international financial, monetary, economic, trade and tax policy;
- Enforcing federal finance and tax laws;
- Investigating and prosecuting tax evaders, counterfeiters, and forgers.[17]

Ninety-eight percent of Treasury employees are employed in its Bureaus.[18]  The largest Bureau is the IRS, which "is responsible for determining, assessing, and collecting internal revenue in the United States." *Id.* Tax collection is not primarily a national security function.

While specific components of Treasury were excluded from bargaining by prior presidents, the Order is grossly overbroad as applied to the entire Department.

**Department of Agriculture ("USDA").** The Order excludes two components of USDA, the Food Inspection Service and the Animal and Plant Health Inspection Service ("APHIS").

---

[17] *See* Treasury*, Role of Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury (last accessed Aug. 28, 2025).
[18] *See* Treasury, *Bureaus*, https://home.treasury.gov/about/bureaus (last accessed Aug. 28, 2025).

15

Taking APHIS as an example, it derives its authority from a number of statutes, none of which are primarily intended to protect national security.[19]  For example, APHIS has responsibility to promote humane methods for the slaughter of livestock. *See* 7 U.S.C. § 1901

Indeed, following "9/11," APHIS' national security functions were transferred to U.S. Customs and Border Protection within DHS. *See* 6 U.S.C. § 231. In 2003, USDA and DHS entered into an agreement concerning the transfer, explaining:

> Historically, the . . . APHIS Agriculture Quarantine Inspection . . . program has focused mainly on preventing the introduction of harmful pests and diseases into the United States. Now, the threat of intentional introduction of these pests or pathogens as a means of biological warfare or terrorism is an emerging concern . . . . Guarding against such an eventuality is important to the security of the Nation.    The transfer of USDA agriculture inspectors, with their extensive training and expertise in biology and agricultural inspection, provides DHS the capability to recognize and prevent the entry of organisms that might be used for biological warfare or terrorism.[20]

The Order is grossly overbroad as applied to the covered components of USDA.

**HHS.** The Order excludes significant parts of HHS, including the Offices of

---

[19] *See* USDA, Animal and Plant Health Inspection Service, *Laws and Regulations*, https://www.aphis.usda.gov/laws-regs (last accessed Aug. 28, 2025).
[20] USDA, *Memorandum of Agreement Between DHS and USDA* (last modified: July 30, 2025), https://www.aphis.usda.gov/plant-protection-quarantine/about/moa.

the Secretary and General Counsel, the Food and Drug Administration ("FDA"),
the Centers for Disease Control and Prevention ("CDC"), the Administration for
Strategic Preparedness and Response, the Office of Refugee Resettlement, and the
National Institute of Allergy and Infectious Diseases within the National Institutes
of Health ("NIH").

Taking the FDA as an example, the FDA's primary function is to ensure the
safety of Americans' food and drugs. Under the Food Drug and Cosmetics Act, the
FDA certifies that new drugs are safe and effective. *See* 21 U.S.C. § 355(d). In
addition to headquarters' offices, the FDA consists of nine centers.[21]  To take just
one example among the Centers, the Oncology Center of Excellence "leads a
variety of research and educational outreach projects and programs to advance the
development and regulation of medical products for patients with cancer."[22]  While
the FDA and its component parts perform critical work, they do not have as a
primary function protecting national security.

Similarly, CDC's components include the National Institute for Occupational
Safety and Health (NIOSH).[23]  NIOSH is statutorily mandated to improve the

---

[21] FDA, *FDA Organizational Charts*, https://www.fda.gov/about- fda/fda-organization/fda-organization-charts (last accessed Aug. 28, 2025).
[22] FDA, *Oncology Center of Excellence*, https://www.fda.gov/about- fda/fda-organization/oncology-center-excellence (last accessed Aug. 28, 2025).
[23] *See* CDC, *CDC Organization and Leadership*, https://www.cdc.gov/about/organization (last accessed Aug. 28, 2025).

safety of domestic workplaces by, for example, conducting workplace health and safety research; identifying "toxic substances" and setting "exposure levels that are safe for various periods of employment;" and developing "new technologies and equipment designed to enhance mine safety." 29 U.S.C. §§ 651; 669(a)(1)-(3), (a)(6), (d), 670, 671(c)(2), (h). All CDC's components do not have as a primary function protecting national security.

And, correspondingly, the Offices of the Secretary and General Counsel do not have as a primary function protecting national security. HHS describes its mission as striving to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."[24] Most HHS employees work at NIH (at which even the Order excludes only one of 21 Institutes), the Indian Health Service, and the Centers for Medicaid and Medicare Services.[25] Promoting Native American health; administering

---

[24] HHS, *About HHS*, https://www.hhs.gov/about/index.html (last accessed Aug. 28, 2025).
[25] *See* CMS, *Fiscal Year 2024 Financial Report I* (Nov. 2024), https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2024.pdf; NIH, *List of Institutes and Centers*, https://www.nih.gov/institutes-nih/list-institutes-centers (last accessed Aug. 28, 2025); Indian Health Service, *Fact Sheet* (Oct. 2024), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/factsheets/IHSProfile.pdf.

18

Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplaces; and seeking a cure for cancer are critical functions, but they do not primarily protect national security.

The Order is grossly overbroad as applied to the covered components of HHS.

In sum, even this abbreviated survey of the excluded departments, agencies, and subdivisions thereof makes clear that the Order is grossly overbroad.[26]

## CONCLUSION

Lifting the stay will not compromise national security. It will leave the President with discretion to use his statutory authority in the same manner as his predecessors, to exclude from collective bargaining only those components of departments and agencies that have as a primary function protecting national security. That will safeguard national security while also respecting the First Amendment.

For the above-stated reasons, this Court should grant rehearing en banc and lift the stay.

---

[26] It is notable that most of the heads of the departments and agencies excluded by the Order do not sit on the National Security Council. *See* 5 U.S.C. § 3021; White House, *Organization of the National Security Council and Subcommittees, NSPM-1* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/organization- of-the-national-security-council-and-subcommittees/.

Respectfully submitted,

/s/Harold Craig Becker
Harold Craig Becker
Norman L. Eisen
Democracy Defenders Fund
600 Pennsylvania Avenue SE, No. 15180
Washington, D.C. 20003
T: (202) 594-9958
Craig@democracydefenders.org
Norman@democracydefenders.org

Counsel for the Amici Curiae

**Appendix 1**
Full List of Amici

<u>Department of Agriculture</u>

- Kathleen A. Merrigan, PhD, Deputy Secretary, 2009-2013; Agricultural Marketing Service Administrator, 1999-2001.
- Kevin Shea, Principal Senior Advisor to the Deputy Secretary, 2024-2025; Administrator of the Animal and Plant Health Inspection Service, 2012-2023; Associate Administrator, 2004-2012.
- Anita Adkins, Chief Human Capital Officer, 2022-2025.
- Roberta Jeanquart, Chief Human Capital Officer, 2015-2017.
- William P. Milton, Chief Human Capital Officer and Human Resources Director, 2012-2015; Deputy Chief Human Capital Officer, 2010-2012; Assistant Administrator of Management, 2003-2008; Director of Labor and Employee Relations, Food Safety Inspection Service, 2000-2003; President, Chief Human Capital Officers Council, 2010-2015.

<u>Department of Energy</u>

- Jennifer Granholm, Secretary, 2021-2025.
- Kevin Knobloch, Chief of Staff, 2013-2017.
- Sean A. Lev, Acting General Counsel, 2011; Deputy General Counsel for Environment & Nuclear Programs, 2009-2011.
- David Turk, Deputy Secretary, 2021-2025.
- Sam Walsh, General Counsel, 2021-2025.

<u>Department of Health and Human Services</u>

- Xavier Becerra, Secretary, 2021-2025.
- Kathleen Sebelius, Secretary, 2009-2014.
- Donna Shalala, Secretary, 1993-2001.
- Samuel Bagenstos, General Counsel, 2022-2024.
- William B. Schultz, General Counsel, 2013-2016; Acting General Counsel, 2011-2013.

21

Department of the Interior

- Bruce Babbitt, Secretary, 1993-2001.
- Deb Haaland, Secretary, 2021-2025.
- Robert T. Anderson, Solicitor, 2021-2025; Counselor to the Secretary, 1997-2000; Associate Solicitor 1995-97.
- John D. Leshy, Solicitor, 1993-2001; Associate Solicitor, 1977-1980.

Department of the Treasury

- Janet L. Yellen, Secretary, 2021-2025.
- Rochelle Granat, Assistant General Counsel (General Law, Ethics and Regulation), 2010-2017; Deputy Assistant Secretary for Human Resources and Chief Human Capital Officer, 2006-2010.
- Ben Harris, Assistant Secretary for Economic Policy, 2021-2023.
- Mark Patterson, Chief of Staff to the Secretary, 2009-2015.
- Sarah Bloom Raskin, Deputy Secretary, 2014-2017.
- Daniel Werfel, Commissioner of Internal Revenue, 2023-2025; Acting Commissioner, 2013.

Department of Veterans Affairs

- Kayla M. Williams, Assistant Secretary of Public and Intergovernmental Affairs, 2021-2022.

Environmental Protection Agency

- Carol M. Browner, Administrator, 1993-2001.
- Gina McCarthy, Administrator, 2013-2017; Deputy Administrator, 2009-2012.
- William K. Reilly, Administrator, 1989-1993.
- Avi Garbow, General Counsel, 2013-2017.
- Gary S. Guzy, General Counsel and Counselor to the Administrator, 1998-2001.

Federal Communications Commission

- Nicholas Johnson, Commissioner, 1966-1973.
- Sean A. Lev, General Counsel, 2012-2013.
- Christopher Wright, General Counsel, 1997-2001; Deputy General Counsel, 1994-1997.

US Agency for International Development

- Samantha Powers, Administrator, 2021-2025.
- Nick M. Gottlieb, Director, Employee and Labor Relations, 2019-2025.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-4014

I am the attorney or self-represented party.

**This brief contains** 4,177 **words,** including [    ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Harold Craig Becker    **Date** 09/22/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*